UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER 99-6153-CR-MOORE (s)(s)(s)(s)

**NIGHT BOX**
**FILED**

FEB 1 1 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

UNITED STATES OF AMERICA,          :

    Plaintiff,          :

        :

v.          :

        :

FABIO OCHOA VASQUEZ, et al.,          :

    Defendants.          :

. . . . . . . . . . . . . . . . . . . . . . . . . . . :

**MEMORANDUM IN SUPPORT OF FURTHER HEARINGS ON FABIO OCHOA'S MOTION TO DISMISS AND FOR OTHER RELIEF**

During the hearing on Ochoa's motion to dismiss, the Court heard testimony from two government witnesses: prosecutor Theresa Van Vliet and DEA Special Agent Paul Craine. Both witnesses acknowledged they were aware of the allegations surrounding the Baruch Vega program.

Van Vliet characterized it as a scam that she heard about just a few months after Ochoa was indicted. Van Vliet testified that she instructed Special Agent Tinsley to stop Vega from contacting Millennium defendants, but Vega and Special Agent Castillo proceeded to meet with Millennium defendants in December in Panama, a meeting which Special Agent Paul Craine attended. Van Vliet, 2/04/03 at page 67. Van Vliet became aware that Vega met with co-defendants Tascon, Rebellon, Sanchez, Londoño, Usuga, and Campusano. Van Vliet, 02/04/03 at page 69. Van Vliet was not aware who had authorized the meetings in Panama between Vega, Special Agent Castillo, and other representatives of the government who were meeting with family members of Millennium defendants. She did not seem to care or do anything substantive about it until she became concerned that her own

-1-

name was implicated in the corruption.

Craine acknowledged that he had heard about Vega and the program months before Mr. Ochoa was indicted in August 1999. Craine testified that he learned about Baruch Vega from the April 1999 intercept in Bernal's office that Craine was responsible for monitoring. Craine testimony, 02/04/03 at page 100. The April 1999 intercept from Bernal's office includes discussions about Vega, the program, and Vega approaching drug traffickers to get them to cooperate. *Id.* at 124-125. Craine realized the seriousness of the allegations regarding Vega, the scam, the deals, and the millions that were exchanged. *Id.* at page 133.

Van Vliet and Craine did not ignore the "allegations" regarding the Vega program, but they did not put a stop to his activities either. Instead, Van Vliet dispatched her case agents to attend the Panama meetings. With Van Vliet's approval, Special Agent Kolen, the co-case agent, traveled to Panama in mid October, 1999 because he had information that family members of Millennium defendants would be there. Kolen went to Panama to give instructions to the Millenium families on how to negotiate cooperation deals with the Department of Justice.

These same instructions would later be given to Millenium family members by Agent Craine who traveled to attend a Panama meeting in December 1999 with Van Vliet's approval. *Id.* at 105. Craine recalled that Agent Castillo, Vega, Dan Forman, and some relatives of some of the defendants in the Millennium investigation were present at the December 1999 meeting in Panama. *Id.* at 95. According to Craine,

> the purpose of the trip was to go there to meet with relatives of defendants in
> the Millennium investigation. I went there in order to instruct them directly
> on what their opportunities - - or what was available to them concerning the

-2-

case in the United States.  And what I instructed each on was that based upon instructions given to me by AUSA Van Vliet, that they would need to get an attorney in the U.S. in order to negotiate, if they wished, directly with Ms. Van Vliet.

*Id.* at 97.  Craine could not explain why Agent Castillo and Vega were meeting with relatives of Millennium defendants other than to say "that Mr. Vega, his reputation was that he had connections and was known as a person that people would go to in order to get representation in the U.S."  *Id.* at 98. Craine admitted that as far as he was concerned, "[DEA] Group 43 through Tinsley, Castillo, and Vega, had operational contact with the defendants and or defendants' relatives in the Millennium case."  *Id.*  at 99.[1]

According to Van Vliet and Craine, Van Vliet instructed Craine to advise the Millennium families that all negotiations with the government would occur through American lawyers and prosecutors in the Millennium case. Van Vliet, 02/0/4/03 at page 82. When Special Agent Craine delivered Van Vliet's message, the family members of Millennium defendants would inevitably conclude that the Millennium prosecutor had authorized them to retain Forman to negotiate with the Millennium prosecutor because Forman was present when Special Agent Craine delivered the message.

Thus, both case agents traveled to Panama with the prosecutor's blessing to participate in "program" meetings organized by Vega, and Agents Tinsley and Castillo.

---

[1] Indeed, according to Millennium defendant Orlando Sanchez Cristancho, Group 43 agents Tinsley and Castillo, along with prosecutor Ed Ryan and defense attorney Daniel Forman, met to discuss a plea agreement for him. *See* Attachment A, Undated Email or Memo from Bill Gomez to David Tinsley regarding CS-00-098248.  The source "CS-00-098248" is Orlando Sanchez Cristancho. *See* November 29, 1999 Memorandum by David Tinsley, indicating on page two that Orlando Sanchez was documented as CS-00-098248.  Through the testimony of Baruch Vega, we would prove that Orlando Sanchez surrendered to the U.S. after negotiating a deal through Vega and Dan Forman.

BLACK, SREBNICK, KORNSPAN & STUMPF, P.A., 201 S. BISCAYNE BOULEVARD, SUITE 1300, MIAMI, FLORIDA 33131 ● (305) 371-6421

Neither Kolen nor Craine put a stop to the meetings; neither agent reported it to their superiors. On the contrary, the agents effectively endorsed Vega's program by making an appearance in Panama without protesting Vega's illicit agenda. Rather than advising the Millennium families to terminate their relationship with Vega and his program attorneys Forman and Perez, Craine and Kolen encouraged the families to retain American lawyers, implicitly endorsing the American lawyers Vega had brought to Panama. Thus, Craine and Kolen's presence in Panama gave greater credibility to Vega's abilities because it appeared to the Millennium family members that Vega succeeded in securing the presence of the Millennium case agents at the meetings in Panama -- meetings which were convened to pitch the program. Even in a light most favorable to Van Vliet and Craine, their testimony establishes, at a minimum, that they were willfully blind to what was obviously going on in Panama with the Millennium defendants, now witnesses against Ochoa. At worst, their testimony establishes that they took advantage of Vega's program to further their agenda to obtain cooperating witnesses against Ochoa.

Whatever doubt this court entertained about the allegations levied in Ochoa's motion to dismiss was surely laid to rest after hearing about Craine's debriefing of Carlos Ramon in early 2000. Craine acknowledged that Carlos Ramon described the program to Craine: Ramon admitted paying money on behalf of himself, Usuga, Campusano, and Sanchez to join the program. Craine testimony, 02/04/03 at page 108. Ramon told Craine that Ramon believed he was getting access to Baruch Vega who had access to DEA Agents and prosecutors. *Id.* at 109. Furthermore, Campusano, Usuga and Sanchez have admitted that monies were paid to Baruch Vega through Carlos Ramon. *Id.* at 92. All three are now

-4-

listed as government witnesses against Ochoa. *See* Defense Exhibit Two, admitted at the hearing.

Craine's testimony has proven beyond doubt that the government's case against Ochoa has been tainted by Vega's program and that the government knows it. Prior to the return of the indictment, the case against Fabio Ochoa was based exclusively on tape recordings, physical surveillance, and photographs. There were no cooperating witnesses. Subsequent to the indictment, the government has obtained cooperation from co-defendants who will testify against Fabio Ochoa. *Id.* at 104. According to the discovery responses, offered as defendant's Exhibit Two at the hearings, these witnesses are the same individuals who had direct contact with Baruch Vega. *Id.* at 104.

To be sure, Agent Craine testified that Campusano, Usuga, Bernardo Sanchez, and Londoño had contact with Baruch Vega. *Id.* at 91. Craine did not know whether Bernal had contact with Vega because Craine failed to ask Bernal about the Vega matter when Craine debriefed Bernal. *Id.* at 92. Through the testimony of Baruch Vega, we would show that Bernal retained attorney Dan Forman to represent Bernal and that Bernal, after being arrested in Colombia, sent his wife to Miami to meet with Vega. Baruch Vega would also testify that Orlando Sanchez, Dan Forman's other client, took Bernal's wife to Vega's office in Miami to discuss possible resolution of Bernal's case.

While the Court's inquiry during the hearing seems to have focused on whether the indictment was tainted by the Vega program, the Court should be equally concerned about the impact that Vega's program has had on the government's trial preparation -- namely, obtaining cooperation from co-defendants and others who participated in the program.

BLACK, SREBNICK, KORNSPAN & STUMPF, P.A., 201 S. BISCAYNE BOULEVARD, SUITE 1300, MIAMI, FLORIDA 33131 ● (305) 371-6421

Further hearings will allow the defense to prove conclusively that these cooperating witnesses were procured through extortion, bribery, and illegal inducements in violation of 18 U.S.C. §§ 201(c)(2) and 1951.

Benefits "traditionally" conveyed to criminals in return for their cooperation do not constitute bribery under Section 201(c)(2), because most forms of plea bargaining are expressly authorized by statute and/or court rules, such as 18 U.S.C. § 3553(e), 18 U.S.C. § 6001, *et seq.*, Federal Rules of Criminal Procedure 11 & 35 and U.S.S.G. § 5K1.1. *See United States v. Lowery*, 166 F.3d 1119 (11th Cir. 1999); *United States v. Singleton,* 165 F.3d 1297 (10th Cir. 1999) (*en banc*). However, the government does not have the authority to obtain cooperation through illegal inducements:

> A prosecutor who offers something *other than a concession normally granted by the government* in exchange for testimony is no longer the alter ego of the sovereign and *is divested of the protective mantle of the government* . . . . Our disposition protects *only* those prosecutorial acts of the government which have been recognized in common law or authorized by statute. *A prosecutor who goes beyond those limitations is clearly not performing a governmental function.*

*Singleton,* 165 F.3d at 1302 & n. 2 (emphasis added). *See also United States v. Revis*, 22 F. Supp. 2d 1242, 1257 (N.D. Okla. 1998) (offering leniency in return for testimony is legal so long as the "conduct by the United States Attorney was specifically authorized by other laws").

No statute, rule, or accepted practice sanctions the outright under-the-table *sale* of "cooperation" agreements. Indeed, the statutes and rules cited in *Singleton* and *Lowery* to distinguish plea bargaining from bribery have two features in common -- they require both (1) on-the-record disclosure and (2) judicial supervision of the government's practices.

We propose to call Special Agents Tinsley, Castillo, and Kolen. Their testimony will further establish that Vega's program was approved by the DEA, without objection from the Department of Justice. Their testimony will also establish, contrary to the government's contentions in its written response to the motion to dismiss, that Tinsley, Castillo, and Group 43 agents working with Baruch Vega, were involved with the Millennium investigation and with Millennium defendants.

Additionally, Agents Tinsley, Castillo, Kolen, and Craine, if directed to comply with our subpoena duces tecum, would be required to produce all their communications, including emails, regarding Baruch Vega, which would further establish that Agent Craine and the DEA knew about Baruch Vega months before the August indictment. For example, we believe that if ordered by this Court to comply with the subpoena, Agents Castillo or Craine would turn over an e-mail that Castillo received from Craine on May 24, 1999, in which Agent Craine asks for the latest news "about Baruch Vega and Orlando Sanchez Cristancho." Orlando Sanchez is a Millennium defendant who brokered a deal with Baruch Vega and Dan Forman.

We would also call the program's architect, Baruch Vega, and his poster boys Carlos Ramon and Nicholas Bergonzoli. Vega would testify that his activities were approved by the United States government long before the return of Ochoa's indictment.[2] Ramon and

---

[2] In defense of a civil forfeiture case brought against $1.4 million of his "fees," *United States v. $1,449,473.32,* Case No. 01-4645-Civ-Lenard (S.D. Fla. March 8, 2002) (DE 17), Vega stated in court filings that:

> The Government is/was aware that drug traffickers . . . were paying Vega [and that] these moneys constituted cooperation for Vega['s] activities on behalf of

BLACK, SREBNICK, KORNSPAN & STUMPF, P.A., 201 S. BISCAYNE BOULEVARD, SUITE 1300, MIAMI, FLORIDA 33131 ● (305) 371-6421

Bergonzoli would testify about the representations made to them by Vega and the DEA agents, and the benefits they received after paying to participate in the program. Ramon and Bergonzoli also pitched the program to the several co-defendants (for example, Usuga, Campusano, and Bernardo Sanchez) who now appear as government witnesses against Fabio Ochoa. We also propose to call Greg Smith, the pilot who flew Vega and the agents to Panama and other countries. He will testify that he flew Vega, DEA agents, defense attorneys, and others to and from Panama at least 12 times between 1998 and 1999.

Finally, we would call attorneys Joaquin Perez and Dan Forman to elucidate on their roles as the attorneys participating in Vega's program. Perez is a particularly critical witness because he had an attorney/client and Sixth Amendment relationship with Ochoa. After Ochoa refused to pay the bribe solicited by Vega, Perez ceased to represent Ochoa yet

---

the Government. The Government was aware that drug dealers would pay Vega for his participation. The Government was aware that some of the money paid to Vega was used to fund the operation.

*** 

The Government approved the operation in which Vega was involved. Agents in charge of monitoring the activities of Vega, were aware that Vega was paid by traffickers for his service. The Government benefitted by accepting the surrender and cooperation of subjects who Vega introduced to agents abroad.

***

An oral contract existed between the Government and Vega whereby Vega would receive payment for his services from drug traffickers and, in turn, Vega would facilitate introduction and meetings between the surrendering traffickers and agents.

Vega's attorneys have been quoted as saying that whatever Vega did, "'he did with the understanding, knowledge and agreement of the DEA agents. This was a Baruch Vega joint venture with the DEA.'" Through his attorney, Vega's has stated that he "concocted a plan *under DEA auspices* to lure drug traffickers into meetings, and received money *with DEA knowledge*."

-8-

BLACK, SREBNICK, KORNSPAN & STUMPF, P.A., 201 S. BISCAYNE BOULEVARD, SUITE 1300, MIAMI, FLORIDA 33131 ● (305) 371-6421

continued to represent cooperating witnesses such as Bergonzoli and Julio Correa, both of whom acted as recruiters for Vega's program. Thus, Perez's clients have assisted the government in building its case against Ochoa, Perez's former client. This obvious breach of Perez's duty of loyalty to Ochoa is surely cause for alarm and warrants additional inquiry by the Court.

This Court must "irrebuttably presume" that the representation of Ochoa by attorney Perez included the disclosure of confidential information, because the "subject matter" of the representation of Ochoa was not only "substantially related" but identical to that of his co-defendants. The government is responsible for any such disclosures because, as demonstrated above, Perez became *de facto* agents of the government in the operation of the Program and Theresa Van Vliet was fully aware of Perez's representation of Fabio Ochoa.

Attachment B to this pleading is a June 7, 2000 Memorandum from Sandalio Gonzalez, then the Associate Special Agent in Charge of the DEA Miami Field Division, to Vincent Mazzilli, the Special Agent in Charge of the DEA Miami Field Division. The memorandum recounts the relationship between Joaquin Perez and his office-mate, attorney Nelson Rodriguez Varela, and their representation of co-defendants regardless of obvious conflicts of interests. The memorandum expresses ASAC Gonzalez's concerns about Nelson Rodriguez representing Baruch Vega and Perez representing Bergonzoli, "whose surrender to the DEA was arranged by Vega." Finally, the memorandum makes reference to a DEA report dated May 27, 1999, under file number G1-98-0373, in which DEA Special Agent Russell Davis spells out the relationship between Perez and Rodriguez-Varela and their representation of multiple defendants despite apparent conflicts.

BLACK, SREBNICK, KORNSPAN & STUMPF, P.A., 201 S. BISCAYNE BOULEVARD, SUITE 1300, MIAMI, FLORIDA 33131 ● (305) 371-6421

The potential violation of Ochoa's rights goes deeper than simply the government acquiring privileged information. The testimony of any witness who is now cooperating against Ochoa through the advice and counsel of attorney Perez must also be suppressed. It was a blatant breach of Perez' duties of loyalty to Ochoa for him to negotiate cooperation agreements with the government for Ochoa's co-defendants and other clients in related cases when those agreements encompassed providing information and/or testimony against his own client, Ochoa. *See Burden v. Zant*, 24 F.3d 1298 (11th Cir. 1994); *Gallegos*, 108 F.3d at 1282-83; *Cook*, 45 F.3d at 393-94. Indeed, absent a waiver from Ochoa, it was improper for attorney Perez to give *any* legal advice to Ochoa's co-defendants and to other clients when that advice was adverse to Ochoa's interests and contemplated seeking leniency and a plea bargain "for [their] testimony against the other" client, Fabio Ochoa. *Burden*, 24 F.3d at 1305. *Accord Ruffin v. Kemp*, 767 F.2d 748 (11th Cir. 1985). A lawyer cannot negotiate a plea agreement that "sacrifices one client . . . in order to protect another client." *Burden*, 24 F.3d at 1305-06. Perez appears to have done just that, not once, but repeatedly in this case.

The government was well aware that Perez represented Fabio Ochoa and we would prove through the testimony of Vega and Agents Tinsley and Castillo that the DEA knew that Perez was lobbying Ochoa to join the Program. Therefore, the government is responsible for the prejudice caused Fabio Ochoa by the conflict-ridden representation rendered by Perez. The only effective remedy for the government's conduct is to suppress

BLACK, SREBNICK, KORNSPAN & STUMPF, P.A., 201 S. BISCAYNE BOULEVARD, SUITE 1300, MIAMI, FLORIDA 33131 ● (305) 371-6421

the testimony of those witnesses that Perez improperly advised to cooperate against Fabio

Ochoa.

Respectfully submitted,

**BLACK, SREBNICK,**
**KORNSPAN & STUMPF, P.A.**
201 S. Biscayne Boulevard, Suite 1300
Miami, Florida 33131
(305) 371-6421, Fax: (305) 358-2006

By: _____
    **ROY BLACK, ESQ.**
    Florida Bar No. 126088
    Counsel for Fabio Ochoa Vasquez

-11-

## CERTIFICATE OF SERVICE

I CERTIFY that a true copy of this pleading was mailed on ___Feb. 11, 2003___ to the

following counsel of record:

Edward Ryan, Esq.
Assistant United States Attorney
United States Attorney's Office
500 East Broward Boulevard, Suite 700
Ft. Lauderdale, Florida 33394
fx: (954) 356-7336

John Bergendahl, Esq.
701 Brickell Avenue
Suite 2080
Miami, FL 33131
(305) 536-2168
fx: (305) 536-2170
ATTORNEY FOR SERGIO PERDOMO

Richard Docobo, Esq.
1571 NW 13th Ct.
Miami, FL 33125
(305) 326-0330
fx: (305) 326-0219
ATTORNEY FOR JAIME CASTIBLANCO

Manuel Gonzalez, Jr., Esq.
782 N.W. 42 Ave.
Suite 440
Miami, FL 33126
(305) 567-0100
fx: (305) 445-0543
ATTORNEY FOR FREDDY IVAN OCHOA

Neal R. Lewis, Esq.
9130 South Dadeland Boulevard
Suite 1609
Miami, Florida 33156-7851
(305) 254-2285
fx: (305) 254-2288
ATTORNEY FOR CARLOS CARDENAS

Mauricio Aldazabal, Esq.
2655 LeJune Road
Suite 1001
Coral Gables, Florida 33134
(305) 569-9566
fx: (305) 444-7578
ATTORNEY FOR SANTIAGO VELEZ

Michael Matters, Esq.
2929 S.W. Third Avenue
Suite 410
Miami, Florida 33129
(305) 358-9222
fx: (305) 285-9110
ATTORNEY FOR LUIS CARLOS ZULUAGA
A/K/A EDWIN ARBELAEZ

John Hogan, Esq.
Holland & Knight
701 Brickell Avenue
Suite 3000
Miami, FL 33131
(305) 374-8500
fx (305) 789-7799
ATTORNEY FOR JOAQUIN PEREZ

Martin Raskin, Esq.
Raskin & Raskin, P.A.
Grove Forest Plaza
2937 S.W. 27th Avenue
Suite 206
Coconut Grove, FL 33131
(305) 444-3400
fx: (305) 445-0266
ATTORNEY FOR DANIEL FORMAN

By: _____
     ROY BLACK, ESQ.

-12-

# Attachment A

Memorandum

| Subject | Date |
|---|---|
| Possible Attorney Conflict in the Investigation of Miami Field Division Group 43 Special Agents | 6/7/2000 |

| To | From |
|---|---|
| Vincent J. Mazzilli<br>Special Agent in Charge<br>Miami Field Division | Sandalio Gonzalez<br>Associate SAC<br>Miami Field Division |

I recently read the attached articles published in the Miami Herald on May 21, 2000, and in the Colombian publication El Tiempo on May 25, 2000, regarding the investigation presently being conducted by the FBI and DEA/OPR involving informants and agents of Miami Field Division Group 43. In view of what was printed in the articles and of other knowledge we possess about some of the individuals involved, I recommend that you provide the information that follows to the appropriate officials in OPR, the FBI, and the Department of Justice.

Although I've never been fully briefed on the FBI/OPR case, as far as I know this affair deals with activities conducted under DEA Operation CALIMAN, a Group 43 SARC approved money-laundering investigation. The articles identify Nelson Rodriguez-Varela as a defense attorney representing Baruch Jairo Vega, a CALIMAN informant now charged with money laundering and obstruction of justice along with fellow Group 43 informant Roman Suarez-Lopez. According to the articles, Vega and Suarez conjured up "phony cooperation deals" with indicted and suspected Colombian drug lords, as DEA agents waited in adjoining hotel rooms.

In connection with my duties as Associate SAC, I have learned over the past year that Mr. Rodriguez-Varela is a close associate of another Miami defense attorney by the name of Joaquin Perez. Mr. Rodriguez and Mr. Perez reportedly practice law out of the same office, share the same secretary, and usually share co-defendants. Mr. Perez is presently the attorney of record for Nicolas Bergonzoli, a high level Colombian trafficker and target of Group 43 under CALIMAN. Several months ago Bergonzoli surrendered to Group 43 and was released following a cooperation agreement approved by the Office of the United States Attorney for the Southern District of Florida. Mr. Bergonzoli is scheduled for sentencing in the near future.

The relationship between Rodriguez-Varela and Perez is spelled out in the attached DEA-6 dated 5-27-99 by SA Russell Davis, under file number GI-95-0373. This report, which concerns a debriefing of cooperating defendant Orlando Garcia, which took place in the presence of two federal

prosecutors, states that Rodriguez-Varela and Perez "share the same law office". The report also states that Garcia asked the DEA agents and federal prosecutors if Rodriguez-Varela could be relieved as his attorney because of his relationship with Joaquin Perez. When Garcia was arrested in November of 1998, Perez was representing Garcia's co-defendants, whom Garcia later fingered for allegedly devising a plan to blame law enforcement officers for stealing ten kilograms of cocaine.

I also learned of another DEA case in West Palm Beach where Rodriguez-Varela and Joaquin Perez represented defendants. The case agent, SA Dan Bruce, told me that the circumstances involving the actions of these two lawyers in that particular case were in his view "suspicious". I did not pursue the matter with SA Bruce.

The issue, as I see it, is that Nelson Rodriguez-Varela, who represents CALIMAN informant and now federal defendant Baruch Vega in a case also involving his DEA handlers, reportedly shares an office and a secretary with Joaquin Perez, who represents CALIMAN defendant Nicolas Bergonzoli, whose surrender to DEA was arranged by Vega. If true, the apparent financial interdependence and close working relationship of these defense attorneys is a kind of defacto partnership which creates a conflict in this case, or at the very least an appearance of impropriety, because it is highly probable that they are material witnesses to the investigation and any subsequent charge involving the two DEA agents.

As an example, both of these gentlemen have material information regarding communications between the agents and their clients, as well as the Vega/Bergonzoli connection and how the surrender/cooperation agreement came to fruition. I have been told it is common knowledge in the Miami legal community that Joaquin Perez gets multi-defendant drug cases and parcels out the defendants to various lawyers in his office building in order to maintain control of both the cases and the defendants. This seems to be a pattern that rears its head in this case, and warrants close scrutiny by investigators and prosecutors.

In sum, I am particularly concerned that we have a pair of defense attorneys, one representing a CALIMAN defendant (Bergonzoli), and the other a CALIMAN informant (Vega) who may be looking for a sweetheart plea deal perhaps at the expense of our two agents, and that these two attorneys may in essence be controlling both sides of the equation in furtherance of their defacto partnership. It is a definite advantage to control both informant and target since this also lends itself to a very profitable situation. These attorneys appear to represent and profit from both Bergonzoli and Vega, and perhaps others, with our agents unwittingly caught in the middle.

Attachment B

From: [illegible]

To: [illegible]    Tuesday, Mark

Subject: Meeting with CS-00 [illegible] and Spouse on 03/15/[illegible].

Tuesday,

On Tuesday, 03/15/20[illegible], at approximately 11:30 A.M., CS-00 (08243) (CS) and his/her Spouse arrived at DEA, [illegible] Lauderdale and requested a meeting with Special Agent L. Castillo and [illegible] native W. Gomez. The CS advised that he had met with his attorney (Dan Forman) and had been provided with his/her plea agreement for signature. The CS advised that the plea agreement was reviewed and the CS found it to be inconsistent with the plea agreement he/she signed at the previous meeting.

The CS related that during the meeting in which the plea agreement was discussed the following individuals were present: SA Edward Lynch, Defense Attorney Dan Forman, C/S David Tinsley, S/A Larry Castillo, and TFA William Gomez. The CS advised that during this meeting, it was agreed that the CS would plead guilty to a single count, cooperate fully with entities, provide court testimony in future cases (if required), and be afforded "S" Visas for the CS' family.

The CS advised that the present plea agreement the CS had reviewed stated that the CS was to plead guilty to a conspiracy to import cocaine and not a money laundering charge. No mention was made of the "S" Visas for the CS' family. The CS confront of his/her attorney (Dan Forman) concerning the charges.

The CS stated that he/she had provided agents form Group # 9 with several names and telephone numbers to be investigated, all of which were actively involved in drug trafficking and/or money laundering. According to the CS, nothing was ever followed up with this information. The CS also furnished agents from Group # 9 with a money laundering mitigation which according to the CS, was never followed up.

The CS related that he/she had been debriefed by agents form Group # 9 and S/A Paul Craine/DEA-Colombia, concerning CS' knowledge of the Northern Valley Cartel (NVC), their members, and their (NVC) involvement with paramilitary and paramount groups in Colombia. The CS was also told by S/A Paul Craine, that he (S/A Craine) has suggested to AUSA Ben Van Vl[illegible] and AUSA Ed Ryan, that the CS be compelled to cooperate with the Colombia Fiscalia (prosecutors) in giving information and testimony with their cases in Colombia.

The CS related that he/she was very frustrated and worried that the incompetence of the agents form Group # 9 and S/A Craine/DEA-Colombia, would get the CS and the CS' family in Colombia killed. The CS advised that neither S/A Paul Craine or the agents from Group # 9, have any clue of how to handle any of the information provided to them. The CS knows that by the time they see the "big picture" it will be to late for the CS to be effective. The CS has already been told by several sources in Colombia willing to work on the CS' behalf, that they were afraid that the U.S. Government had put the CS into turning times/there' in to face charges and that the U.S. Government would not follow through and help the CS. The CS further related that several highly placed individuals within the Northern Valley Cartel who were willing to follow the CS to the negotiation table with the U.S. Government have gone into hiding because of the way things turned out with the CS.

The CS was advised by S/A Castillo and TFA Gomez that the CS should discuss these issues with his attorney and/or S/A Van Vliet. The meeting was terminated by the agents at approximately 12:15 PM.



1

Memorandum  

Subject
  Orlando SANCHEZ-CRISTANCHO

Date
  November 29, 1999

To
  G/S Jim Hurt
  Miami Group 9

From
  G/S David Tinsley
  Miami Group 43

This memorandum is being generated to serve as a schematic which defines Miami Group #43's history of association with Orlando SANCHEZ-CRISTANCHO, both as a target and a potential cooperating source.

During late 1998, A DEA Miami Group #43 Confidential Source provided intelligence regarding a Colombian-National who was a very high placed member of the Cali Cartel, reportedly living in Houston, Texas and Miami, Florida. The source initially identified the Colombian as Orlando SANCHEZ. Approximately two (2) months later the source provided the completed indentification of Orlando SANCHEZ-CRISTANCHO with associated cellular telephone numbers.  From January to April 1999, SANCHEZ-CRISTANCHO was the point of our investigative focus.  The DEA Miami Confidential Source reported in late April, that SANCHEZ-CRISTANCHO was actively working as a Confidential Source for the FBI Houston.  On May 2, 1999, I confirmed that SANCHEZ-CRISTANCHO and his (CRISTANCHO'S wife) were documented as Confidential Sources by FBI Houston.

On May 3, 1999, S/A Larry Castillo and myself advised Tuffy Von Briesen DEA Bogota and G/S Mike McManus Group 9, that SANCHEZ-CRSITANCHO was working with FBI Houston.

On May 13, 1999, a meeting was held at the DEA Miami SAC's conference room regarding SANCHEZ-CRISTANCHO.  Those in attendance were A/ASAC Kanz, ASAC Perez, ASAC Silvestri, A/CA Von Briesen, S/A Paul Craine, S/A Bob Versis, S/A Nick Kolen, S/A Mike Upchurch, S/A Kevin Burns, S/A Larry Castillo and G/S Dave Tinsley.  During this meeting there was a lengthy discussion regarding the merits and pros/cons of how best to proceed with DEA Bogota's operation, DEA Miami Group #9's investigation and DEA Miami Group #43's investigation.

A distillation of the meeting could be summarized as follows:

Group #43:  Approach SANCHEZ-CRISTANCHO with the idea of securing a guilty plea agreement and document SANCHEZ-CRISTANCHO as a DEA Miami source, targeting Group #43, Group #9, and DEA Bogota targets.  The basis for this was the result of previous meetings between SANCHEZ-CRISTANCHO and Group #43 Agents, as well as information/intelligence provided by a well placed Group #43 Confidential Source.  Group #43 focus was/is proactive investigations utilizing SANCHEZ-

Group #9: Debrief pitch SANCHEZ-CRISTANCHO and attempt to conduct a Title III of SANCHEZ'S cellular telephones with the objective to indict SANCHEZ-CRISTANCHO for a violation in Miami. Group #9 focus was/is the capture of case related fugitives and testimony of SANCHEZ against Group #9 defendants.

BOGOTA: Somewhat of a split-vote by the agents. A/CA Von Brixen recommended not approaching SANCHEZ-CRISTANCHO.

June 16, 1999, FBI Houston Agents contacted DEA Miami inquiring about CRISTANCHO-SANCHEZ.

June 24, 1999, ASAC Perez, and G/S Dave Tinsley had discussions with ASAC Silvestri and G/S McManus regarding existing issues concerning obtaining a guilty plea and cooperation from SANCHEZ-CRISTANCHO.

October 19-20, 1999, G/S Tinsley advised A/GS Upchurch that a DEA Group #43 source and S/A Castillo had made contact with SANCHEZ-CRISTANCHO and were speaking to SANCHEZ regarding surrender, pleas and cooperation.

October 21, 1999, Group #43 S/A Larry Castillo and S/A Steve Macklin convinced SANCHEZ-CRISTANCHO to surrender and return to the United States from Panama.

November 9, 1999, meeting at Fort Lauderdale U.S. Attorneys Office with prosecutors Van Vliet, Ryan, DOJ Sandy Acosta, Bogota S/As Kolen and Craine, Group #9 S/As Upchurch and Burns, Group #43 G/S Tinsley and S/A Castillo, discussed issues regarding SANCHEZ-CRISTANCHO status, pending pleas, cooperation, proactive activity, debriefings and fugitives. Subsequent to his (SANCHEZ-CRISTANCHO) surrender and arrest, SANCHEZ-CRISTANCHO was jointly documented as a DEA Miami source (CS-00-09824S) for Group #9 and Group #43.

To date, SANCHEZ-CRISTANCHO has provided extended briefings to Group #43 and Group #9 Agents regarding various topics of interest. It is my understanding that SANCHEZ-CRISTANCHO has provided Group #9 Agents with historical conspiracy information regarding indicted targets of OPERATION MILLENNIUM. SANCHEZ-CRISTANCHO was also debriefed by DEA Bogota Agents regarding Colombia based activity.

INVESTIGATIVE/OPERATIONAL TARGETS

During various meetings and conversations between A/SAC Gonzalez, A/SAC Kane, ASAC Silvestri, A/GS Upchurch, ASAC Perez, G/S Tinsley and S/A Castillo, the following targets of interest were defined by each group:

Group #9 -- DEA BOGOTA GROUP #2

Alejandro BERNAL-MADRIGAL
Jairo SANCHEZ
Mauricio SANCHEZ-VIDAL

5.

Jaime Gonzalo-CASTIBLANCO-CALORCONTE
Walter SEPULVEDA
Javier LINDO
Juan Gabriel USUGA
Alberto GALLEGO
Guillermo MORENO
Nebon ALBERTO-GREALDO
Plus #13-43 as listed on OPERATION MILLENNIUM indictment #99-6153

GROUP #2 TARGETS

Danilo GONZALEZ
Ivan URDINOLA
Archangel HENAO
William RODRIGUEZ
Andres LOPEZ
(Various other CALI and North Valley Targets)
Hernando GOMEZ-BUSTAMANTE
Miguel SOLANO
Juan VARELA

CROSS OVER TARGETS

1. Diego MONTOYA-SANCHEZ
   *Indicted in OPERATION CALI-MAN
   *Indicted in OPERATION MILLENNIUM

2. Miguel SOLANO

3. Juan Gabriel USUGA

4. Fabio OCHOA

SUMMARY

Jim, I believe the best way to enhance both cases, is to secure bond for SANCHEZ-CRISTANCHO as soon as possible and have him working for DEA's collective interests. There has been much talk and considerable confusion about SANCHEZ pending plea. The bottom line is that he (SANCHEZ-CRISTANCHO) will plead guilty with the understanding that he will be given an extended period of time to work covertly and/or overtly for DEA, with the hope of reducing his exposure to incarceration. It is my view, that any other course of action would have expansively negative results for DEA. I would like to meet with you as soon as possible and discuss this further.

cc: A/SAU Sandy Gonzalez
ASAC IV Emile Perez
ASAC II Bill Silvestri
S/A Mike Upchurch