UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,       )
                                )        CR-MOORE
        *Plaintiff,*            )        CASE NO. 99-6153(s)(s)(s)(s)
                                )
v.                              )        **DEFENDANT'S MOTION FOR NEW**
                                )        **TRIAL BASED ON NEWLY**
FABIO OCHOA-VASQUEZ,            )        **DISCOVERED EVIDENCE**
                                )
        *Defendant.*           )
_____)

The defendant, FABIO OCHOA-VASQUEZ ("OCHOA"), through undersigned counsel,

respectfully moves this Court for a new trial, pursuant to Fed. R. Crim. P. 33, based on newly

discovered evidence consisting of: (1) the recently unsealed transcript of the May 23, 2003,

hearing in *United States v. Nicholas Bergonzoli*, Case No. 99-196-Cr-Davis/Seitz (S.D. Fla.);

(2) the also recently unsealed transcript of Nicholas Bergonzoli's plea hearing on February

10, 2000, in *United States v. Nicholas Bergonzoli*, Case No. 99-196-Cr-Davis/Seitz (S.D.

Fla.); (3) the March 25, 2004, sentencing transcript in *United States v. Baruch Jairo Vega*,

Case No. 01-606-Cr-Jordan (S.D. Fla.); and (4) the hearing testimony before the Merit

Systems Protection Board on March 15, 16, and 17, 2004, in *David T. Tinsley v. U.S.

Department of Justice*, Docket No. AT-0752-04-0116-I-1.

The defendant further moves for an evidentiary hearing on this motion, for an order

compelling the government to produce, or for authority to subpoena, pursuant to Fed. R.

Crim. P. 17, the hearing exhibits in the *Tinsley* case and for an order, pursuant to *United

States v. Ellsworth*, 814 F.2d 613 (11th Cir. 1987), certifying to the United States Court of

Appeals for the Eleventh Circuit that the Court would grant Ochoa's motion for new trial if the case was remanded to this Court.[1]

In support of these requests, the defendant submits the following memorandum. Part I summarizes the newly discovered evidence and its relevance to various issues raised during Ochoa's case. Part II demonstrates that Ochoa is entitled to a new trial based on the potential impact of the newly discovered evidence.

**MEMORANDUM**

**I.    BACKGROUND**

**A.    The Relevant Pre-Trial and Trial Litigation**

In August 1999, the Ochoa, was indicted for participating in two drug conspiracies.[2] (DE 111, 349.) Following the return of a  superseding indictment, on October 13, 1999, Ochoa was arrested in Colombia and, after exhausting his legal remedies in Colombia, he was extradited to the United States in 2001 to stand trial.

Shortly after his arrest, Ochoa's family contacted and retained Miami attorney Joaquin Perez to represent Ochoa.   Perez traveled to Colombia and, by his own admission, met with

---

[1] While a case is on appeal, a district court retains jurisdiction to consider a motion for new trial.  Under the procedure established in *Ellsworth*, the Court may "either deny the motion on its merits or certify that the motion should be granted in order to afford the appellate court jurisdiction to entertain a motion to remand." *Ellsworth*, 814 F.2d at 614.

[2] Ochoa's Sixth Amendment right to counsel attached upon the return of the first indictment in August 1999. *See Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (plurality opinion).

Ochoa and his family on January 27, 28, 29, 31, 2000 and February 26, 2000.[3]   Perez had "attorney-client privilege[d]" communications with Ochoa during these meetings. (*Id.* at pp. 2-3.) During the course of Perez's representation of Ochoa, Perez also corresponded directly with Ochoa's prosecutor, Senior Litigation Counsel Teresa Van Vliet, on Ochoa's behalf. (DE 987: 62; DE 989: #34.)

At trial before this Court, the government's case against Ochoa revolved around an alleged drug-related "land-swap" in Colombia, South America, involving Ochoa, the government's chief witness against Ochoa at trial, Alejandro Bernal-Madrigal, and Nicholas Bergonzoli, who was also represented at all material times in this case by Joaquin Perez.

By the time Ochoa was extradited to the United States in 2001, he had replaced Perez with new counsel for trial.  In preparing for trial and the filing of pretrial motions, Ochoa's new counsel discovered that Bergonzoli had been indicted in the District of Connecticut for drug trafficking in 1995 and that his case had been  transferred to the Southern District of Florida in late 1998.  However, according to the Clerk's Office in the Southern District of Florida, the Miami case number listed in the Connecticut court file  (Case No. 99-CR-196-Davis), did not exist.

In an effort to solve the mystery behind Bergonzoli's role in his case, Ochoa moved this Court to either unseal or to compel the government to unseal the *Bergonzoli* file and to

---

[3] *See* [Bergonzoli's] Motion To Strike Intervenor's [Ochoa's] Reply To Objections, September 16, 2003, *United States v. Nicholas Bergonzoli*, Case No. 99-196-Cr-Davis/Seitz (S.D. Fla.) (DE 67), attached hereto as **EXHIBIT 1**, at p. 3 & n. 2.

disqualify Perez from representing Bergonzoli in connection with that litigation. (DE 985.) Ochoa also filed a lengthy motion to dismiss the indictment arguing, among other things, that Perez's conflict of interest in representing both Bergonzoli and Ochoa had violated Ochoa's Sixth Amendment right to counsel. (DE 987-989.)

In addition, based on the government's discovery, which included dozens of tape recordings made in Colombia by the Colombian police at the request of the United States government, Ochoa filed two discovery motions, both of which were aimed at uncovering whether Ochoa had a basis to seek the suppression or exclusion of the tapes. Ochoa's first discovery motion was directed to obtaining evidence surrounding the tape recordings and how they were conducted and maintained. (DE 843.) Among other specific requests, Ochoa moved for the disclosure of "[e]vidence that General Serrano and/or any of the agents who conducted the electronic surveillance were corrupt or being bribed by narcotics traffickers, Carlso Castano, the FARC, Baruch Vega, the DEA or others." (DE 843, p. 3.) Ochoa's second motion requested the disclosure of a list of specific *Brady* material. This list included a request for "[a]ll evidence that former Chief of the Colombian National Police Rosso Jose Serrano has engaged in acts of corruption, bribery, or other misconduct." (DE 984: 5.)

The government's responses to these related requests were similar. In its first response, the government argued that Ochoa was not "entitled" any other information that might be important for a potential motion to suppress. (DE 875: 7.) In its second response, the government similarly asserted that since General Serrano was not going to be a "government witness" at trial, there was no legal requirement to produce any thing about

4

him. (DE 1072: 8.) Both discovery motions were subsequently denied. (DE 909, 1162.) With no evidence to support a claim that the officials in charge of the tape recordings were corrupt, Ochoa did not file a motion to suppress the tapes.

The government also opposed Ochoa's motion to unseal the *Bergonzoli* file on "standing" grounds, arguing that this Court had no authority to unseal proceedings sealed by another judge. It also opposed Ochoa's motion to disqualify Perez, arguing that Ochoa had not alleged sufficient facts to establish that he ever had an attorney-client relationship with Perez. (DE 1071.)

On February 3-4, 2003, United States Magistrate Judge William Turnoff convened a limited evidentiary hearing on Ochoa's motion to dismiss but quashed the subpoena Ochoa had issued to Perez for both his testimony and records relating to his earlier representation of Ochoa. (DE 1158, 1160, 1167, 1174, 1179.) Magistrate Turnoff also refused to order Perez's disqualification, or to hear further argument or testimony on the matter, claiming that Ochoa had not sufficiently established an attorney-client relationship with Perez. (*Id.*)[4] This Court later adopted Magistrate Turnoff's ruling on the disqualification issue and also adopted the government's position that he had no authority to unseal matters pending before other

---

[4] Prior to this ruling, Perez intervened in the proceedings on his own behalf and moved to quash the subpoena and acknowledged having "represent[ed]" Ochoa. *See* Joaquin Perez's Motion To Intervene For Limited Purposes and Incorporated Memorandum of law (DE 1087), at p. 6, n. 4 ("Mr. Perez's *representation of* the Defendant [Ochoa] was a very limited *representation*") (emphasis added); *id.* at p. 8, n. 8 (arguing that, by seeking to call Perez as a witness, Ochoa was waiving the "attorney-client privilege"); Joaquin Perez's Motion To Quash Subpoena Duces Tecum and Incorporated Memorandum of Law (DE 1118), at p. 2, n. 1 ("Mr. Perez *represented* Defendant Ochoa for a brief period of time") (emphasis added).

judges and summarily denied Ochoa's motion to unseal. (DE 1193.)   As part of his direct appeal in 11th Cir. No. 03-14400-DD, Ochoa is challenging these rulings.

Toward the end of Ochoa's trial, when the relevance and importance of Bergonzoli became increasingly clear, Ochoa renewed his request for the unsealing of the *Bergonzoli* file.  After a lengthy debate, this Court invited Ochoa to seek emergency relief before Judge Seitz, the judge who, Ochoa and counsel were informed for the first time, had been assigned to Bergonzoli's case.  This invitation was expressly based on the government's continuing argument that this Court lacked authority to grant Ochoa relief directly.

Accordingly, on May 22, 2003, Ochoa filed an emergency motion before Judge Seitz to unseal the *Bergonzoli* case.  Due to Judge Seitz's unavailability, the emergency motion was randomly re-assigned back to this Court.  Over Ochoa's objections to Perez's continued representation of Bergonzoli, on May 23, 2003, Perez and the government made an *ex parte* presentation to the Court concerning the Ochoa's renewed motion to unseal.  As noted at the outset of this motion, the full transcript of this hearing was recently unsealed by Judge Seitz.  *See* Hearing Transcript, May 23, 2003, **EXHIBIT 2**.

Based on the substance of what occurred during this *ex parte* and, at the time, sealed presentation, the Court (in its capacity as Judge Seitz's temporary replacement in the *Bergonzoli* case) denied Ochoa's request to unseal the entire file and unsealed only a portion

6

of the pleadings that had been filed up until that point in time (docket entry nos. 1-55). Ochoa, still in trial, did not attempt to appeal this limited unsealing.[5]

However, following his conviction, Ochoa discovered two new pieces of information concerning the conduct of the government, Bergonzoli and Perez – an affidavit filed by Bergonzoli in a pending civil forfeiture case in Arizona and an article published by *The New Times* on December 11, 2003. Based on this first wave of newly discovered evidence, on June 17, 2003, Ochoa filed a motion for new trial, arguing that: (1) the sealing of the *Bergonzoli* case until the end of Ochoa's trial had violated his rights under First, Fifth and Sixth Amendments; (2) the Bergonzoli "land swap" theory used at trial was either a constructive amendment of the indictment or a material variance; (3) the Court should re-open hearings on his motion to dismiss because materials belatedly unsealed in the *Bergonzoli* case supported an inference that the government and Perez were involved in the Program long before Ochoa was indicted; and (4) Perez' continuing representation of Bergonzoli in apparent collusion with the government violated Ochoa's Fifth and Sixth Amendment rights. (DE 1473.) In anticipation of receiving a hearing on his motion, Ochoa subpoenaed both Perez and Bergonzoli to his sentencing. Perez moved to quash the subpoenas (DE 1530, 1544) and, on August 25, 2003, the day before sentencing, the Court summarily did so and denied Ochoa's motion for new trial as well. (DE 1551, 1553, 1554.)

---

[5] The Court, back in his capacity as the judge overseeing the *Ochoa* case, denied Ochoa's motion to continue the trial.

7

As part of his direct appeal to the Eleventh Circuit, Ochoa has argued that the Court's summary denial of his (first) motion for new trial was reversible error. In addition to his direct appeal, Ochoa also filed a renewed motion before Judge Seitz to unseal the remaining portions of the *Bergonzoli* file. In response to this litigation, Judge Seitz eventually unsealed most of the May 23, 2003, hearing discussed above. *See* **EXHIBIT 2**. In addition, Judge Seitz unsealed Bergonzoli's February 10, 2000, plea colloquy. *See* Transcript of Plea Colloquy, February 10, 2000, **EXHIBIT 3**. Ochoa has separately appealed Judge Seitz's refusal to unseal the remaining portions of the *Bergonzoli* file and that appeal (11th Cir. No. 04-10718-D) has been consolidated with Ochoa's direct appeal (11th Cir. No. 03-14400-D).

Since the time Ochoa lodged his direct appeal, two other material events have occurred. Baruch Vega was sentenced before Judge Jordan on March 25, 2004. *See* **EXHIBIT 4**. And, on March 15, 16, 17, 2004, evidentiary hearings took place before the Merit Systems Protection Board on whether to terminate one of Vega's supervisors, DEA Agent David Tinsley, from the DEA. *See* Transcript Excerpts, **EXHIBIT 5**. As described below, these proceedings contain material evidence that further bolsters Ochoa's contention that the government has systematically violated his First, Fifth and Sixth Amendment throughout this case and require a new trial.

### B.     The Newly Discovered Evidence and Its Materiality

#### *1.     The Unsealed Bergonzoli Transcript of the May 23, 2003.*

As noted above, Ochoa filed a post-trial motion for new trial arguing that his former attorney, Joaquin Perez, violated Ochoa's Sixth Amendment rights by continuing to actively

represent the interests of another client, Bergonzoli, in a manner that conflicted with Ochoa's interests. At the time Ochoa filed his motion for new trial, only a small portion of the May 23, 2003, hearing had been unsealed. The recently unsealed portions document the Sixth Amendment violation in graphic detail. At a time when Ochoa was desperately seeking access to the full *Bergonzoli* file in order to determine whether to call him as a witness, Ochoa's former attorney, Perez, came before this Court and openly argued ***against*** Ochoa's request on behalf of Bergonzoli. The unsealed transcript thus reveals that Perez and the prosecutor handling the *Bergonzoli* case "discussed" Ochoa's motion and, as Perez stated: "We have selected eight items I believe should be sealed...." *See* Hearing Transcript, **EXHIBIT 2**, at pp. 4, 9. Perez's advocacy against the interests of his former client was a blatant conflict of interest and, along with the government's knowing exploitation of that conflict, violated both Ochoa's Sixth Amendment right to counsel and his Fifth Amendment right to due process.

## 2.    *The Unsealed Bergonzoli Plea Colloquy.*

The unsealed plea colloquy of December 10, 2000, demonstrates that the Fifth and Sixth Amendment violations, discussed above, began from the inception of Perez's dual representation of Ochoa and Bergonzoli and were far more serious. As discussed in detail in Ochoa's pretrial motion to dismiss, in January 2000, the Ochoa family in Colombia received visits from Perez and Bergonzoli. During these meetings, which the Ochoa family tape recorded, Perez and Bergonzoli urged the Ochoa family to participate in the bribery scheme being run by Baruch Vega. According to the terms of this proposal, if the Ochoa

9

family paid $30 million to Vega, Ochoa would receive, at most, five years in prison.  (*See generally* DE 987: 60-65;  DE 989, ## 32, 33.)  At the time Ochoa filed his motion to dismiss, and indeed throughout the trial, Ochoa did not know – because the government would not disclose it and used the sealing of court records to conceal it – whether Bergonzoli and Perez were working for the government at the time they made these extortionate proposals to the Ochoas.

In the now unsealed transcript of February 10, 2000 – *i.e.,* less than two weeks after Perez and Bergonzoli last met with the Ochoas – AUSA Patricia Diaz, Perez and Bergonzoli appeared before now retired Judge Davis for Bergonzoli's guilty plea.  In the recently unsealed portions of this hearing, Vega's supervisor, DEA Agent Tinsley, testified that Bergonzoli had already been cooperating with the government and had "presented some extraordinary results for us." *See* Transcript of Plea Colloquy, **EXHIBIT 3**, at p. 5.  None of Bergonzoli's bribery efforts were disclosed to Judge Davis.  Instead, Agent Tinsley argued to Judge Davis that Bergonzoli should remain free conduct more proactive cooperation because he had already provided the government with important information about not only drug trafficking but also about "corruption matters and leaks within foreign governments and related very delicate political issues...." *Id.* at pp. 5-6.  In particular, Bergonzoli "provided a lot of information regarding ... leaks within our embassy, of the United States embassy in Colombia where gorilla [sic] factions, communist factions as well as narcotics traffickers. Very high level stuff, very sensitive stuff that has been addressed at the very highest level of our agency." *Id.* at 7.  By information and belief, the "leak" within the U.S. Embassy was

a relative of General Serrano, the individual about whom the government refused to provide any discovery pretrial.

Finally, the transcript of Bergonzoli's plea colloquy exposes how the entire *Bergonzoli* case remained sealed on an entirely non-public docket for so long. At the end of the hearing, Judge Davis was assured by his Deputy Clerk that as of "yesterday," Bergonzoli's "name does not appear anywhere on the court's computer records." *Id.* at 16.

### 3. *Baruch Vega's Sentencing*

The transcript of Baruch Vega's sentencing on March 25, 2004, corroborates many of the allegations made by Ochoa in his pre-trial motion to dismiss and his first post-verdict motion for new trial. In a proffer concerning Vega's cooperation that the government did not dispute, Vega's counsel stated *inter alia* that:

> Vega "was approached" by the government to "assist the government in conducting" an investigation of Colombian drug traffickers;

> "As a result of [Vega's] cooperation ... over 114 major drug traffickers ... surrendered to the authorities in the United States...."

> Numerous sentencing reductions under U.S.S.G. 5K1.1 and/or Fed. R. Crim. P. 35 have been granted to these traffickers "based on the work that was done with Vega."

*See* **EXHIBIT 4**, at pp. 5, 7.[6]

---

[6] The only aspect of Vega's proffer that the government disputed was that his assistance was

(continued...)

11

When Vega himself spoke, he added that he had been assisting government agents and prosecutors in New York since *1998* – long before Ochoa was first indicted (August 1999). *Id.* at p. 19. More specifically, he worked on an investigation dubbed "Operation .... Eldorado" in which drug traffickers paid Vega "substantial amounts of money on the side, with the knowledge, full knowledge of the U.S. government and with the approval of the U.S. government." *Id.* at p. 20. Vega "enjoyed that money" and "was able to expend a lot of the money" for himself. *Id.* The government did not dispute Vega's statement.

During pre-trial litigation over Ochoa's motion to dismiss, the government convinced Magistrate Turnoff and this Court that the government was unaware of Vega's activities until *after* Ochoa's first indictment and that it was not responsible for any payments made to him by traffickers.

### 4.    The Merit Systems Protection Board Hearings

Between March 15-17, 2004, hearings took place before the Merit Systems Protection Board on the conduct of DEA Agent David Tinsley. Testimony adduced at the hearing also supports Ochoa's previous claims and undercuts many of the positions taken by the government before this Court. Although undersigned counsel have been able to obtain a full transcript of the proceedings, the exhibits introduced during the hearing remain under seal.

---

[6](...continued)
"part of some operation," but the government expressly agreed that Vega's assistance had led "to the arrest of approximately 114 individuals. The government's not disputing that." *Id.* at p. 12.

During the hearings, Elizabeth Walker Kempshall, Chief of Executive Policy and Strategic Planning Unit for the DEA, testified that Vega "had been a confidential source for several other Federal Agencies" for many years. *See* Transcript Excepts, **EXHIBIT 5**, at p. 11. Consistent with Vega's claims during his own sentencing, Ms. Kempshall testified that Vega worked with the FBI in 1988 and used the same methods that he later employed in Operation Millennium. That is, Vega pretended to have corrupt influence over the DEA and the FBI permitted Vega to take money from the traffickers: "I believe they did, yes sir. And with that approval that they were given back in '88 he was authorized to accept money from the traffickers." *Id.* at 60-61. The FBI also permitted Vega to *keep* the money he extorted from the traffickers: "Yes, they did.... He had been previously approved to do that, yes sir, by the FBI." *Id.* at 61-62.

Vega began working with DEA Group 9 in Miami and Agents Tinsley and Castillo. Under their supervision, Vega made six trips from Miami to Panama. The trips were taken on a jet leased by Vega. *Id.* at 45-46. On at least one trip to Panama in December 1999, attorney Dan Forman paid for the agents' expenses, including their hotel bill. *Id.* at 48-50. The purpose of the trips, she learned, was "to recruit or solicit the cooperation of Colombian traffickers." *Id.* at 84. With only one exception, there were no reports prepared concerning the trips, including the one paid for by Forman. *Id.* at 11, 25, 37-40, 50, 80, 82.[7]

---

[7] The only report concerning the trips was a lengthy report concerning Gomez Bustamante ("Rasguno"). *Id.* at 31, 85, 119, 121.

However, later, Ms. Kempshall admitted that Agent Castillo prepared a series of "classified" which were "maintained in a separate file.... They're being secured in a safe." *Id.* at 87. However, she did not review them because the case file "noted" that the "Top Secret or Secret Reports had been removed." *Id.*

During this time period, Ms. Kempshall also testified that Agent Castillo met on two occasions in Miami with Oscar Campuzano, one of Ochoa's original co-defendants who, at the time of the meeting, was a fugitive and "hiding out" in Miami. *Id.* at 51.[8] According to Ms. Kempshall, Agent Castillo "had dinner with Mr. Campuzano and Ramon Suarez" and later had a breakfast meeting at a restaurant with Campuzano and a woman named Christina Questa. *Id.* Ms. Kempshall testified that Ms. Questa was really an associate of drug trafficker Carlos Ramon and that Agent Castillo "eventually admitted that he had an intimate relationship with Christina Questa. And Oscar Campuzano worked for Carlos Ramon." *Id.* at 52. The implication was that Roman and Campuzano were using Ms. Questa to compromise Agent Castillo. *Id.*[9] Ms. Kempshall further testified that Agent Castillo should have arrested Campuzano, rather than meeting with him, since there was a warrant out for his arrest. "[H]e was bound by the Judge's Order to arrest Mr. Campuzano." *Id.* at 53. No investigative reports were generated for this meeting. *Id.*

---

[8] As explained in Ochoa's motion to dismiss, Campuzano is one of the individuals who benefitted from the $7 million payment/bribe paid by Carlos Ramon to Vega.

[9] In a separate administrative proceeding, Agent Castillo has been charged with having "an inappropriate association with ... Ms.... Questa." *Id.* at p. 91.

Another witness during the hearings was the former DEA Special Agent, Vincent Mazzilli.[10] Mr. Mazzilli testified primarily about the surrender of one of Ochoa's original co-defendants, Orlando Sanchez-Cristancho in October 1999. *Id.* at 142. Mr. Mazzilli testified that there were numerous meetings held prior to the surrender. *Id.* at pp. 204-205. Cristancho was eventually flown to Miami on Vega's private jet. *Id.* at 152-153. The CIA actually put Cristancho on the plane in Panama. *Id.* at 213, 215.[11] Vega was later reimbursed $23,200. *Id.* at 153-155.

Mr. Mazzilli was also aware that Vega had made "several" trips to Panama in 1999 and 2000 in order to "persuade" traffickers to "turn themselves in to DEA in return for some consideration later on." *Id.* at 178-179. He confirmed that Vega's attorney, Dan Forman, paid the agents' hotel expenses, thereby putting "us in a position of having been bought by an informant." *Id.* at 184.

The Acting Group Supervisor of DEA Group 9, Michael F. Upchurch, also testified about Cristancho's surrender in October 1999. Vega's plane landed at the Ft. Lauderdale airport and was met by agents from both Group 9 and Group 43. *Id.* at 323-328. Indeed, he recalled that lead Operation Millennium prosecutor Teresa Van Vliet "was there" as well. *Id.* at 328.

---

[10] Mr. Mazzilli currently is employed by Corporate Integrity Services, a wholly owned subsidiary of Holland & Knight, the same law firm that has represented Joaquin Perez in this case. *Id.* at 126.

[11] DEA Special Agent Jay Bergman later testified that the "Intelligence Community" was directly involved in Cristancho's surrender. *Id.* at pp. 538-539. Mr. Mazzilli also remembered seeing at least one classified DEA report in the safe in his office. *Id.* at 221-222.

Regarding the missing classified reports of Vega's activities in Panama, DEA Special Agent Sandalio Gonzalez testified that there were between 5 and 10 classified DEA 6's, all of which pertained to "high level Columbian traffickers." The classification was required since the traffickers "talked about possible corruption in the Colombian Government and possibly leaks in the U.S. Embassy, and things of that nature." *Id.* at 492, 494.

The star witness during the hearings was David Tinsley himself. Agent Tinsley testified about the meetings in Panama using two cooperating sources, Julio Correa and Nicholas Bergonzoli. *Id.* at 653. He also confirmed that Agent Castillo wrote "several" classified DEA 6 reports concerning the meetings in Panama. *Id.* at 656-658, discussing "corruption in Colombia ... high level corruption" and the "Colombian National Police." *Id.* at 658, 664-665. At least some of these allegations came from Cristancho. He told the agents that "[o]ur counterparts [in Colombia] were corrupt, sir. That's what Orlando Cristancho is giving us information on, is our counterparts that are taking U.S. money illegally." *Id.* at 673. At least one of high level Colombian officials accused of corruption was General Serano himself. *Id.* at 732. Agent Tinsley claimed that there were "several active OIG and DOJ, PI's, investigations on the officials that were giving money to Colombia or that are stealing money. This is all part of the Classified 6's that nobody wants to talk about." *Id.* at 673.

Regarding Operation Millennium, Agent Tinsley testified that Ochoa was a "target" from the beginning. *Id.* at 666. "That's the initial target in the SARC, is Fabio [Ochoa]." *Id.* at 666-668. Indeed, Agent Tinsley testified that Ochoa had been targeted even ***before***

Operation Millennium began:   "We predated Millennium by like a year-and-a-half or two years.  So we're targeting [Ochoa] as well." *Id.* at 666.

Using Vega to run a program similar to the one he had worked with the FBI was, according to Agent Tinsley, expressly approved in advance by both of Ochoa's prosecutors, Teresa Van Vliet and Ed Ryan.  He had to "sell the program on up the chain" and both Van Vliet and Ryan "were a thousand percent for it."  *Id.* at 711.[12]  The plane Vega used had previously been used by Vega when he worked with the FBI:  "I know they used it.  They told me they used it and I read the OPR Report where they used it 17 or 18 times...."  *Id.* at 674.

As early as the Spring or Summer of 1999, Agent Tinsley testified that he had concerns about Vega and tried to get him deactivated as an informant and polygraphed nine times.  *Id.* at 701.  However, he then claimed that the first time he heard that Vega was involved in corruption was in November 1999 from Forman. *Id.* at 702.  Agent Tinsley blamed the FBI for not telling him what Vega had been doing with them.  *Id.*  According to Agent Tinsley, Vega had worked with both the FBI and CIA in the past and that the DEA "knew" that Vega was working for the "spooks" or CIA.  *Id.* at 703-704.  Indeed, "everyone knew that Vega worked for the CIA and the FBI and they knew he was down there doing other things besides what he did for us."  *Id.* at 710.

---

[12] During the limited pretrial hearing conducted by Magistrate Turnoff in February 2003, Van Vliet disavowed any knowledge of Vega or his activities prior to late October or November 1999.  Transcript, February 4, 2003, at 18, 42-43.

When Agent Tinsley began describing the Panama trips and the presence of Dan Forman on the plan and during the subsequent meetings with traffickers, the Adminstrative Judge interrupted and asked why Vega's attorney was going on the trips. Agent Tinsley responded that there are certain attorneys known "for cooperators that they bring in" and Forman was one of them. *Id.* at 728-729. In addition, Forman himself "provided information to us and actually gave us a lot of information from time to time...." *Id.* at 729. Forman also went "for his own interest as well. I would be wrong to tell you he didn't get a benefit." *Id.*

## II.   OCHOA IS ENTITLED TO A NEW TRIAL

A defendant is entitled to a new trial under Fed. R. Crim. P. 33 based upon a claim that the government withheld exculpatory information from him at trial if he can establish that: (1) the government was in possession of evidence favorable to his defense; (2) the defendant neither possessed the evidence nor could have uncovered it through the exercise of "reasonable" diligence; (3) the government suppressed the evidence; and (4) if the evidence been disclosed, there was a "reasonable probability" that the outcome of the proceedings would have been different. *United States v. Fernandez*, 136 F.3d 1434, 1438 (11th Cir. 1998).

As the Supreme Court made clear in *Kyles v. Whitley*, 514 U.S. 419 (1995), the test "for materiality is *not* a sufficiency-of-the-evidence test." *United States v. Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996) (emphasis in original). *Accord United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995). Rather, the test focuses on "whether the undisclosed information could have substantially affected the efforts of defense counsel." *Smith*, 77 F.3d

18

at 515. *See also Alzate*, 47 F.3d at 1110. In other words, "[t]he question is not whether the defendant would more likely than not have received *a different verdict* with the evidence, but whether in its absence he received *a fair trial*, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434 (citation omitted). *Accord United States v. Arnold*, 117 F.3d 1308, 1315 (11th Cir. 1997); *Hays v. State of Ala.*, 85 F.3d 1462, 1497-98 (11th Cir. 1996). A new trial is required if the withheld evidence would have cast "the whole case in a different light." *Kyles*, 514 U.S. at 435.

A defendant is entitled to an evidentiary hearing on a motion for new trial if he "has made sufficient allegations so that it cannot be *conclusively* stated that he is entitled to no relief." *United States v. Yizar*, 956 F.2d 230, 234 (11th Cir. 1992) (remanding for evidentiary hearing on motion for new trial). *See also Fernandez*, 136 F.3d at 1438. Under these standards, Ochoa is entitled to a new trial or, at the very least, an evidentiary hearing and discovery concerning his claims.

*First*, the government was plainly in the possession of favorable evidence regarding Ochoa – evidence that contradicted the claims made by the government in response to Ochoa's motion to dismiss and discovery motions relating to possible corruption in Colombia. *Second*, Ochoa did not possess and had no ability to independently obtain this evidence through the exercise of due diligence. The evidence was either exclusively within the possession and control of the government or sealed at the government's request. *Third*, the government actively suppressed this exculpatory evidence by either denying its existence and/or vigorously opposing undersigned counsel's efforts to pry the information loose

19

through litigation. *Fourth*, there is at least a "reasonable probability" that the outcome of Ochoa's trial would have been different if the suppressed evidence had been disclosed.

A verdict is not "worthy of confidence" when the government's own actions undermine the very premises upon which the charges were brought. *Kyles*, 514 U.S. at 434. The evidence summarized above would clearly have cast "the whole case in a different light." *Kyles*, 514 U.S. at 435. *See Monroe v. Angelone*, 323 F.3d 286, 301-309 (4th Cir. 2003) (granting new trial based on prosecutor's suppression of *Brady* material at trial); *Conley v. United States*, 323 F.3d 7 (1st Cir. 2003) (en banc) (remanding for hearing on defendant's motion for new trial based on allegations of withheld *Brady* material).

WHEREFORE, the Court should convene an evidentiary hearing on the defendant's *Brady* claims, issue an order certifying to the Eleventh Circuit under *Ellsworth* that it would grant the defendant's motion for new trial if the case was remanded to this Court and, thereafter, order the requested new trial.

Respectfully submitted,

ROY BLACK
[Fla. Bar No. 126088]
BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.
201 South Biscayne Boulevard
Suite 1300
Miami, FL 33131
Telephone: (305) 371-6421

G. RICHARD STRAFER
[Fla. Bar No. 389935]

20

G. RICHARD STRAFER, P.A.
2400 South Dixie Highway, Suite 200
Miami, FL 33133
Telephone:  (305) 854-9090

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of August, 2004, I caused a true and

correct copy of the foregoing Motion to be mailed to:

EMILY M. SMACHETTI
Assistant U.S. Attorney
U.S. Attorney's Office
99 N.E. 4th Street
Miami, FL 33132

GLENN C. ALEXANDER
Assistant U.S. Attorney
500 East Broward Blvd., Suite 700
Fort Lauderdale, FL 33394

ROY BLACK

21

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 99-00196 CR-SEITZ

UNITED STATES OF AMERICA        )
                                )
                                )
                                )          **RECEIVED**
v.                              )
                                )          SEP 1 9 2003
                                )
NICHOLAS BERGONZOLI,            )          Black Srebnick
       Defendant.               )          Kornspan & Stumpf, PA
_____ )

### DEFENDANT'S MOTION TO STRIKE INTERVENER'S
### REPLY TO OBJECTIONS FILED BY NICHOLAS BERGONZOLI,
### OR ALTERNATIVELY, TO DEEM ATTORNEY-CLIENT PRIVILEGE
### WAIVED AND INCORPORATED MEMORANDUM OF LAW

Nicolas Bergonzoli, by and through undersigned counsel, moves this Court to

enter an order striking the Intervener's Reply to Objections Filed by Joaquin Perez

(sic)[1] on the grounds that it is highly inflammatory and contains numerous

misstatements of law and fact, or alternatively to deem the attorney-client

privileged waived.

The Intervener, Fabio Ochoa, is clearly a desperate man.  He has been tried,

convicted and sentenced. *U.S. v. Fabio Ochoa*, Case No. 99-6153-CR-Moore ("Ochoa

matter").  In the Ochoa matter, at each stage of the proceedings he pointed the

finger at everyone else, including the Government and undersigned counsel in

attempt to obscure the truth.   His court filings often contained unfounded

_____

[1] The pleading to which Intervener Ochoa's response is directed is Bergonzoli's Objections To
Intervener's Consolidated Renewed Motion To Unseal Court File And Motion To Disqualify Joaquin
Perez. The Intervener, in his continued personal attack on undersigned counsel, has lost sight of the
fact that the objections are those of Nicholas Bergonzoli.

accusations, innuendos and outright falsehoods regarding the alleged conduct of numerous individuals, including the Government and undersigned counsel. Attached hereto as Exhibit A is Joaquin Perez's Motion to Intervene For Limited Purposes And Incorporate Memorandum of Law that was filed in the Ochoa matter; it provides this Court with a clear picture of the impermissible tactics Ochoa engaged in the Ochoa matter and is continuing to utilize in the instant matter.[2] Even more appalling than the Intervener Ochoa's distortion of facts and law, however, is the Intervener's continued "potshots" directed at undersigned counsel. Placed in an impossible position, undersigned counsel cannot ethically respond to the personal attacks as Intervener Ochoa has refused to waive the attorney-client privilege. Ochoa cannot be allowed to continue to attack undersigned counsel and seek to use the attorney-client privilege as a shield. *Owen v. Crosby,* Case Nos. SC01-2146, SC01-2476, 2003 WL 21554960, at p. *4 (Fla. July 11, 2003) (Defendant waived any attorney-client privilege that existed between him an counsel when he accused counsel of ineffectiveness and conflict of interest.); *Jenney v. Airdata Wiman, Inc.,* 846 So.2d 664, 667 (Fla. 2nd DCA 2003)("Under the sword and the shield doctrine, a party who raises a claim that will *necessarily* require proof by way of privileged communication cannot insist that the communication is privileged.") (emphasis in the original).

Accordingly, although there are numerous factual allegations that undersigned counsel desires to address, unless and until the Court deems the

---

[2] The Motion to Intervene and the attached transcripts also provides an accurate picture of undersigned counsel's limited contact with Ochoa and of the true nature of the discussions between undersigned counsel and certain members of Ochoa's family.

attorney-client privilege waived, due to undersigned counsel's ethical obligations, only certain of the factual misstatements and the pervasive misstatements of law in Intervener Ochoa's Reply can be addressed in detail in this Motion.

### Intervener Ochoa Lacks Standing to Move to Disqualify

For the record, Intervener Ochoa has not cited a single case in which an individual was permitted to intervene in a criminal matter, move to unseal records <u>and</u> move to disqualify counsel for the defendant in the action. Instead, Intervener Ochoa seeks to interject himself into the instant matter ostensibly as a "member of the public"[3] and then call himself an "aggrieved former client." Intervener Ochoa, in an attempt to define the duty of loyalty that he believes the undersigned counsel owes him, includes in his Reply a direct quote from an opinion by the U.S. Court of Appeals for the First Circuit regarding New Hampshire Rules of Professional Conduct with respect to <u>current</u> clients. Intervener's Reply To Objections, at p. 2. Although Intervener Ochoa references generally Rule 4-1.9, the Florida Bar Rule pertaining to former clients, he makes his argument regarding standing based upon the duty of loyalty as provided under the New Hampshire Bar Rules respecting current clients --- a standard that is inconsistent with the Rule 4-1.9.

### Failure to Demonstrate Substantial Relationship

Intervener Ochoa has failed to demonstrate that the subject matter of the present matter, the motions to unseal records and to disqualify undersigned counsel, is substantially related to the "prior representation", i.e., undersigned

---

[3] Both of the cases cited by Intervener Ochoa in his Reply involve intervention by newspaper publishers seeking to intervene solely for the limited purpose of seeking to unseal court records.

counsel's prior limited contact with Ochoa.  *See Freund v. Butterworth*, 165 F.3d

839, 859 (11th Cir. 1999).  Instead of providing the requisite facts demonstrating the

relatedness of the prior and current representations[4], Intervener Ochoa merely

recites the various claims he has made in the Ochoa matter; all of which were

rejected at the trial level.  Rather than responding to the legal requirements

necessary to establish relatedness, Intervener impermissibly makes the same

unfounded and spurious allegations against certain "government officials" and

undersigned counsel.  Reply, at p. 6.  Such tactics should not be condoned by the

Court.  Either Intervener Ochoa's Reply should be struck or the attorney client

privileged must be deemed waive so as to allow undersigned counsel to respond to

the false and malicious allegations made against him.

### Ochoa's Sixth Amendment Claim Is Absurd

As with each of the prior arguments, Intervener Ochoa fails to address the

legal arguments[5] and instead resorts to a personal attack on undersigned counsel.

Contrary to Intervener Ochoa's allegations, undersigned counsel moved to intervene

in the Ochoa matter not to "litigate *against* Ochoa", but rather to address the

malicious falsehoods and innuendos directed at undersigned counsel in Ochoa's

---

[4] The only case cited by Intervener Ochoa in his Reply in support of his argument that the prior and present representations in question are related despite "the difference in nature of the two lawsuits" is *Oxford Systems, Inc. v. Cellpro, Inc.*, 45 F. Supp.2d 1055 (W.D. Wash. 1999).  The facts in *Oxford Systems, Inc.* are wholly inapposite to the matter at hand.  Although Intervener Ochoa is correct in noting that the two representations at issue in *Oxford Systems* were different in nature, *i.e.*, a patent infringement action and a securities fraud action, he left out the fact that both the securities fraud case and the patent infringement case had the exact same central issue.  *Oxford Systems, Inc.*, 45 F. Supp.2d at 1061.  Such is not the case in the instant matter.

[5] Although Intervener Ochoa cites several Sixth Amendment cases, he resorts to the "sound bite" approach, quoting portions of the opinions that sound good, but lack substance or relevance to the matter at hand.  Reply, at pp. 8-9.  (*Strickland, Hamilton,* and *Culyer* are joint or concurrent representation cases.)

4

motion to dismiss. Reply, at p. 7.  Again, contrary to Intervener Ochoa's allegations, undersigned counsel had no personal stake in the outcome of the motion to dismiss, merely a desire to set the record straight to the extent possible with the confines of the ethical rules.  Reply, at p. 7.  Nowhere is it more evident that Intervener's Reply must be struck or the attorney-client privileged waived in order to allow undersigned counsel to respond to the blatantly false allegations made against him than the section of Ochoa's Reply relating to Ochoa's so-called constitutional claims. The allegations set forth on pages 7-9 of Ochoa's Reply, are not only false, they are outrageous and so baseless that they are not worthy of being repeated in this Motion.  At best they are mere unfounded speculations, which have no basis in truth -- at worst they constitute a sanctionable fraud upon the court.  Whether Ochoa is simply a grasping at straws in an attempt to overturn his conviction or whether he is seeking to intimidate Nicholas Bergonzoli or undersigned counsel, such tactics cannot and should not be condoned.

## Conclusion

Based upon the foregoing[6], Nicholas Bergonzoli respectfully request that this
Court grant Defendant's Motion to Strike Intervener's Reply to Objections Filed by
Joaquin Perez (sic), or Alternatively Motion to Deem Attorney-Client Privileged
Waived.

        Respectfully submitted,

        Joaquin Perez, Esq.
        Counsel for Nicolas Bergonzoli
        6780 Coral Way
        Miami, Florida  33155
        Tel.: 305-261-4000
        Fax: 305-662-4067

        (FBN 238082)

By: _____
        Joaquin Perez
        Florida Bar No. 985339

---

[6] Notably, Intervener Ochoa fails to address Bergonzoli's Objections relating to the arguments made
by Ochoa regarding the fact that the Government filed an affidavit by Nicholas Bergonzoli in a civil
forfeiture action in Arizona against Luis Guillermo Angel-Restrepo.  Presumably, Intervener Ochoa
has dropped that argument for fear that his relationship with Mr. Angel-Restrepo, would become an
issue in this matter.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was

sent via facsimile this 16th day of September, 2003 to:

Roy Black, Esq.
Black, Srebnick, Kornspan
   & Stumpf, P.A
201 S. Biscayne Blvd., Suite 1300
Miami, Florida 33131

G. Richard Strafer, Esq.
2400 South Dixie Highway
Suite 200
Miami, Florida 33133

Lilly Ann Sanchez, Esq.
Assistant U.S. Attorney
U.S. Attorney's Office
99 N.E. 4th Street
Miami, Florida 33132

John M. Hogan, Esq.
Holland & Knight, LLP
701 Brickell Avenue
Suite 3000
Miami, Florida 33131

(FBN 238082)

Joaquin Perez

# 445928_v1

# EXHIBIT 2

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Docket No. |
| | ) | 99-196-CR-SEITZ |
| Plaintiff, | ) | (MOORE) |
| | ) | |
| v. | ) | Miami, Florida |
| | ) | May 23, 2003 |
| NICOLAS BERGONZOLI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| - - - - - - - - - - - - - - - - - - - - - - x | | |

**SEALED**

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE MICHAEL K. MOORE

APPEARANCES:

For the Government:    LILLIAN SANCHEZ, ESQ.

For the Defendant:    JOAQUIN PEREZ, ESQ.

Court Reporter:    Richard A. Kaufman, C.M.R.R.

ATTACHMENT / EXHIBIT _____

2

1          THE COURT:  United States of America versus Nicolas

2     Bergonzoli, Case Number 99-196.

3          Counsel state their appearances for the record.

4          MS. SANCHEZ:  Lily Sanchez for the United States.

5          MR. PEREZ:  Joaquin Perez for Mr. Bergonzoli.

6          THE COURT:  Let me lay out the chronology of events

7     that bring us to the hearing today and I will begin by advising

8     the parties in the Bergonzoli case that I set this on short

9     notice and I appreciate you appearing on short notice.

10          I guess, Mr. Perez, it is apparent you have some sort

11    of sore throat.  I hope you feel well enough to help us out

12    here.

13          This motion that was filed to unseal the file in the

14    Bergonzoli case was filed by Mr. Black, who is requesting the

15    information in connection with a case that is before me, United

16    States versus Fabio Ochoa, and I don't have the number

17    immediately in front of me, but he is attempting to look at

18    that file because apparently, to the extent that

19    Mr. Bergonzoli's name has come up in the Ochoa case, he is

20    trying to make a determination whether or not to call him as a

21    witness.  Before he makes that determination, I would like to

22    get as much information as possible and he believes he is

23    entitled to the information that is contained in the Bergonzoli

24    case.

25          When he brought it to my attention, I didn't know, or

3

1    at least according to him if you look in the clerk's office

2    file all you get is nothing, so I suggested, based on what the

3    U.S. Attorney's Office had represented in the hearing

4    yesterday, in the Ochoa hearing yesterday, he go ahead and file

5    something to unseal and that it would get routed to whatever

6    Judge was assigned the Bergonzoli case.  That happened, and it

7    went to Judge Seitz who is out of the district, and it went

8    into the emergency wheel, he certified it as an emergency.  It

9    went into the emergency wheel and I was told the emergency

10   motion was assigned to me, which I can only conclude is a

11   coincidence.

12        I called Judge Seitz and she returned my call, we

13   spoke last night about the sealing issue and I explained to her

14   that I would like to be as deferential as possible to some

15   other Judge's determination that a file should be sealed.  But

16   in view of the manner in which this has progressed, I also

17   wanted to do whatever we could to resolve the motion so it

18   would not impact in the Ochoa trial and that is what we are

19   trying to do here.

20        I have gotten the file and I have looked at the

21   lengthy case that Mr. Black was citing to and it looks to me

22   under Valenti, the docket should be made, the docket sheet at a

23   minimum, should be made public, and that the docket should

24   reflect the number of docket entries that have been made in the

25   case, with the corresponding docket numbers.  Then, if a matter

4

1   needs to be sealed, that it should be reflected on the docket

2   entry that it has been sealed.

3        To my understanding, that is not what the docket

4   currently reflects, so I will give you both an opportunity to

5   be heard on this; bu at a minimum, we need to get the docket in

6   conformity with Valenti.  That is point one.

7        There also should be an order in the file that

8   addresses the sealing of whatever document the parties seek to

9   have sealed, and stating the reasons why that docket needs to

10  be sealed and that that order should be made public.  That is

11  the way I read Valenti, and none of the sealing orders in this

12  case have been made public.

13       I just want you to know where I am coming from, and

14  now tell me if you think I am wrong and if I am wrong, then

15  what you think we ought to do.

16       MS. SANCHEZ:  Your Honor, I have discussed this with

17  defense counsel, we concur with your reading of the Valenti

18  case.  We do believe the docket sheet should reflect the number

19  of the case, the Judge, the name of the defendant and also the

20  docket entry number with the appropriate sealed document entry

21  next to it if the document is so sealed.

22       As far as the order sealing the document, whether

23  those should be sealed or not, the government does not have any

24  objection to those orders not being sealed, so long as that

25  order sealing that document is a very general order that

5

1    basically says that the sealing is for a good cause that has

2    been represented to the Court, and I think that most of the

3    orders in this case that are orders to seal are those type of

4    general orders.

5         THE COURT:  Accordingly, the District Court's denial

6    of the motion to unseal must be supported with a finding that

7    the denial of access is necessary to preserve a higher value

8    and is narrowly tailored to serve that interest.

9         The order has to say something as to why we are

10   sealing these pleadings.  Otherwise, for example, anybody who

11   takes up the District Court on appeal and the Eleventh Circuit

12   looks at this, the Eleventh Circuit is not going to know why

13   the District Court acted in a way that it did.

14        MS. SANCHEZ:  To the extent that the order sealing

15   gives reason in a very general, vague manner -- the problem is,

16   if the sealing order says, hypothetically, we are sealing this

17   case because the defendant is working in an undercover capacity

18   with the United States and that undercover capacity with the

19   defendant working in such; if that information were to be

20   public would jeopardize the operation or the investigation,

21   then why seal anything at all because you are giving away

22   exactly what it is that is being sealed.

23        THE COURT: So what do you say?

24        MS. SANCHEZ:  The order should say something along the

25   lines, because this Court has reviewed the motion to seal and

1   the pleadings filed by the government and defense, the District

2   Court has found good cause and sufficient reasons why this case

3   merits the sealing of the documents in this case, the documents

4   that are being asked to seal and not sealing could jeopardize

5   the government's or the defendant's interest in this case,

6   etc., etc.; something in a more general fashion that wouldn't

7   be giving away the reason why the case needed to be sealed.

8        THE COURT:  Mr. Perez, do you want to contribute to

9   this discussion.

10       MR. PEREZ:  I don't have anything to add to the

11  presentation by the government.

12       THE COURT:  The other part of the Valenti case notes

13  **even when a Court properly** denies the public and the press

14  **access to portions of a** criminal trial, the transcripts of

15  properly closed proceedings must be released when the danger of

16  prejudice passes; which raises the question of, is there today

17  a continuing need to have these, some or all, of the documents

18  in this file sealed?

19       MS. SANCHEZ:  It is the government's position, there

20  are at least **eight separate** documents that the government

21  believes **should remain** sealed.

22

23

24

25

7

1       THE COURT:  It looks to me there are at least 48

2   docket entries in the file.  Does that appear correct?

3       MS. SANCHEZ:  Your Honor, I don't have an exact

4   number, but there are a lot more than eight.

5       THE COURT:  Let's just use 48 for discussion purposes.

6   I know there are 49 now which is the motion for judicial

7   recommendation and we have what would now be 50 and that is the

8   emergency motion to unseal the Court file.

9       MS. SANCHEZ:  And our response.

10      THE COURT:  That is 51.  We also have 52, which would

11  be Mr. Perez'.  We are dealing with 52 docket entries.  You say

12  eight should remain sealed.

13      MS. SANCHEZ:  At a minimum.  I haven't been able to go

14  through all those docket sheets with Mr. Perez to see if he

15  feels there is a need to keep more than those sealed.

16      THE COURT:  I think that is what we need to do.  If

17  what you are saying is a minimum of eight need to be sealed out

18  of 52, that leaves 44 that can be unsealed.

19      MS. SANCHEZ:  Right.  The reason why I say there are

20  eight, because at this point everybody knows Mr. Bergonzoli has

21  been arrested, there was an arrest warrant, an indictment, a

22  lot of the initial entries are the appearance paperwork, the

23  bond paperwork, the appearance document, the Rule 20 paperwork

24  when it was transferred down here, the waiver of removal, the

25  reassignment of the case when Judge Davis retired, the

8

1  sentencing date ordered, the resetting of the sentencing, the

2  order of continuance of sentence, the judgment and commitment

3  order which at this point we don't have a problem with

4  disclosing or unsealing.

5          THE COURT:  You don't need to go through them one by

6  one right now.  That is what we will have to get, and part of

7  this is, I have to make an independent determination.  I want

8  the benefit of both of your input and I also want to make a

9  record for appellate purposes and I want to demonstrate we have

10 been very deliberate in doing this so it will withstand

11 appellate scrutiny.

12

13

14

15

16

17

18

19

20

21

22         MS. SANCHEZ:  We can do that, Your Honor, but if we do

23 go into specifics what Mr. Bergonzoli was doing, this whole

24 hearing would be sealed.

25         THE COURT:  It would be, then we can pack it up, ship

9

1    it up and have the Eleventh Circuit look at it and I assume

2    from the Valenti opinion, that is what they expect of us to do

3    so they could have an independent review of it as well.

4         If you can tell me what documents you want sealed, we

5    can go through them one by one and you can make your case.

6         MR. PEREZ:  Judge, can I take a look at the file and

7    the docket entries?

8         (Interruption.)

9         THE COURT:  What do you think, Mr. Perez?

10        MR. PEREZ:  We have selected eight items I believe

11   should be sealed.  The rest can be unsealed.

12        THE COURT:  Can you identify those eight docket

13   numbers?

14        MS. SANCHEZ:  I have the dates the documents were

15   filed.  I did not have docket entries because I could not find

16   the docket entry on each one of them.

17        THE COURT:  It is on the first page.

18        There was a plea that took place on February 10, 2000.

19   That transcript should remain sealed.  There is an order in

20   there unsealing some portion specifically for the government

21   and defendant's counsel use.  The remaining minutes of the plea

22   should remain sealed.

23        THE COURT:  Let's start with the eight.  Give me your

24   first one.

25        MS. SANCHEZ:  The plea transcript of February 10,

1    2000.  I am not sure the transcript is in there.

2         The plea was sealed but before sentencing, both the

3    government and the defense wanted a transcript.  In order for

4    the court reporter to provide us a transcript, portions of it

5    had to be unsealed which is what happened.  There is an order

6    in there saying a portion of the transcript was unsealed for

7    the benefit of the government and defense counsel, but I don't

8    want the plea transcript itself to be unsealed.

9         THE COURT:  I have the transcript of the plea

10   colloquy.  It is an attachment.

11        MS. SANCHEZ:  For the support of a sentence reduction

12   filed on November 26, 2001.

13        THE COURT:  That is Docket Entry number 21.

14        You have no objection to the unsealing of the motion,

15   do you, or do you?

16        MS. SANCHEZ:  Yes, I do.  Which motion are you talking

17   about?

18        THE COURT:  In support of sentence reduction.

19        MS. SANCHEZ:  That should be sealed and there is a

20   corresponding motion with respect to the PSI and a motion for

21   departure which goes along with that also filed on November 26,

22   2001.

23        THE COURT:  What is that called?

24        MS. SANCHEZ:  Objections to the PSI and request for

25   downward departure.

1          I believe that should be Docket Entry 20.

2          THE COURT:  20 is the motion to seal.  19 is the

3     objection to presentence investigation.

4          MS. SANCHEZ:  That is the one that needs to be sealed

5     also.

6          THE COURT:  I am assuming that, or tell me there are

7     attachments to Docket Entry 19 which include the reference to

8     the Colombian constitution, a letter from someone with a last

9     name Esperanzo, in Spanish, and some other Exhibit 3 that is

10    also in Spanish.  And you are also asking that they be sealed?

11         MS. SANCHEZ:  Yes, Your Honor, all the exhibits to

12    Docket Entry 19 and to the memo in support.

13         THE COURT:  That is two.

14         What is your next one?

15         MS. SANCHEZ:  The government's motion pursuant to

16    F.R. 3.1, dated January 28, 2002.

17         THE COURT:  Rather than me do your job for you, I will

18    let you do it for yourselves.  You can take the file and you

19    can go through it and identify by docket entry number what

20    docket entry numbers you want sealed.  When you finish that,

21    then we can discuss why you want them sealed and we can justify

22    them on an entry by entry basis why you want them sealed.

23         (Interruption.)

24         MS. SANCHEZ:  We are ready, Your Honor.

25         THE COURT:  Go ahead.  Which docket entries?

1          MS. SANCHEZ:  Docket Entry number 9, the minutes of

2    the change of plea.  I don't believe that is in your file.

3          THE COURT:  There is a Docket Entry 9 in the file, the

4    minutes of the change of plea.  What is so special about that?

5          MR. PEREZ:  We don't need to seal that.

6          MS. SANCHEZ:  I want to make sure the minutes of the

7    change of plea do not include the transcript.

8          THE COURT:  It is a one page piece of paper.

9          MS. SANCHEZ:  Okay.

10         Docket Entry 19.

11         THE COURT:  19 and attachments.  What is it about 19

12   that requires in your mind, justifies sealing?

13         MR. SANCHEZ:  Mr. Perez is looking through it.

14         THE COURT:  Do you want it sealed?

15         MS. SANCHEZ:  I do.  I think it includes not only

16   personal information of the defendant, Mr. Bergonzoli, within

17   the objections, but it also asks for some reasons why downward

18   departure is applicable in his case and attached documents that

19   should not be in the public record.

20         THE COURT:  Can you refer me to where in the document

21   you are referring?

22         MR. PEREZ:  The concern I have has to do with

23   identifying family members.

24         THE COURT:  Can you show me where?

25         MR. PEREZ:

13

1

2          THE COURT:   Where do you say that?

3

4

5

6

7          THE COURT:   You want the last paragraph on page 6 out?

8          MR. PEREZ:   And the attachment.

9          THE COURT:   The attachment is?

10         MR. PEREZ:   Exhibit number 2.

11         THE COURT:   It is a series of letters.   Which letter

12    are you referring to?

13

14

15

16         THE COURT:   How about the rest of the docket entry?

17    So far you have gotten the paragraph on page 6 and Exhibit 2 of

18    that entry.

19         MR. PEREZ:   I think tha  will be all.

20         THE COURT:   That is Docket Entry number 19.   The rest

21    of it can remain unsealed.

22         Next?

23         MS. SANCHEZ:   Your Honor, Docket Entry number 21, the

24    memorandum in support of sentence reduction.

25         THE COURT:   What of that do you request needs to be

14

1    sealed?

2            MR. PEREZ:

3

4

5

6

7            THE COURT:   On page 1?

8            MR. PEREZ.   Page 2.

9            THE COURT:   Nothing on page 1?

10

11

12

13

14

15

16

17

18

19

20

21

22            THE COURT:   The last paragraph on page 1, the first

23    paragraph on page 2.

24

25

15

1

2

3

4

5

6

7

8

9

10          MS. SANCHEZ:   The government objects to doing this in

11   a piecemeal way where little portions of documents is sealed

12   and everything else is unsealed.  First of all, if we are going

13   to go paragraph by paragraph, line by line, on these documents,

14   for instance I myself don't feel comfortable doing that unless

15   I go back and do a careful review of each one of these

16   documents, specially, for instance, the memorandum in support

17   of sentence reduction.

18

19

20

21

22

23

24

25

oOo

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____                    _____

Date                    Official Court Reporter

# EXHIBIT 3

1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
3                     CASE NO. 99-196-CR-DAVIS
4

THE UNITED STATES OF AMERICA,

5
                              Plaintiff,
6
                                              MIAMI, FLORIDA
        vs.                                   FEBRUARY 10, 2000
7
8    NICHOLAS BERGONZOLI
                              Defendant.
9
10
11
                    TRANSCRIPT OF PLEA COLLOQUY
12        BEFORE THE HONORABLE EDWARD B. DAVIS,
                    UNITED STATES DISTRICT JUDGE
13
     APPEARANCES:
14
     FOR THE GOVERNMENT:
15
                              PATRICIA DIAZ, A.U.S.A.
16                            8245 N.W. 53rd Street, Ste. 101
                              Miami, FL  33166 - 305/597-2084
17
18   FOR THE DEFENDANT:
19                            JOAQUIN G. PEREZ, ESQ.
                              6780 Coral Way, Ste. 200
20                            Miami, FL  33155        305/261-4000
21   REPORTED BY:
                              LARRY HERR, RPR-CM-FCRR-AE
22                            Official Federal Court Reporter
                              Federal Justice Building, Ste. 1155
23                            99 Northeast 4th Street
                              Miami, FL  33132 - 305/523-5158
24
25

Page 2

## TABLE OF CONTENTS

1   Witnesses:              Direct  Cross  Redirect  Recross
2   David Tinsley ................. 4
3   Reporter's Certificate ................................. 17

---

Page 3

1       DEPUTY CLERK: Case number 99-196-CR-Judge Davis,
2   United States of America vs. Nicholas Bergonzoli.
3       Counsel, please note your appearance.
4       MS. DIAZ: Good morning, Your Honor, Patricia
5   Diaz for the United States. Seated with me is group
6   supervisor David Tinsley and a Special Agent Larry Castillo
7   for the DEA.
8       MR. PEREZ: Good morning, Your Honor, Joaquin
9   Perez on behalf of Nicholas Bergonzoli who is present in
10  court and is aided by an interpreter.
11      THE COURT: I believe the Rule 20 requirements
12  have been met, have they not?
13      MS. DIAZ: Yes, they have, Your Honor.
14      THE COURT: If I'm not mistaken, I understand
15  there is a plea to the indictment as such; is that correct?
16      MR. PEREZ: That is correct. And also the
17  defendant has already initially appeared before Magistrate
18  Bandstra, so we also complied with that requirement.
19      I think the government wanted to make a little
20  presentation about the case before we take the plea.
21      MS. DIAZ: Your Honor, may it please the Court,
22  we are here today to take a plea to the indictment for
23  Mr. Bergonzoli. Mr. Bergonzoli does not have a plea
24  agreement. There were some promises made and we will
25  enunciate those promises at the appropriate time during the

---

Page 4

1   plea colloquy.
2       Group supervisor David Tinsley is here because he
3   wished to address the court in an appropriate time to
4   discuss Mr. Bergonzoli's cooperation. I don't know when
5   the court would like to hear it, either before or during
6   the plea.
7       THE COURT: I think we might as well do that
8   right now.
9       MS. DIAZ: I introduce David Tinsley, group
10  supervisor.
11      DAVID TINSLEY, GOVERNMENT'S WITNESS, SWORN.
12          DIRECT EXAMINATION
13      DEPUTY CLERK: State your full name, please, and
14  spell it.
15      THE WITNESS: David Tinsley, T-i-n-s-l-e-y. I'm
16  a supervisory special agent with the DEA stationed in
17  Miami, Florida, Your Honor.
18      The reason I wanted to address you this morning
19  regarding Mr. Bergonzoli is that from a management
20  prospective within the Drug Enforcement Administration we
21  have found the good fortune of Mr. Bergonzoli presently
22  cooperating with the government.
23      We initially looked at this rather jaundicely
24  because a lot of times as you know people say they are
25  going to cooperate and produce results and oftentimes they

---

Page 5

1   do not.
2       I am here to tell you under oath that
3   Mr. Bergonzoli has presented some extraordinary results for
4   us in the time that he has been out cooperating. And what
5   I'm here to do is also to seek your assistance in securing
6   some extended time periods for him to cooperate.
7       To date he has provided some very sensitive
8   documents about corruption matters and leaks within foreign
9   governments and related very delicate political issues that
10  are of great benefit to the United States regarding
11  international narco trafficking and money laundering.
12      He has also been able to illuminate for us
13  important avenues regarding where we are being compromised
14  as far as drugs coming into our country.
15      For example, Mr. Bergonzoli has very clearly
16  detailed some of the methods where narcotics are shipped
17  from Colombia, South America, all the way to Europe and
18  then return shipped back into the United States simply
19  because that bulk cargo coming from Europe into the United
20  States does not suffer the scrutiny that cargo from South
21  America, as you are well aware.
22      He's been able to pinpoint a lot of that
23  activity. He has worked very slowly and methodically. And
24  at times not quite as fast as we would like, but the issue
25  here has been safety and he has been able to do it safely

Page 6

1   for himself and his family, as well as for the agents who
2   are working undercover and presently here in Miami.
3        Secondly, of recent Mr. Bergonzoli provided
4   information about individuals who were able to help the DEA
5   here in Miami, Panama and Santiago, Chile and Colombia
6   which resulted in a 9,000 kilo shipment of cocaine on the
7   high seas. This cocaine was destined for Europe and the
8   United States. This is the second biggest maritime
9   shipment seizure in the world history. Mr. Bergonzoli was
10  instrumental.
11       Just to explain the uniqueness of this. This
12  cocaine was secreted within a 660 foot vessel. Was loaded
13  at sea inside a four and eight story mast of the vessel
14  itself. It was dropped down through cargo containers into
15  the mast. The latest techniques of ion scanning and
16  cocaine detection failed brutally in trying to detect this
17  cocaine. The only way we could get it from human
18  intelligence which Mr. Bergonzoli was instrumental in
19  providing to us.
20       These things are helping us fine tune our skills
21  as far as intercepting major trafficking loads. And for
22  the next several months we have plans to be debriefing
23  Mr. Bergonzoli and get proactive as far as how we could do
24  a better job here in the states and even specifically right
25  down the street at the Port of Miami.

Page 7

1        Additionally, Mr. Bergonzoli was responsible, or
2   his people, as well, were responsible for information which
3   led to substantial cocaine shipment in London, England.
4   And a couple of others that we are working presently.
5        He has also provided a lot of information
6   regarding, as I said earlier, leaks within our embassy, of
7   the United States embassy in Colombia where information is
8   being leaked out to gorilla factions, communist factions as
9   well as narcotics traffickers. Very high level stuff, very
10  sensitive stuff that has been addressed at the very highest
11  levels of our agency.
12       To say he is carrying out his part, agreement
13  with the DEA and with the United States, is a definite
14  truth, and we ask that he continue to be allowed to work
15  with us on the outside.
16       THE COURT: Thank you.
17       THE COURT: I would seal this portion of the
18  information. It always troubles me sometimes when we seal
19  records because it identifies that they are being sealed
20  for some purpose. I think maybe the best way to do is we
21  will seal what has been presented here and we will go back
22  to the beginning of a plea and discuss that and that will
23  be — I don't know what it will look like on the record but
24  it ought to look better.
25       MS. DIAZ: Then I should just for completion's

Page 8

1   sake put on the record that one of the promises under seal,
2   one of the promises that I won't talk about during plea
3   colloquy but which have been made to Mr. Bergonzoli, is
4   that his cooperation at the appropriate time will be made
5   known to this court. And if appropriate, the U.S.
6   Attorney's office will be filing a 5K1.1 and or a Rule 35
7   motion.
8        THE COURT: I think that will be good. When the
9   time comes to consider that it will be available in the
10  record some time in the future when that comes.
11       MS. DIAZ: Perhaps we should also talk about the
12  sentencing date. I think Mr. Perez and myself are both
13  concerned that his sentencing date be put off as far as
14  logistically possible without causing great inconvenience
15  to the court. Although I understand that we could also do
16  an initial sentencing and then do an extended surrender.
17       But given the sensitivity of what he is doing we
18  would prefer to have his cooperation finished before we
19  initially come in for sentencing.
20       THE COURT: According to my note from Michael is
21  that if we set a sentencing date based on your notification
22  to me that the parties are ready to proceed, we will defer
23  the PSI until such time and we will just continue to keep
24  this entire case sealed so it will not be out. There will
25  be no chance of a problem arising by looking at records

Page 9

1   because there will be no way to see them.
2        MS. DIAZ: Thank you, Your Honor.
3        MR. PEREZ: We appreciate that.
4        THE COURT: Before I accept your plea there are
5   some questions I will ask to assure it's valid. If you
6   wish to consult with your lawyer before you answer, I will
7   allow you to do that.
8        Swear the defendant, Michael.
9        [The defendant was duly sworn].
10  BY THE COURT:
11  Q.  Do you understand that now that you have been sworn if
12  you do not tell me the truth your answers to my questions
13  will later be used against you in a separate prosecution for
14  perjury or making a false statement?
15  A.  I do.
16  Q.  For the record, state your full name, age, and the
17  extent of your education?
18  A.  My name is Nicholas Bergonzoli, I am 36, and I am an
19  architect.
20  Q.  Have you been able to communicate satisfactorily with
21  your lawyer either in English or Spanish or through an
22  interpreter?
23  A.  I do.
24  Q.  Have you recently been treated for any medical illness,
25  drug addiction of any kind, taken any drugs or medicine,

Page 10

1  anything that would affect your understanding of what's
2  happening here today?
3  A. No, sir.
4  Q. You do understand what we are doing here today, do you
5  not?
6  A. Yes, sir.
7     THE COURT: Counsel, you don't have any doubt
8  about your client's competence to enter into this agreement
9  with the government?
10    MR. PEREZ: No, I do not, sir.
11 BY THE COURT:
12 Q. Have you had enough time to thoroughly discuss your
13 plea and the charges in your case with your lawyer?
14 A. Yes, sir.
15 Q. Are you satisfied with his representation and advice?
16 A. Yes, sir.
17 Q. Anyone threaten you or anyone else, force you in any
18 way to enter into this plea agreement?
19 A. No, sir.
20 Q. Anyone make any promise to you other than the promises
21 that have been outlined here today in open court in this
22 sealed proceeding in addition to those promises that induced
23 you to plead guilty?
24 A. No, sir.
25 Q. Did your lawyer explain to you that under the

Page 11

1  constitution and laws of the United States if you had
2  persisted in your not guilty plea you would be entitled to a
3  trial by a jury where you would be presumed innocent, the
4  government would have to prove your guilt beyond a
5  reasonable doubt by presenting evidence and witnesses in
6  court in your presence, your lawyer could cross examine the
7  government's witnesses, object to the government's evidence
8  and offer evidence on your behalf; you would not have to
9  prove your own innocence? Did he explain that to you?
10 A. Yes, sir.
11 Q. Did he also tell you at a trial while you would have
12 the right to testify if you wanted to, if you chose not to
13 testify I would instruct the jury not to consider that in
14 any way during their deliberations? But if you do plead
15 guilty here today to the indictment you will give up that
16 right not to incriminate yourself since I will ask you
17 questions about what you did in order to satisfy myself that
18 you are guilty as charged and you will have to admit your
19 guilt, you understand that?
20 A. Yes, sir.
21 Q. And if you do plead guilty, and I accept it, you will
22 give up your right to a trial, the other rights I have just
23 discussed, there will be no trial, I will enter a judgment
24 of guilty and sentence you on the basis of this guilty plea
25 after I consider a presentence report?

Page 12

1  A. Yes, sir.
2     THE COURT: Ms. Diaz, what is the minimum,
3  maximum sentence, fine?
4     MS. DIAZ: Unless the defendant qualifies for the
5  safety valve the minimum sentence would be a ten year
6  minimum and a maximum of life imprisonment, a $4 million
7  fine and five years supervised release. Those would be the
8  maximums. $100 special assessment would also be
9  appropriate.
10    Your Honor, I don't know if it is a $100 special
11 assessment or $50 special assessment. $50, it is a 1991
12 case.
13 BY THE COURT:
14 Q. You realize you would be subject to that ten year
15 minimum mandatory plus a maximum of life, a fine of as much
16 as maybe $4 million, an assessment of $50 and a period of
17 supervised release after your term of imprisonment is up, do
18 you understand all of that, sir?
19 A. Yes, sir.
20 Q. Do you understand in federal law today parole has been
21 abolished so any sentence I ultimately sentence you to you
22 will not be released early on parole?
23 A. Yes, sir.
24 Q. Having discussed your rights with you, do you still
25 want to plead guilty in this case?

Page 13

1  A. Yes, sir.
2     THE COURT: Ms. Diaz, what in summary would the
3  government's evidence show if the case had to go to trial?
4     MS. DIAZ: Your Honor, if this case were to go to
5  trial the government's evidence at trial would show that
6  between August 1991 and December 7, 1991 in the District of
7  Connecticut, and elsewhere, this defendant, Nicholas
8  Bergonzoli, conspired with others, both known and unknown
9  to import cocaine into the United States.
10    As a result of the conspiracy a shipment of
11 approximately 1200 kilograms of cocaine was intercepted as
12 it came in by Customs and DEA agents. The government's
13 proof at trial would be proven by physical evidence along
14 with testimony of coconspirators and of the investigating
15 agents.
16    That would be the summary at trial.
17 BY THE COURT:
18 Q. Then how do you plead to the charge in the indictment
19 just described by the government that you conspired to
20 import cocaine into the United States, guilty or not guilty?
21 A. Guilty.
22    THE COURT: The Court finds that this defendant
23 is competent and capable of entering into an informed plea;
24 that you understand the nature of the charge against you;
25 appreciate the consequences of pleading guilty and fully

Page 14

1   understanding your rights and possible penalties.
2        The Court also finds that the evidence which the
3   government is prepared to present contains all the elements
4   of the crime and that your decision to plead guilty here
5   today is freely, voluntarily, knowingly and intelligently
6   made. It is not the result of force or threats or
7   promises, apart from those contained in the verbal plea
8   colloquy we heard in open court. That you have had the
9   advice and counsel of a competent lawyer with whom you say
10  you are satisfied. Your guilty plea to the indictment is
11  accepted. I find you guilty of the offense charged in the
12  indictment.
13       As I indicated earlier, we will defer preparation
14  of the PSI until such time as I'm advised by your counsel
15  and the government that preparation of the PSI should be
16  commenced. When that does occur it will be in your best
17  interests to cooperate so that it will make an affect on
18  how they calculate the guidelines.
19       If you find you believe the report is in error
20  you could seek to have them change it through your lawyer.
21  If you fail in that and you file a motion that's timely,
22  the Court will consider that on the sentencing date that we
23  will set in the future.
24       Let's talk about the conditions of bond at this
25  time. What is the government's pleasure on that?

Page 15

1        MS. DIAZ: Your Honor, this defendant is
2   presently on $150,000 personal surety bond. With the only
3   reporting requirements to be made to the investigating
4   agency that's supervising his cooperation. We would
5   request that those same conditions continue.
6        THE COURT: We will go ahead and continue with
7   those same conditions.
8        MR. PEREZ: Just a very minor detail. As part of
9   the agreement I advised Mr. Bergonzoli that the government
10  will not oppose, assuming he qualifies for it, the safety
11  valve provisions. On the 1991 case the government will not
12  seek any type of enhancement because of role in the
13  offense. It is minor but I do want to mention that.
14       THE COURT: I think we need to get whatever there
15  is out there on this record.
16       MS. DIAZ: That's correct, Your Honor. And those
17  are the two promises that we have made to this defendant.
18       THE COURT: Does that cover everything we needed
19  to this morning?
20       MR. PEREZ: Obviously they will consider the
21  cooperation and within their sole discretion.
22       THE COURT: You know what that rule is.
23       MR. PEREZ: I want the defendant to understand
24  all of that is incorporated into the discussions that we
25  have.

Page 16

1        THE COURT: I think she indicated that earlier
2   that she would based on what has occurred file a 5K motion.
3   Did I not hear that?
4        MS. DIAZ: Your Honor, I have all expectations.
5   As the Court knows, this has to go through my office. But
6   I don't anticipate any problems whatsoever on that.
7        THE COURT: We will go ahead and -- counsel, come
8   on up a minute and let's talk about what the record looks
9   like precisely with this so we will know that we aren't
10  sealing something. You could bring the agent up too.
11       [Proceedings at side-bar follow]:
12       MS. DIAZ: His initial appearance was under seal.
13  He also waived removal. On December 9, 1998 he appeared,
14  he waived removal, and that was all done under seal.
15       THE COURT: Let me tell you what isn't under seal
16  is my calendar. It says surrender in open court.
17       I think Michael has covered it much better than I
18  would have. Because it has bothered me because I know in
19  talking to the marshals these records are searched for
20  things that say sealed proceeding that are sort of separate
21  and part of a plea or something under seal. I want to be
22  sure it sounds like this is about as good as we could do.
23       DEPUTY CLERK: I checked yesterday. His name
24  does not appear anywhere on the court's computer records.
25       MS. DIAZ: The waiver of the Rule 20 is sealed.

Page 17

1        THE COURT: Let's assume we don't have a record.
2        [Proceedings in open court follow]:
3        THE COURT: That's all. Court's in recess.
4        [Court adjourned at 9:55 a.m.]
5           C E R T I F I C A T E
6        I hereby certify that the foregoing is an accurate
7   transcription of proceedings in the above-entitled matter.
8
9        _____
DATE         LARRY HERR, RPR-CM-FCRR-AE
10           Official Federal Court Reporter
             Federal Justice Building, Ste. 1155
11           99 Northeast 4th Street
             Miami, FL  33132 - 305/523-5158
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 4

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

UNITED STATES OF AMERICA,　　　. Case No. 01-606-CR-Jordan
　　　　　　　　　　　　　　　　.
　　　　　　　　Plaintiff,　　　　. Miami, Florida
　　　　　　　　　　　　　　　　. March 25, 2004
　　　　　　　　v.　　　　　　　. 10:30 a.m.
　　　　　　　　　　　　　　　　.
BARUCH JAIRO VEGA,　　　　　　.
　　　　　　　　　　　　　　　　.
　　　　　　　　Defendant.　　　　.
. . . . . . . . . . . . . . .

- - - - -

Transcript of Sentencing Hearing had
before the Honorable Adalberto Jordan,
United States District Judge.
- - - - -

APPEARANCES:

For the Government:　Greg Tortella, Esq.
　　　　　　　　　　Room 5161
　　　　　　　　　　U.S. Department of Taxation
　　　　　　　　　　Tax Division
　　　　　　　　　　600 E. Street NW, Fifth Floor
　　　　　　　　　　Washington, DC  20004

For the Defendant:　Nelson Armando Rodriguez-Varela
　　　　　　　　　　Two Alhambra Plaza
　　　　　　　　　　Coral Gables, Florida  33134

Court Reporter:　　Francine C. Salopek, RMR, CRR
　　　　　　　　　　Official Court Reporter
　　　　　　　　　　United States District Court
　　　　　　　　　　301 North Miami Avenue, Room 804
　　　　　　　　　　Miami, Florida  33128-7709
　　　　　　　　　　(305)523-5568

- - - - -

Proceedings recorded by mechanical stenography, transcript
produced by computer.

1           THURSDAY, MARCH 25, 2004, 10:30 A.M.

2        THE COURT:  Okay.  Good morning.

3        Be seated, please.

4        This is Case Number 03-20528, United States vs.

5  Baruch Vega.  If you could please announce your appearances.

6        MR. TORTELLA:  Good morning, your Honor.  Greg

7  Tortella on behalf of the United States.

8        THE COURT:  Good morning.

9        MR. RODRIGUEZ-VARELA:  Nelson Rodriguez on behalf

10  of Baruch Vega, your Honor.  Mr. Vega is present before the

11  Court.

12        THE COURT:  Good morning.

13        Good morning, Mr. Vega.

14        THE DEFENDANT:  Good morning.  Thank you, your

15  Honor.

16        THE COURT:  If we could have our probation officer

17  introduce himself, as well.

18        THE DEFENDANT:  Yes.  Ken Gonzalez with

19  U.S. Probation.

20        THE COURT:  Good morning.

21        Okay.  Mr. Vega, we're here for your sentencing

22  hearing.  I need to ask you a couple of questions before we

23  get started, even though I think I may have asked them to you

24  the last time, as well.

25        The first question is whether you've received a

1   copy of the presentence investigation report prepared by the

2   probation officer?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  And have you had a chance to go over

5   that report and discuss it with your attorney?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  Okay.

8          Okay.  Mr. Tortella, I've received your sealed

9   filing.

10         MR. TORTELLA:  Yes, your Honor.

11         THE COURT:  Has it been filed with the clerk's

12   office under seal?

13         MR. TORTELLA:  Yes, your Honor.

14         THE COURT:  Okay.  I just wanted to make sure it

15   was there.

16         Okay.  And, Mr. Rodriguez-Varela, have you received

17   a copy of that filing by Mr. Tortella?

18         MR. RODRIGUEZ-VARELA:  Yes, sir.  I got that

19   yesterday, FedEx.

20         THE COURT:  Okay.  Well, I'm ready to listen to

21   whatever all of you have to tell me, but it seems to me that,

22   at this point, the government is not prepared to file a

23   motion for a reduction on Mr. Vega's behalf.

24         What I am prepared to do is to provide a lengthier

25   than normal surrender date for Mr. Vega, so that any ongoing

1    matters can be resolved.  And if the government is going to

2    file a motion on his behalf, it can do that without the

3    necessity of Mr. Vega surrendering before that matter is

4    finally determined.  So, I am prepared to do that.  And I

5    thought I would let both sides know before we actually got

6    started.

7            But, Mr. Rodriguez-Varela, at this point, I don't

8    see a basis for not proceeding with sentencing.

9            MR. RODRIGUEZ-VARELA:  Thank you, your Honor.

10           If I may?

11           THE COURT:  Yes.

12           MR. RODRIGUEZ-VARELA:  Judge, we've been dealing

13   with this case since the year 2000, when Mr. Vega was

14   initially arrested.  Mr. Vega was arrested on charges of

15   laundering money and obstruction of justice.  I don't know

16   how much the Court knows about that particular case.

17           THE COURT:  Well, I know what I've learned in the

18   papers I've received, and I think a little bit of that was

19   discussed in the proffer when Mr. Vega pled guilty.  So, I

20   know a little bit of it.

21           MR. RODRIGUEZ-VARELA:  Yeah.

22           THE COURT:  But not as much as all of you probably

23   do.

24           MR. RODRIGUEZ-VARELA:  Well, that was part of an

25   operation geared toward the dismantling of a number of drug

1    organizations in Colombia that, for many years, controlled

2    the substantial percentage of the drug trade -- of the drugs

3    that were arriving in the United States.

4         Mr. Vega -- and at the time Mr. Vega was approached

5    to conduct this investigation and to assist the government in

6    conducting this investigation, the government was very, very

7    interested in his ability to come forward and assist them in

8    bringing forward and assisting in the surrender of many of

9    the big traffickers that were involved over many, many years

10   in Colombia.

11        As a result of his cooperation, Judge, it is my

12   understanding that over 114 major drug traffickers had

13   surrendered to the authorities of the United States; not just

14   themselves, but surrendering their assets, surrendering

15   intelligence, surrendering information, making the United

16   States -- or conferring upon the United States a huge

17   benefit, in terms of the information that they've gained and

18   in terms of a lot of the things that they have been doing up

19   till now.

20        A lot of those men, Judge, who for many years were

21   responsible for the importation of thousands and thousands of

22   kilos of cocaine, have received substantial, substantial

23   sentence reductions to the point that some are serving 30 to

24   40 months after looking at, perhaps, 20 years, based upon the

25   things that they have done, the things they have surrendered.

1    And Mr. Vega was the one that was instrumental in that.

2           Today what you're looking at, Judge, is basically

3    the ruins of a man who, at one point, was the biggest and the

4    most important and most relevant individual in the

5    facilitating of those surrenders, to the point that today it

6    is almost impossible for Mr. Vega to have an opportunity to

7    get the government to allow him to come forward with

8    additional information and additional persons.

9           And that's why I'm telling you all this, because

10   even though the government today is not in a position to file

11   a Rule 5K1.1, it is not entirely Mr. Vega's fault, because

12   from the year 2000 that he was arrested, he was debriefed

13   time and time again, provided loads of information over

14   periods of time -- and I don't think that that is a surprise

15   to anyone, because it is consistent with his trajectory over

16   the years -- information that we don't have a way of finding

17   out how the government benefitted, although we know that the

18   information was relevant to many of the pending cases here in

19   the Southern District.  We have a total inability to

20   determine what, in fact -- or how the government used that

21   information.  But, certainly, some of the information was

22   relevant to a lot of the cases that were pending.

23          And -- and I say that because over a period of time

24   after his arrest, there have been a number of 5K motions

25   filed on behalf of defendants that surrendered through Vega,

1   and they continue to receive benefits in terms of Rule 35s

2   that judges across the Southern District are granting based

3   on the work that was done with Vega.

4           Now, Vega today amounts to essentially nothing,

5   except for those who care for him, his family and his

6   friends.  And to some extent, I think that that is a heavy,

7   heavy price to pay for something like this.

8           The government, at one point, when they filed the

9   charges in this case, completely abandoned the money

10  laundering case and the obstruction of justice case.  The

11  agents that were involved in this operation have either been

12  reinstated or are in the process of being reinstated.  The

13  benefits conferred on the United States have been enormous

14  over the years, and it seems that no one has paid a price but

15  Mr. Vega.

16          The case that you have before you, it's basically

17  the essence of what all this boiled over to, it's nothing

18  more than an agreement to close a case, to close an

19  investigation in a manner which allows the parties, to some

20  extent, save some face.  And what I am suggesting to you is

21  that, although Mr. Vega did fail to file the taxes, as he

22  pled to, the reason that happened is surrounded by

23  circumstances that are far more relevant than these charges

24  would show, or would matter.

25          The charges are somewhat irrelevant in the scheme

1  of things, where you have the greatest cooperation that ever

2  was conferred upon the United States, granted -- or given by

3  this man.  The trips that they took, the efforts that the

4  government made to shut down the largest of the largest in

5  Colombia.  I mean that, your Honor, to me not only takes this

6  case outside the heartland of the cases that we see, but

7  would potentially make this person the greatest cooperator or

8  the greatest facilitator or quasi-agent of the government

9  that ever existed.

10       THE COURT:  Well, what are you asking me to do?

11       MR. RODRIGUEZ-VARELA:  What I am asking you to do

12  is to consider that this case, your Honor, is far more than

13  what it seems to be.  We need to be able to find a way -- and

14  I looked at, regretfully, the manner in which the downward

15  departures are structured don't provide very much along the

16  lines of this kind of exceptional cooperation, except after a

17  person pleads.

18       And what I would imagine that should happen in this

19  case is that all that cooperation that was rendered, that has

20  basically conferred zero benefits and many headaches on my

21  client, be considered to some extent in the imposition of

22  sentence.  We are one point away from invoking this Court's

23  discretion to impose some kind of home confinement over

24  incarceration.  Right now, this man is at a Level 11 in

25  Zone C of the Sentencing Guidelines, a sentence between eight

1  months and 14 months, I believe is the spread, of which half

2  of it must be satisfied by incarceration, of which he's

3  already done I believe 56 days, and the other half can be, if

4  the Court wishes to do so, be served in community confinement

5  under interment and confinement.  Those two months to put

6  this person in jail, the difference is one point.

7         And I believe that if there's ever a case that is

8  deserving of some sort of minor deviation from the Sentencing

9  Guidelines, to accommodate an interest that is beyond most of

10  what is ever asked of this Court in drug cases, should be

11  granted, should be given.

12        Now, the reason I don't file a downward departure

13  motion is because, essentially, the case law is not on our

14  side.  There's always a time to make some decisions in cases

15  that are new, in cases that are so different from all the

16  others.  This case is that case.  This man is that man.

17        The man you're sentencing today is someone who is

18  responsible for a lot of benefit conferred upon the United

19  States, benefits that I don't have the ability to

20  investigate.  Because even at the time where one of the

21  persons, who we outlined in our sealed pleading to the Court,

22  was in the midst of cooperating, at that point when Mr. Vega

23  continues to try to get involved, he is told essentially by

24  the government, no, no, the lawyers said no, the government

25  said no, get out of the loop, stay out of this, because of

1   the concern of Mr. Vega's charges and because of his

2   trajectory and his history.

3           So, if essentially nothing has happened, it's

4   because Mr. Vega has not had the opportunity for something

5   like that to happen; it's because the government, who is the

6   only one who controls the gate as to who can come in and do

7   something and who cannot, essentially has closed the gate for

8   Mr. Vega.

9           And I am not referring to these gentlemen that are

10  here, who I've been able to work very closely and, actually,

11  I have absolutely nothing negative to say.  I could not even

12  file a motion based on the permissible grounds to enforce a

13  plea agreement of constitutional grounds, because there's

14  nothing to allege they've done what they can do (sic).

15          But Mr. Vega has not done everything that he can

16  do.  Because, frankly, he has been -- he has not been put in

17  a position where he can.  His codefendant, charged with more

18  money, charged with a bigger chunk of money, I believe,

19  received a sentence of credit for time served, because days

20  before, he agreed that he would allow -- or assist the

21  government in making sure that the defendant in this case

22  would actually plead in this case.

23          Mr. Vega had always been interested in pleading and

24  cooperating in this case.  It had been his trajectory

25  forever, forever.  That's all he's done.  He has been nothing

1   but the -- a friend of the government since the beginning of

2   the time that he began, as you can see in the presentence

3   report.

4           So, you know, I am asking the Court to take,

5   perhaps, extraordinary measures in this case, perhaps look at

6   this case a little closer along the lines of what I am

7   suggesting.  Because this is not a man who just simply didn't

8   file his taxes on a year; this is the result of a negotiation

9   that culminated in this charge, but it has a lot more to do

10  with it, including, perhaps, you know, how informants or how

11  cooperators would file federal income taxes, what are some of

12  the concerns when somebody does that.  I don't know who

13  counseled him or who was his accountant or who was the person

14  who would be in charge of doing these things for him, but,

15  frankly, perhaps he should have been a little bit better

16  guided along these lines.  But, initially, this is not what

17  the government wanted from him.  Initially, the charges were

18  not these charges.

19          THE COURT:  All right.  Thank you, Mr. Rodriguez.

20          MR. RODRIGUEZ-VARELA:  Yes, sir.

21          THE COURT:  Mr. Tortella.

22          MR. RODRIGUEZ-VARELA:  And I think that my client

23  would like to also make a short statement.

24          THE COURT:  Sure.  I'll give him the opportunity to

25  speak in a minute.

1          MR. RODRIGUEZ-VARELA:  Yes, sir.

2          MR. TORTELLA:  Your Honor, just briefly.  The

3    government is unaware, based upon Mr. Rodriguez's earlier

4    statement at the beginning, that Mr. Vega's assistance was

5    part of some operation.  My understanding of this matter,

6    your Honor, is that Mr. Vega and several DEA agents engaged

7    in a series of meetings with some Colombian narcotics

8    traffickers, and Mr. Rodriguez is correct, it did lead to the

9    arrest of approximately 114 individuals.  The government's

10   not disputing that.

11         While commendable as that may be, it's the result

12   of Mr. Vega's receipt of monies that gives rise to the crime

13   that he stands before you to be sentenced.  While his

14   cooperation might have been the greatest that's been

15   conferred upon the United States, according to Mr. Rodriguez,

16   the fact is, your Honor, the Court cannot ignore the fact

17   that Mr. Vega committed an offense against the United States,

18   and he should be punished accordingly.

19         The government has given Mr. Vega every opportunity

20   to render substantial assistance since he entered into his

21   plea agreement, and the government stands by its

22   representations that it would file a substantial assistance

23   reduction motion, if warranted.  That has not occurred to

24   date.

25         The government, again, if the Court is inclined to

Page 13

1    defer Mr. Vega's reporting, if he renders substantial

2    assistance prior to that reporting date, the government will

3    file a Rule 35 motion, if appropriate.

4            The government has in no way impeded Mr. Vega's

5    efforts to cooperate and render substantial assistance.  The

6    key to Mr. Vega's jail cell is in his pocket, your Honor.  If

7    there was a way to depart, your Honor, I believe that is the

8    most appropriate manner of reducing Mr. Vega's sentence.  But

9    short of that, I don't believe that he should be given credit

10   for matters that occurred prior to his -- his arrest.

11           And I've conferred with Special Agents Brian

12   La Fever of the Internal Revenue Service and, also, Paul Hank

13   Twahughes of the Federal Bureau of Investigation, who are

14   intimately familiar with this matter, your Honor, and since

15   Mr. Vega's arrest, they are unaware of any individuals who've

16   been arrested as a result of Mr. Vega's cooperation.

17           Thank you.

18           THE COURT:  There are still those matters that are

19   ongoing and uncertain as of this time.

20           MR. TORTELLA:  Are you referring to the matters

21   that were cited in the --

22           THE COURT:  In both pleadings, yes.

23           MR. TORTELLA:  I've -- as I said, your Honor -- and

24   both agents are prepared to testify -- that none of the

25   information that Mr. Vega could have provided or an

1    individual identified in the pleading of -- has resulted in

2    the arrest of the individual cited in Mr. Rodriguez's

3    pleading.

4              THE COURT:  Right.  My only question to you is that

5    those matters are still outstanding.  In other words, they

6    haven't been closed; there's been no final resolution of them

7    at this time.

8              MR. TORTELLA:  That's correct, your Honor.

9              THE COURT:  And that's why I think it makes sense

10   to defer a reporting date.

11             MR. TORTELLA:  I have -- I agree with you, your

12   Honor, except that the fact that those two cited cases, one

13   in the Southern District of Florida and the other in the

14   Eastern District of New York, I don't believe that Mr. Vega

15   would be able to cooperate in those cases.  I don't believe

16   that either of the two respective U.S. Attorney's offices

17   would seek the cooperation of Mr. Vega in those cases.  I --

18   again --

19             THE COURT:  Well, no, and I wasn't presupposing

20   that.  But it seems to me that if there was an arrest of

21   those individuals or an extradition of those individuals,

22   then at least the government would have that information in

23   hand and would then be able to decide whether or not -- and

24   to file a Rule 35 motion based solely on that.

25             MR. TORTELLA:  I'm sorry.  There's nothing that

1   would prohibit Mr. Vega, if for -- if he is called to

2   testify, certainly, again, the government would file a

3   substantial assistance motion, if warranted.

4          THE COURT:  All right.  It's not my place to guess

5   about what might happen in the future.

6          MR. TORTELLA:  I understand, your Honor.

7          THE COURT:  So ... okay.  All right.

8          Well, Mr. Rodriguez, let me say this.  A lot of

9   cases bring a lot of history before they end up here.  And

10  this certainly appears to be one of them.  But it seems to me

11  that there's really no basis for me to depart.  And I don't

12  think it's appropriate for me to depart at this point.

13         As Mr. Tortella said, the crimes to which Mr. Vega

14  pled guilty in this case occurred after he was engaged in

15  negotiating the surrender of 114 individuals who were

16  suspected of drug trafficking to the United States.  And

17  there were also charges brought against him, as you said, for

18  money laundering and obstruction, which were then dismissed

19  or dropped, and then this indictment or information ensued.

20         So, it seems to me that the government has, at

21  least in part, considered what Mr. Vega did before the tax

22  offenses that are the subject of this case.  And that's why

23  there were no money laundering or obstruction charges that

24  were brought against him.

25         With regard to the other matters, as you, I think,

Page 16

1    conceded, there's no basis for me to second-guess the

2    government's decision to not file at this time a Rule 5K1.1

3    motion or a Rule 35 motion on Mr. Vega's behalf.  But, if at

4    any time you have a basis, or believe you have a basis, for

5    asking me to do that, you can file the appropriate motion

6    and, if warranted, I'll schedule and hold an evidentiary

7    hearing on it.  I don't think you've stated that case yet.

8    And, right now, it's simply a disagreement over whether or

9    not Mr. Vega's assistance after the commission of these

10   offenses has been substantial enough to merit a downward

11   departure motion.

12          So, I am not going to exercise my discretion and

13   depart at this time.  I don't think that there is a basis for

14   departing.  But, as I said, if you think you have a basis for

15   forcing the government to file one of these motions, should

16   something happen in the future, or should you learn of

17   something, you can file a motion, and I will hold the

18   appropriate hearing and take evidence, if it is necessary.

19          So, Mr. Vega, if there's anything you'd like to say

20   before I impose sentence, you're certainly able to do so.

21   And, as I said, I am not going to incarcerate you at this

22   time, and I'm going to give you a lengthy surrender date so

23   that some of these matters can hopefully be worked out.

24          THE DEFENDANT:  Yes, your Honor, I would like to

25   address the Court.  May I?

1          THE COURT:  Sure.  The podium is probably a little

2     easier, Mr. Vega.

3          THE DEFENDANT:  Thank you, your Honor.

4          First, I finally have the opportunity to say

5     something that goes on record.  Since four years ago,

6     March 22nd, when I was arrested, I never have the opportunity

7     to say absolutely anything, because my attorney always were

8     controlling me or try to stop me in saying anything, except

9     to the press.  But I wanted to say something to the

10    U.S. government, to the proper authorities, and whoever could

11    pay attention to what I have to say.

12         I was arrested from a false report given by a

13    U.S. Customs agent, Mr. Ed Kacerosky.  When Mr. Ed Kacerosky

14    did the false report, send it to Ms. Teresa Van Vliet, the

15    prosecutor in the millennium case at that time, I was arrest

16    (sic).  I give nine -- a little over 16 months of extensions

17    to the government.  I waive indictment.  I left the

18    government to properly investigate the entire case to be able

19    for them to prove that was not what Mr. Kacerosky has

20    reported.  As a matter of fact, we were par -- or we were a

21    group, a combined or a joint operation between FBI and DEA

22    investigating one of the biggest drug cartels in history.

23         At the time that I have a meeting, a private

24    meeting with Mr. S. Ed Ryan, Mr. Dick Gregorie, Mr. Ed

25    Kacerosky, a member of the FBI, and a Colombian attorney, and

1    the daughter of an ex-drug trafficker that was planning to

2    surrender 125 million -- or $120 million to the

3    U.S. government, I explained at that time all the proceeds

4    and all the schemes and everything that we have cleared it in

5    order to attract these drug traffickers.  I explained how we

6    were very close to near probably, and, in fact, we have

7    infiltrate one of the biggest drug organizations that were

8    Northern Valley Cartel.

9         After my explanation to all of them, I have no idea

10   that Northern Valley Cartel was cooperating with Mr. Ed

11   Kacerosky.  A few days after my exposition (sic) at the

12   prosecutor's office, some of my partners were executed in

13   Colombia.  The information have leaked to Colombia, and now

14   is a major rampage going to kill all of us, and including

15   some of the American attorneys that were participating in

16   this.

17        Later on, in the case of Maya Hoyos -- of Carlos

18   Maya, and later on, in the case of Victor Patino, we were

19   able to establish that all the information given by the

20   Northern Valley Cartel was provided by Mr. Ed Kacerosky,

21   which lead into the assassination of the people that were

22   cooperating to the -- at the U.S. government -- or with the

23   U.S. government at that time with us.  That was very

24   detrimental.

25        And that's the reason, basically, why I was

1   arrested.  I was arrested from false report after.  I let the

2   government investigate the whole thing.  I knew I have --

3   receive money and I have declared the money; I represent that

4   money to the government.  I was working in major clandestine

5   operations.  I was doing major, extremely secret operations,

6   that every time I was going overseas, I was not even

7   permitted to say that I was coming on behalf of the

8   U.S. government.

9          And that's the reason why I still have a Colombian

10  nationality, because when I was planning to become an

11  American citizen, they told me I cannot become an American

12  citizen yet to help the government, because the

13  U.S. government will have to report me in my clandestine

14  operations going overseas as one of the U.S. government

15  officers, which is an obligation with the U.S. government.

16         I never became an American citizen.  I have been in

17  this country over 30 years.  I have served this country for

18  many, many years.  Yes, I committed a crime of not reporting

19  my income taxes timely for the years '98.  But it's also

20  something behind that.  In 1998, when we -- when -- we were

21  about to start an operation -- operation ... Eldorado out of

22  New York, Miss Bonnie Klaper, a prosecutor from New York,

23  sent two IRS agents, that's August, '98, together with the

24  NYPD to help me prepare my income tax -- my income taxes that

25  I have not properly prepared report -- before for one

1    specific reasons, because I was receiving money from drug

2    deal -- drug traffickers.  They were paying me substantial

3    amounts of money on the side, with the knowledge, full

4    knowledge, of the U.S. government and with the approval of

5    the U.S. government.  I cannot report taxes in saying, these

6    go for these or these go for that.  I have to review certain

7    things if I would report those taxes.

8          Besides that, out of that money, we have to pay

9    informants in Colombia and informants in other parts of the

10   world that allowed us to control or to carry on with these

11   operations.  These operations were not financed by the

12   U.S. government.  This was a self-financed operation.  That's

13   why the government allowed us to have certain money.

14         Of course I enjoyed that money.  And I was able to

15   expend a lot of that money.  I was risking my life every day

16   that I was going -- doing this kind of operations.

17         For that reason, yes, I did not report my taxes

18   properly.  But I did allow the government to properly

19   investigate this case.  I suggest to the government --

20   knowing my tax situation, I suggest to the government to

21   finalize this case, let's treat this case as a tax matter.  I

22   suggest that to the -- to the prosecutors; I suggest that to

23   my attorney.

24         We are here today.  I am pleading guilty.  I have

25   pled guilty to fail to report income taxes timely for 1998.

1   I did report them, because as soon as we finished everything,

2   then immediately my charges were dropped from obstruction of

3   justice and money laundering, immediately I file my taxes.

4   Not on time, unfortunately, your Honor.  And, yes, I have

5   tried to render substantial cooperation since March -- since

6   February 13, when I sign a plea agreement at the office of

7   Mr. Greg Tortella in Washington.

8           I went to Washington.  I signed the plea agreement

9   for one specific reason.  It was a major -- it was uncovered

10   by DEA, a plot for my assassination.  They were paying

11   $5 million at that time for my head.  DEA notify my attorney.

12   My attorney notify me.  I was staying at my brother's house.

13   He says, get -- get out immediately, out of your house,

14   because they going to kill you.  I came to Miami.  Yes, I met

15   with DEA.  It was a plot for my assassination.  And I said,

16   "What can I do?"

17           I went immediately public.  I went on television.

18   I went on radio and all the newspapers, and I denounced

19   publicly the members that were planning to assassinate me and

20   who has the contract.  Those were the same members that

21   Mr. Ed Kacerosky have helped before and were the same members

22   that Mr. Ed Kacerosky, from the U.S. Customs, was trying to

23   help.  I was trying to cover in their operations.

24           At that time, I went to Mr. Tortella and I say --

25   and I knew one thing, I cannot fight with the government and

1  continue doing things with the government.  When I denounced

2  them publicly, all these individuals -- which you have some

3  of the names in the sealed statements or sealed report that

4  Mr. Rodriguez filed with the Court -- when I denounced them

5  publicly, they say, "Well, we are not the ones that put the

6  contract on you."

7          And I say, "Well, you are the ones that control the

8  whole thing.  Either you know or you did it or you know."

9          And then he said -- they say the following -- and I

10 do have the tape recorder, because I became obsessive in

11 recording the conversations, especially when you deal with

12 these individuals.

13         They told me, "If you help us with the

14 U.S. government, we help you here."  At that time, I drove to

15 Washington, met with Mr. Tortella, explain exactly what was

16 the situation with these individuals.

17         Mr. Tortella says, "Give me a few months, give me

18 some time, I will see what I can do."

19         Later on, Mr. Tortella called me a few months

20 later, or a month later, says, "I have tried every possible

21 thing.  It is very difficult.  The U.S. government do not

22 want anything with you.  The prosecutors in Miami, they don't

23 want you.  But, finally, I have possibly a green light.

24 Narcotics and dangerous drugs are interested.  Bring the

25 individuals or you have to bring attorneys or whatever."

Page 23

1          Immediately --

2          MR. RODRIGUEZ-VARELA:  Excuse me.

3          (Discussion had off the record.)

4          THE DEFENDANT:  I'm sorry, your Honor.

5          Then, bottom line of the whole thing is, I brought

6     a Colombian attorney representing these group of drug

7     traffickers, brought him to Mr. Tortella's office, met with

8     him.  Immediately under the instructions of the

9     U.S. government, we hire and we retain an attorney's firm in

10    Washington, Morin & Oshinsky.  Senator Joseph Tidings became

11    the head -- which is one of the main partners of this firm --

12    started to represent these individuals.  I arrange a trip.

13    We went to Aruba.

14          In Aruba, there were five members of these firm,

15    from Senator Tidings' firm in Washington, met with the

16    individuals, and at that moment, I received notification from

17    the U.S. government to step down immediately and not to do

18    anything around them.  That I have already introduced them

19    and that was the limitation and they don't want me around

20    anymore.

21          I don't know what has happened.  What I know is

22    this.  Right now, in Colombia, have been over a hundred

23    assassinations, because if (sic) it's a major division

24    between the two -- two groups of the Northern Valley Cartel.

25    One group is blaming the other group on cooperating with the

1    U.S. government.  One group is blaming the other group in

2    giving up and -- accusing people and giving up people to the

3    U.S. government.  The arrest of Arcangel DeJesus was done in

4    Panama.

5                THE COURT:  A-R-C-A-N-G-E-L.

6                THE DEFENDANT:  The arrest of the half brother of

7    Diego Montoya has been done, also.  People blame Varela, one

8    of the major drug traffickers in Colombia, and members -- one

9    of the main members of Northern Valley Cartel to be the

10   person pinpointing the finger to individuals.  I don't know

11   if they're a part of the group that are cooperating on behalf

12   of the people that I brought to the U.S. government -- to the

13   government.  What I know is this.

14               When -- in September, Miss Lee Stapleton was

15   arrested in Bogota meeting with one of the major drug

16   traffickers -- remember that Miss Lee Stapleton marry the

17   ex-director of DEA, and she was also a prosecutor here in

18   Florida.  When she was arrested in September in Colombia in

19   the company of the attorney that I brought to Mr. Tortella's

20   office, and I -- and, also, with one of the key names that I

21   brought to Mr. Tortella's attention at that time of as

22   members that were planning to surrender to the

23   U.S. government, I did not know.  I learn the arrest, because

24   it was in the newspapers, and some people call me and says,

25   this has happened.  Well, these are the same individuals that

1   I been trying to bring.

2          I have no control in what the government is doing,

3   if it's doing or not doing.  I have no way to find out if

4   these people are cooperating.  I suspect there must be some

5   cooperation.  It is a major war going on in Colombia and a

6   major killings, because they say some people are giving up

7   other people.  I don't know if these are the same people that

8   I brought up.  It seems that way.  It seems very much.

9   Everything indicates that it is that way.

10          Anyway, your Honor, this is basically what I have

11   to say.  I hope I don't have to go back to Colombia.  They

12   will execute me.  A day in jail for me represent a possible

13   deportation.  Possibly my life is in your hands, your Honor.

14          THE COURT:  All right.  Thank you, Mr. Vega.  You

15   can stay there.

16          Mr. Rodriguez-Varela, if you'll come up to the

17   podium with Mr. Vega, please.

18          Is there any legal reason why I should not impose

19   sentence, Mr. Rodriguez-Varela?

20          MR. RODRIGUEZ-VARELA:  No.

21          THE COURT:  All right.  Let me say this.  Mr. Vega,

22   I understand what you've told me and I understand what

23   Mr. Rodriguez-Varela has argued on your behalf, and I've

24   reviewed the sealed pleadings in this case, which I will

25   unseal at the appropriate time.  Now is not the time to do

1    that.  So, those matters will remain under seal for the time

2    being.

3              As I said before, I don't think that there is a

4    basis for me to depart in this case, even though, obviously,

5    you and Mr. Rodriguez-Varela have a very different view of

6    things than Mr. Tortella does, at least with regard to

7    sentencing in this case.

8              But I do think that there is merit in some of the

9    things that the two of you have said to me, and I want to

10   make sure that there's time for things to run their course

11   before I make you report for the remainder of the prison

12   sentence that I am going to impose.  And so I am going to

13   provide for what is a relatively lengthy term of reporting.

14             I am also not going to recommend deportation in

15   this case, or that you be turned over to the Immigration and

16   Naturalization Service, or whatever its new acronym is these

17   days.  I'm not going to recommend that in this judgment and

18   commitment order.

19             I don't have any power to keep you in the United

20   States, or to order that you not be deported or removed;

21   that's something that's an executive branch function, at

22   least initially, in terms of the exercise of discretion.  But

23   I am not going to recommend in this judgment and commitment

24   order that you be turned over to the Bureau of Immigration

25   and Customs Enforcement, or the INS, for any removal or

1   deportation proceedings.

2           MR. RODRIGUEZ-VARELA:  Would the Court consider the

3   opposite, recommending that it not happen?

4           THE COURT:  No, I'll hear from Mr. Tortella at the

5   end of the proceeding.

6           MR. RODRIGUEZ-VARELA:  Yes, sir.

7           THE COURT:  Okay.  There's an offense level of 11,

8   a criminal history category of one, a Guideline imprisonment

9   of eight to 14 months in Zone C of the Guidelines, and the

10  fine range is 2,000 to $20,000.

11          Mr. Tortella, your recommendation as to the

12  sentence to be imposed in this case.

13          MR. TORTELLA:  Your Honor, pursuant to the plea

14  agreement, the government would recommend a sentence at the

15  low end of the Guideline range.

16          THE COURT:  So, a split sentence.

17          MR. TORTELLA:  Yes, your Honor.

18          THE COURT:  Okay.  Mr. Rodriguez-Varela, it's your

19  recommendation, as well.

20          MR. RODRIGUEZ-VARELA:  I agree with that

21  recommendation.

22          THE COURT:  Okay.

23          MR. RODRIGUEZ-VARELA:  And I thank Mr. Tortella for

24  making it.

25          THE COURT:  Mr. Gonzalez, what is the special

1   assessment?

2           THE PROBATION OFFICER:  The special assessment for

3   a Class A misdemeanor is $25.

4           THE COURT:  Okay.  Thank you.

5           I've considered the statements by all of the

6   parties, and I have reviewed the presentence investigation

7   report, the parties' filings, and I've considered their

8   arguments here in court.  As I said before, I don't think

9   there's a basis for a departure at this point in time, and I

10  am not going to depart.

11          It is also my finding that Mr. Vega does not have

12  the ability to pay a fine, and, therefore, in this case, no

13  fine shall be imposed.

14          Pursuant to the Sentencing Reform Act of 1984, it

15  is the judgment of the Court that the defendant, Baruch Jairo

16  Vega, be hereby committed to the custody of the Bureau of

17  Prisons to be imprisoned for a term of four months as to

18  Count I of the information.  Upon release from imprisonment,

19  Mr. Vega shall be placed on supervised release for a term

20  of -- it's up to one year, right, Mr. Gonzalez?

21          THE PROBATION OFFICER:  Yes, your Honor.

22          THE COURT:  Okay.  And I can go below that, given

23  that it's a sentence of less than a year in prison?

24          THE PROBATION OFFICER:  Judge, I'm not sure if it

25  is less than one year, on second look.  The -- at

1  paragraph 64 of the Guideline range, for a term of supervised

2  release is one year.  It doesn't say it's the maximum, but --

3          THE COURT:  I've run into this problem before.

4  This is one place where the Guidelines make absolutely no

5  sense to me.  So, if I decide to impose a term of supervised

6  release, it has to be a year, it looks like, or I can just

7  completely forget it and not give a year.  That makes no

8  sense to me whatsoever.  So, we'll do this, then.

9          We'll not impose a term of supervised release in

10  this case.  But following the completion of the term of

11  imprisonment with the custody of the Bureau of Prisons,

12  Mr. Vega shall participate in the home detention electronic

13  monitoring program for 120 days.  During this time, Mr. Vega

14  shall remain at his place of residence, except for employment

15  and other activities approved in advance by the

16  U.S. Probation officer.  He shall maintain a telephone at his

17  place of residence without call forwarding, call waiting, a

18  modem, caller ID, or call back/call block services for this

19  period of time.

20          Mr. Vega must also wear an electronic monitoring

21  device and follow the monitoring procedure specified by the

22  probation officer.  Mr. Vega must also pay the cost of

23  electronic monitoring at the rate of $3.47 per day, if he is

24  able to do so.  If he is not, then he can let his financial

25  circumstances be known to the probation officer.

Page 30

1              During the period of home confinement, Mr. Vega

2    shall not commit any federal, state, or local crimes; he

3    shall be prohibited from possessing a firearm or other

4    dangerous device; and he shall not possess any controlled

5    substance.  He must also comply with all of the conditions of

6    electronic monitoring that have been adopted by this Court

7    and by the probation officer.

8              There is also a mandatory special assessment of

9    $25, which is due immediately.

10             The total sentence is four months in the custody of

11   the Bureau of Prisons, with credit, of course, for time

12   already spent in custody, followed by 120 days of electronic

13   monitoring and home confinement.  There is no separate

14   supervised release, there is no fine, and there's a $25

15   mandatory special assessment.

16             Mr. Tortella, your view with regard to a

17   recommendation either way with regard to removal or

18   deportation?

19             MR. TORTELLA:  Your Honor, the government would

20   leave that to the sound discretion of the Court.  I think the

21   Court was correct in its determination that this is not a

22   matter that would be left to the Court to make a

23   determination, but I'm sure that an immigration judge would

24   consider any order from this Court in determining whether or

25   not Mr. Vega is a deportable alien.

1          THE COURT:  All right.  All right.  I am --

2    understanding that it's only a recommendation and that I have

3    no control over the executive branch's decision about whether

4    or not to begin removal proceedings against Mr. Vega, I will

5    recommend that the United States in this case not remove or

6    deport Mr. Vega from the United States.

7          Mr. Rodriguez-Varela, now that I have imposed

8    sentence, do you or Mr. Vega have any objections to my

9    findings of fact, conclusions of law, or to the manner in

10   which sentence was pronounced?

11         MR. RODRIGUEZ-VARELA:  No, no, your Honor, none

12   other than what's been filed and discussed in open court

13   today.  Thank you.

14         THE COURT:  Okay.

15         Mr. Tortella, any objections from the United

16   States?

17         MR. TORTELLA:  No, your Honor.

18         THE COURT:  Mr. Vega, pursuant to the Rules of

19   Criminal Procedure that govern in this Court, you have the

20   right to appeal your conviction and the sentence that I've

21   imposed.  Any notice of appeal must be filed within ten days

22   after the entry of the judgment.  If you're unable to pay the

23   cost of an appeal, you may apply for leave to appeal in forma

24   pauperis; that is, without prepaying any costs or fees.  And

25   if you cannot afford an attorney for an appeal, I will

1    appoint one to represent you at no cost to you.

2            Do you understand your appellate rights?

3            THE DEFENDANT:  I do understand, your Honor.

4            THE COURT:  All right.

5            Mr. Tortella, do you have any objection to a

6    six-month reporting delay?

7            MR. TORTELLA:  No, your Honor.

8            THE COURT:  All right.

9            Mr. Vega, I am going to require you to report to

10   the institution to which you've been designated no later than

11   September 17th of this year; that's a Friday.  If by then you

12   don't have a designation, you are to report on that day no

13   later than two p.m. to the U.S. Marshals on the second floor

14   of this building.

15           And, again, if there are any further developments

16   or anything else that arises from either side, you can let me

17   know and I'll take the appropriate action.

18           MR. RODRIGUEZ-VARELA:  Thank you, your Honor.

19           If I may just for a moment?

20           (Discussion had off the record.)

21           MR. RODRIGUEZ-VARELA:  Judge, I would ask that the

22   Court make a recommendation to designate Mr. Vega for the

23   remainder of the BOP time to FDC/Miami.  If the Court could

24   make that recommendation, we would appreciate it.

25           THE COURT:  Okay.  Mr. Tortella, any objections to

1   that recommendation?

2           MR. TORTELLA:  No, your Honor.

3           THE COURT:  No?  I will so recommend that Mr. Vega

4   be designated to FDC/Miami.

5           Okay.  Mr. Vega, between now and the time of your

6   reporting, whenever that turns out to be, and right now it's

7   September 17th of 2004, all of the conditions of bond that

8   have applied to you will continue to apply.

9           Do you understand that?

10          THE DEFENDANT:  I do understand, yes, your Honor.

11          THE COURT:  Okay.  Mr. Tortella, anything else on

12   behalf of the United States?

13          MR. TORTELLA:  Your Honor, I believe -- just with

14   respect to Mr. Vega's travel, I'm not sure -- the government

15   allowed Mr. Vega to travel, I guess, anywhere in the world

16   subject to reporting to probation.  I'm not sure whether the

17   Court would want to change that or just leave it as is.

18          THE COURT:  Well, you tell me if you want me to

19   change it.

20          MR. TORTELLA:  Your Honor, Mr. Vega has dutifully

21   reported and appeared at every proceeding.  I wasn't sure if

22   the Court -- if there would be any restriction on his travels

23   since sentence is imposed.

24          THE COURT:  No, I mean I take them on a

25   case-by-case basis, and there are times when after a guilty

Page 34

1    plea or a sentencing hearing, I tighten up on requirements

2    and the allowance of travel or not, and sometimes people get

3    remanded or taken into custody.  This is not one of those

4    cases for a misdemeanor conviction.  So, unless you wanted me

5    to do that --

6            MR. TORTELLA:  No, your Honor.

7            THE COURT:  -- I'm not going to.

8            MR. TORTELLA:  No, your Honor.  I just wanted to

9    alert the Court to that fact.

10           THE COURT:  Okay.

11           Mr. Rodriguez-Varela, anything else at this time on

12   behalf of Mr. Vega?

13           MR. RODRIGUEZ-VARELA:  No, Judge.  I thank the

14   Court and Mr. Tortella for their time this morning.

15           THE COURT:  All right.  You'll need to go with

16   Mr. Vega and Mr. Gonzalez to check in with probation, given

17   that he's got a surrender date out in the future.

18           MR. RODRIGUEZ-VARELA:  Okay.

19           THE COURT:  Mr. Vega, good luck to you.

20           THE DEFENDANT:  Thank you, sir.  Thank you.

21           (Proceedings concluded at 11:19 a.m.)

22                       -  -  -  -  -

23

24

25

Page 35

```
1              C E R T I F I C A T E

2   I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.

4

5   _____    _____

6   Francine C. Salopek, RMR, CRR        Date
    Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 5

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
ATLANTA REGIONAL OFFICE


DAVID T. TINSLEY,
        Appellant,

v.                           DOCKET NUMBER
                            AT-0752-04-0116-I-1


U. S. DEPARTMENT OF JUSTICE,
        Agency.
_____/

*    *    *

TRANSCRIPT OF PROCEEDINGS

*  VOLUME I  *

      The above and forgoing cause having come on to be heard before RICHARD W. VITARIS, Administrative Judge, on March 15, 16 & 17, 2004 at the hour of 9:00 a.m. o'clock each day in the City of Miami, County of Dade, State of Florida, for the purpose of taking testimony in this cause.


                  COURT REPORTER,

                  ALBERT C. WEIR
                  Court Reporter

CERTIFIED COPY

3

# I N D E X

**WITNESS**                                           **PAGE**

ELIZABETH KEMPSHALL
Direct Examination by Mr. McCoy..................7
Cross Examination by Mr. Roth..................60
Redirect by Mr. McCoy.........................109
AdministrativeJudge...........................110
Recross Examination by Mr. Roth...............116
Further Redirect Examination by Mr. McCoy.....124

VINCENT MAZZILLI
Direct Examination by Ms. Pantos-DeAgostino...126
Cross Examination by Mr. Roth..................190
Redirect Examination by Ms. Pantos-DeAgostino.231
Administrative Judge..........................233
Recross Examination by Mr. Roth...............237
Further Redirect by Ms. Pantos-DeAgostino.....242

KEVEN PEDERSON
Direct Examination by Mr. McCoy...............245
Cross Examination by Mr. Roth.................249
Redirect Examination by Mr. McCoy.............260

MICHAEL KANE
Direct Examination by Ms. Pantos-DeAgostino...266
Cross Examination by Mr. Roth.................290
Redirect Examination by Ms. Pantos-DeAgostino.312
Recross Examination by Mr. Roth...............317
Administrative Judge..........................318

MICHAEL UPCHURCH
Direct Examination by Mr. McCoy...............323
Cross Examination by Mr. Roth.................326
Redirect Examination by Mr. McCoy.............333
Administrative Judge..........................336

MARK MINELLI
Direct Examination by Mr. McCoy...............339
Cross Examination by Mr. Roth.................343
Redirect Examination by Mr. McCoy.............372
Recross Examination by Mr. Roth...............376

DAVID WILLIS
Direct Examination by Ms. Pantos-DeAgostino...382
Cross Examination by Mr. Roth.................415
Redirect Examination by Ms. Pantos-DeAgostino.435
Administrative Judge..........................437
Recross Examination by Mr. Roth...............442

4

WITNESS                                              PAGE

DAVID WILLIS (continued)
Further Redirect by Ms. Pantos-DeAgostino.....443
Further Recross by Mr. Roth...................444
Further Redirect by Ms. Pantos-DeAgostino.....446

SANDALIO GONZALEZ
Direct Examination by Mr. Roth...............449
Cross Examination by Mr. McCoy...............493
Redirect Examination by Mr. Roth.............514
Recross Examination by Mr. McCoy.............515
Administrative Judge.........................516

JAY BERGMAN
Direct Examination by Mr. Roth...............526
Cross Examination by Mr. McCoy...............544
Redirect Examination by Mr. Roth.............546

EDWARD RYAN
Direct Examination by Mr. Roth...............549
Cross Examination by Mr. McCoy...............562

FRANK TARALLO
Direct Examination by Mr. Roth...............566
Administrative Judge.........................576

WILLIAM MITCHELL
Direct Examination by Mr. Roth...............579
Cross Examination by Mr. McCoy...............590
Redirect Examination by Mr. Roth.............592

DAVID STEPHENS
Direct Examination by Mr. Roth...............596
Cross Examination by Mr. McCoy...............605
Redirect Examination by Mr. Roth.............607

GEORGE B. SLATTERY
Direct Examination by Mr. Roth...............609
Cross Examination by Mr. McCoy...............632

DAVID T. TINSLEY
Direct Examination by Mr. Roth...............635
Cross Examination by Mr. McCoy...............697
Redirect Examination by Mr. Roth.............714
Administrative Judge.........................718
Recross by Mr. McCoy.........................733

Certificate of reporter......................736

11

1  Attorney   General   approved   Money   Laundering

2  Investigation.

3       Q    And again, the group that was responsible

4  for Operation Caliman?

5       A    Group 43.

6       Q    Is that also HIDA Group 3?

7       A    Yes.

8       Q    Who was the Group Supervisor for Operation

9  Caliman?

10      A    David Tinsley.

11      Q    Who is Larry Castillo?

12      A    He's   a   Special   Agent   with   the   Drug

13 Enforcement assigned at the time to Group 43.

14      Q    And William Gomez?

15      A    He's a Task Force Officer that was also

16 assigned to Group 43.

17      Q    We mentioned Berut Vega.

18           Who was the controlling Agent for Berut

19 Vega?

20      A    Larry Castillo.

21      Q    And can you briefly describe for us how

22 Berut Vega became a confidential source for Group 43

23 under Operation Caliman.

24      A    Berut Vega had been a confidential source

25 for several other Federal Agencies.   And it's my

18

1    Q    Second sentence.   "Mr. Williams continued

2    by saying..."

3    A    Yes.

4    Q    Could you read that for us please.

5    Q    "Mr. Williams continued by saying that all

6    standard operating procedures in the Miami Field

7    Division would be adhered to and that unilateral

8    operations must be vetted through Headquarters."

9    Q    Thank you.

10       Agent Kempshall, what is an Investigative

11   Report?

12   A    An Investigative Report is a document

13   prepared to document any Law Enforcement activity or

14   Intelligence gathered during the course of an

15   investigation.

16   Q    And when is it required?

17   A    It is required five days after the -- it

18   must be completed within five days subsequent to the

19   activity occurring.

20   Q    And who is responsible for ensuring that

21   these reports are written?

22   A    Well the Special Agent is charged with

23   knowing that the report needs to be prepared and

24   completed.   And the Supervisor has the ultimate

25   responsibility to make sure that the report is

25

1  and each of us went through each volume of the Case

2  File looking for these reports that were on the

3  list.

4     Q    And what were your findings?

5     A    That, as I stated earlier, they -- the

6  reports for the undercover Money Laundering

7  Operation where they would do money pickups and

8  launder the drug proceeds, those were very well

9  documented.  But when it came to activities that

10 were occurring associated with Berut Vega or Ramon

11 Suarez the -- the reports were almost, were

12 virtually non-existent.

13    Q    Were the trips that, or activities that

14 Berut Vega were involved in, were some of these --

15 did some of these place in Panama?

16    A    Yes.   There were six trips that were

17 documented that were from Miami, Florida to Panama

18 to conduct debriefings, Intelligence gathering

19 informatio, that type of situation.

20    Q    If you would, please look at the Agency

21 binder, Tab 7.

22         Is this one of the Expense Reports that you

23 reviewed?

24    A    Yes sir.

25    Q    And whose Expense Report is this?

31

1  well.

2      Q   And then finally the reimbursement.

3      A   He signed each check utilizing his

4  undercover name.

5      Q   And again, your findings on each of -- Well

6  let's withdraw that.

7      Did you find any Investigative Reports for

8  any of these six trips?

9      A   There was one rather lengthy Investigative

10  Report written regarding the debriefing of one of

11  the -- a very significant high level trafficker.

12      Q   And was that Rasguno?

13      A   Yes sir.

14      Q   And for the other five trips  --

15      ADMINISTRATIVE JUDGE:  Could you repeat

16  that.

17      MR. McCOY:  I'm sorry.  Rasguno.

18      ADMINISTRATIVE JUDGE:  The whole last

19  answer.

20      THE WITNESS:  There was one rather lengthy

21  Report which documented the debriefing of a

22  high level Columbian trafficker.  And his

23  nickname is Rasguno.

24  BY MR. McCOY:

25      Q   And for the other five trips were you able

32

1   to locate Investigative Reports?

2       A   No sir.

3           ADMINISTRATIVE JUDGE:  Could you spell the

4       name of that trafficker?

5           THE WITNESS:  R-A-S-G-U-N-O.

6           ADMINISTRATIVE JUDGE:  R-A-S-G-U-N-O?

7           THE WITNESS:  Yes sir.

8   BY MR. McCOY:

9       Q   In this particular case, Agent Kempshall,

10  why was the lack of Investigative Reports so

11  important as it related to these confidential

12  sources, Vega and Suarez?

13      A   Well there were several reasons why it was

14  so important.  These -- these informants were

15  debriefing or meeting with high level Columbian

16  traffickers and that should have been documented in

17  itself by the very nature of who they were meeting

18  regardless of the nature, the level of the

19  trafficker, just because they were meeting with

20  traffickers it should have been documented.

21          And there was an allegation of corruption.

22  And in an effort to defend the confidential sources'

23  activities that's why you need an Investigative

24  Report, to prove what they were doing and who they

25  were meeting with.

37

1   were various types or versions of that.

2       Q   So when you reviewed the Confidential

3   Source Files what were you looking for with respect

4   to that justification?

5       A   I was looking for if any reports were taken

6   relative to the debriefings of these informants.

7   And any debriefings or interviews that they may have

8   participated in to corroborate that they were in

9   fact meeting with high level traffickers while in

10  Panama.

11      Q   And you've mentioned a couple times that

12  there were allegations of corruption against these

13  two confidential sources, specifically Berut Vega

14  and Ramon Suarez.

15      What were the allegations of corruption?

16      A   That they were charging Defendants a fee to

17  -- so the trafficker, -- the traff -- Vega and

18  Suarez, or Mr. Vega was alleged to have been

19  charging the traffickers a fee in order to secure

20  their cooperations with some, quote/unquote,

21  "corrupt DEA Officials" in Washington.

22      And that way they would serve very little,

23  if at all, any jail time if they cooperated with the

24  Drug Enforcement Administration.

25      Q   And is the Confidential Source File a place

38

1 that you would have looked to determine whether or

2 not -- or determine what the role of these

3 confidential sources was?

4    A    Yes.

5    Q    And what did you determine based on your

6 review of the Confidential Source Files specifically

7 to Berut Vega and Ramon Suarez?

8    A    That there were very few reports that

9 documented any activity.

10   Q    And can you compare for us the reports as

11 to the activities that you found that they had been

12 involved in?

13   A    There were none.

14   Q    Other than Investigative Reports is there

15 anything else that should be maintained in the

16 Confidential Source File?

17   A    What we refer to as 103's, which is a form

18 utilized to pay a confidential source.

19        MR. ROTH:  Judge, I object.  This has been

20        dismissed by the Agency.

21        MR. McCOY:  On the contrary.  The contents

22        of the Confidential Source File is still a part

23        of specification regarding poor supervision,

24        that the Confidential Source File was lacking

25        in documentation.

39

1        MR. ROTH:  Judge, can I be heard on this?

2        ADMINISTRATIVE JUDGE:  Why don't we have

3    the witness step out for a moment.  Let's go

4    off the record first.

5        (Whereupon, the witness was excused from

6    the hearing room and a discussion was had off

7    the record.)

8        (Back on the record.)

9        (Whereupon, the Witness reentered the room

10   and the Hearing was resumed.)

11       ADMINISTRATIVE JUDGE:  We're back on the

12   record.

13       The objection is overruled.

14       You may proceed, counsel.

15       ME. McCOY:  Thank you, sir.

16   BY MR. McCOY:

17   Q    Agent Kempshall, returning to the question

18   that we were asking regarding 103's.

19       Did you review the Confidential Source

20   Files for Operation Caliman specifically with

21   respect to Berut Vega and Ramon Suarez?

22   A    Yes, I did.

23   Q    And what were your findings regarding

24   103's?

25   A    There were very few 103's in either file.

40

1    Q    But there were some?

2    A    There were some.

3    Q    And relative to the amount of debriefings

4    that you determined that these two sources took part

5    in, could you compare for us the amount that you

6    found compared to what you expected?

7    A    There were very few Investigative Reports.

8    It was the bare minium Debriefing Reports and

9    Quarterly Reports that are required.

10   Q    And did you follow the same process in

11   reviewing the Confidential Source Files that you

12   followed with the Investigative Reports?

13   A    Yes.  Yes, I did.

14        I didn't have -- To clarify, I didn't have

15   all six OPR Inspectors review the files.  Two of us

16   reviewed the CS Files.

17   Q    Thank you.

18        When you interviewed Mr. Tinsley in the

19   course of your OPR investigation, what did he tell

20   you regarding the motivation of Berut Vega to work

21   as a confidential source?

22   A    Like all informants it was for money.  For

23   the majority of informants it was money.

24        ADMINISTRATIVE JUDGE:  I'm sorry.  Could

25        you repeat that?

42

1   required to review the Confidential Source File

2   file?

3        A    I believe it's on a monthly basis, and then

4   they have to do a Quarterly Report.

5        Q    In reviewing the six trips to Panama was

6   there anything that gave you concern about Agent

7   Castillo's mode of transportation during these

8   trips?

9        A    Yes.  In reviewing several of the trips it

10  was indicated on the Travel Voucher that travel was

11  via private aircraft.

12       Q    If you would please look at Tab 21?

13            Is this a telex as we described earlier?

14       A    Yes.

15       Q    And what is the purpose of this telex?

16       A    This is to secure or request country

17  clearance for foreign travel.

18       Q    And in paragraph three, specifically who is

19  it requesting clearance for?

20       A    That country clearance be given for Larry

21  Castillo, Task Force Officer William Gomez and two

22  informants.

23       Q    And are these two informants Berut Vega and

24  Ramon Suarez?

25       A    Yes.

43

1    Q    If you would please look at Tab 22?

2         Can you tell me what that is?

3    A    This is a Custom's Private Aircraft

4  Enforcement System.   It's a system that -- an

5  automated system utilized by Customs to track the

6  arrival and departure of private aircraft.

7    Q    Can you turn to the third page at Tab 22

8  for me?

9    A    Yes sir.

10   Q    Do you recognize the names?

11   A    Yes sir, I do.

12   Q    And is the name Lawrence Castillo there?

13   A    Yes, it is.

14   Q    And is Lawrence Castillo the only Law

15  Enforcement Officer listed there?

16   A    Yes sir.

17   Q    And you know that because you recognize the

18  other names on the list?

19   A    Yes sir.

20   Q    Would you please turn to Tab 23?

21        Is this the Expense Report that was

22  submitted by Agent Castillo with respect to the

23  travel that was just discussed?

24   A    (Reviewing document.)

25   Q    Tab 23.

44

1     A    Yes, it is.

2     Q    And the first expenditure listed on the

3 expense or the first, excuse me, I guess the first

4 item listed on the Expense Report, what is that?

5     A    That indicates that Larry Castillo traveled

6 from Fort Lauderdale, Florida to Panama City, Panama

7 via private aircraft.

8     Q    And is there any indication of a charge for

9 that?

10    A    No.

11    Q    And who approved this Expense Report?

12    A    Dave Tinsley.

13    Q    And this Expense Report you said relates

14 back to the travel in which Lawrence Castillo was on

15 a private aircraft as a sole Law Enforcement

16 Officer?

17    A    That's correct.

18    Q    Is there an Expense Report related to -- or

19 was there an Expense Report related to this travel

20 for William Gomez?

21    A    No, there was not.

22    Q    So in your review of the file the only

23 Expense Report related to this travel was for Agent

24 Castillo?

25    A    That's correct.

45

1    Q    If you would please look at Tab 24?    If
2   you'll look at paragraph three also at Tab 24.

3    A    (Reviewing document)

4    Q    For whom is the country clearance requested
5   in this telex?

6    A    It's for Larry Castillo, Paul Craine, who
7   was an Agent assigned to the Bogota Country Office,
8   and three confidential sources.

9    Q    And what is the period of travel?

10   A    From December 6, 1999 through December 8,
11  1999.

12   Q    And where are they to travel to?

13   A    Panama.  Panama City, Panama.

14   Q    And if you would please look at Tab 26?
15  Excuse me, Tab 25.  I apologize.  Tab 25.

16        Is this the associated Business Expense
17  Report for that trip?

18   A    Yes, it is.

19   Q    And is this for Lawrence Castillo?

20   A    Yes, it is.

21   Q    And the first entry on this report?

22   A    It's travel from Fort Lauderdale, Florida
23  to Panama City, Panama via private aircraft.

24   Q    And is there an associated charge?

25   A    No, there's not.

46

1    Q    And who approved the reimbursement for this

2    Expense Report?

3    A    Dave Tinsley.

4    Q    If you would please look at Tab 26?

5         This also is a Custom's Report regarding

6    travel by a private aircraft?

7    A    Yes sir, it is.

8    Q    And the third page there's a list of names?

9    A    Yes, there are.

10   Q    Do you recognize those names?

11   A    Yes, I do.

12   Q    And once again is Lawrence Castillo the

13   only Law Enforcement Officer in that list?

14   A    Yes sir.

15   Q    In the course of your investigation did you

16   determine who paid for the lease of that private

17   aircraft?

18   A    It was determined that Berut Vega was

19   leasing to purchase that private aircraft.

20   Q    And how did you learn that information?

21   A    Through interviews with Berut Vega.

22   Through interviews with Dan Foreman.   Through

23   interviews with the company that rented the

24   aircraft.

25   Q    Did you also interview Larry Castillo

47

1   regarding that information?

2       A    Yes.

3       Q    And what did Larry Castillo tell you?

4       A    That he had not paid for the travel.  That

5   Berut Vega had paid for it.

6       Q    And why is it important that Larry Castillo

7   was the only Law Enforcement Officer on this plane -

8   - on these two trips?

9       A    Because   it's   an   extremely   dangerous

10  situation for Larry Castillo because he's the only

11  Law   Enforcement   Officer   present   with   several

12  informants   and   narcotics   traffickers   who   are

13  Defendant   informant   cooperating   and   who   are

14  currently -- it had turned out that some of the

15  individuals were fugitives.

16       And it's a very unsafe situation for an

17  Agent to be on a private aircraft, one that he has

18  no control over, flying with confidential sources

19  and a defense attorney.  He's put himself in a

20  position where he doesn't have control over the

21  situation.  And he could possibly be blackmailed or

22  allegations of misconduct could come against him and

23  you would not be able to defend yourself because

24  it's   your   word   by   yourself   against   several

25  traffickers or cooperators.

48

1    Q    And were there allegations similar to that

2  in this case?

3    A    Yes.

4    Q    What were those allegations?

5    A    The allegation of corruption.

6    Q    And the allegations of corruption were

7  specifically against whom?

8    A    Berut Vega and Ramon Suarez?

9    Q    Were there ever allegations that either the

10 Appellant  or  Lawrence  Castillo  knew  of  the

11 corruption scheme?

12   A    Initially, yes sir.

13   Q    If you would please look back at Tab 23,

14 which is one of the Expense Reports that we just

15 referred to for November 22nd through the 24th.

16        Can you tell me, is there a charge for a

17 hotel stay on Castillo's -- Mr. Castillo's Expense

18 Report?

19   A    No, there's not.

20   Q    And what did you determine regarding the

21 lack of a hotel charge on that Report?

22   A    That  it  was  determined  that  Defense

23 Attorney Dan Foreman had paid for the expenses on

24 this particular occasion.

25   Q    Would you turn to the fourth page?

49

1        Can you tell me what that is?

2    A    That's the hotel receipt in the name of Dan

3    Foreman and the room charges for Larry Castillo,

4    Berut Vega, Mr. Suarez and another source of

5    information.

6        ADMINISTRATIVE JUDGE:  What tab is this?

7        MR. McCOY:  This is Tab 23, page 4.

8    BY MR. McCOY:

9    Q    And again, who is Mr. Foreman?

10   A    He's a defense attorney.

11   Q    And if you would please turn to Tab 25?

12       This is the Business Expense Report

13   referred to earlier for the trip from 12/5/99 to

14   12/8/99?

15   A    Yes.

16   Q    And is there a charge for Larry Castillo

17   for a hotel stay during this trip to Panama?

18   A    No, there's not.

19   Q    And what did you learn in your

20   investigation about who paid for his hotel stay?

21   A    That Dan Foreman paid for his hotel stay.

22   Q    Would you turn to Page 4 again?

23   A    Yes sir.

24   Q    And is that the charge from the Marriott?

25   A    Yes sir, it is.

50

1    Q    And who paid for it?

2    A    Dan Foreman.

3    Q    And are Mr. Castillo's charges on there?

4    A    Yes.

5    Q    I think you may have answered this earlier
6 and I apologize if I'm going back over it again.

7    What was it about those two Expense Reports
8 that alerted you to an issue with respect to the
9 travel?

10    A    Well initially it's listed right on the
11 Travel Voucher that they were travel -- traveled --
12 Larry Castillo traveled via private aircraft and
13 there's no fee associated with that.  And then the
14 fact that they were in Panama for several days and
15 there's no lodging charges.

16    Q    And you testified earlier that you reviewed
17 this trip and found no DEA 6 or Investigative
18 Reports for this trip?

19    A    That's correct.

20    Q    If an Investigative Report had been written
21 to justify the expenses would that have made it
22 easier to discover the problem?

23    A    Yes.

24    Q    In the course of your investigation did you
25 learn that Larry Castillo was alone at any other

51

1  time with the drug trafficker or fugitive?

2      A    Yes.    There were two occasions in Miami,

3  Florida, when he met with Oscar Campuzano who was a

4  fugitive from the Millennium Investigation who was

5  hiding out or in Miami, Florida and Mr. Castillo had

6  dinner with Mr. Campuzano and Berut Vega and Ramon

7  Suarez on that occasion.

8          And then later on he was -- he had a

9  breakfast meeting at a restaurant with Oscar

10 Campuzano and a female by the name of Christina

11 Questa.

12         ADMINISTRATIVE JUDGE:  Do you know how to

13     spell Mr. Campuzano's last name?

14         THE WITNESS:  It's C-A-M-P-U-Z-A-N-O.

15 BY MR. McCOY:

16     Q    Did you interview Mr. Campuzano in the

17 course of your investigation?

18     A    Yes, I did.

19     Q    And what did he tell you regarding this

20 meeting with Lawrence Castillo?

21     A    That he knew that Christina Questa was

22 friends with Larry Castillo and that he wanted to

23 speak with Larry about the status of his cooperation

24 agreement.    And that he wanted her to arrange a

25 meeting with Larry Castillo, between Larry Castillo

52

1   and himself, and that he eventually did meet with

2   Larry Castillo and Christina Questa who had been

3   driven to the location by an individual by the name

4   of Maurico Andrata.

5       Q    Did you interview this individual, Andrata?

6       A    Yes, I did.

7       Q    And what did he tell you?

8       A    That he in fact did drive Christina Questa

9   to meet with Larry Castillo and ultimately Oscar

10  Campuzano.

11      Q    Did you interview Larry Castillo about

12  these allegations?

13      A    Yes.

14      Q    And what did he tell you?

15      A    That he had met with Oscar Campuzano.

16      ADMINISTRATIVE JUDGE:  I'm confused as to

17  who Christina Questa is.

18      THE WITNESS:  Christina Questa is -- she's

19  an associate of Carlos Ramon who is also a

20  cooperator.  And Larry Castillo had gotten to

21  know Christina through his travels back and

22  forth and it was -- he eventually admitted that

23  he had an intimate relationship with Christina

24  Questa.  And Oscar Campuzano worked for Carlos

25  Ramon.

53

1          And so when he wanted to meet with Larry

2     Castillo he knew that if he contacted Christina

3     Questa she could help facilitate the meeting

4     between Larry Castillo and himself.

5          ADMINISTRATIVE JUDGE:  Thank you.

6          THE WITNESS:  Yes sir.

7  BY MR. McCOY:

8     Q    These meetings in Miami between Oscar

9  Campuzano and Lawrence Castillo, was Agent Castillo

10 the only Law Enforcement present?

11    A    Yes.

12    Q    What was Oscar Campuzano's status at the

13 time that Mr. Castillo met with him in Miami?

14    A    He was a fugitive.

15    Q    And    what    were    Mr.    Castillo's

16 responsibilities    as    an    Agent    regarding    Mr.

17 Campuzano?

18    A    Because it was a lawful warrant that had

19 been issued he was bound by the Judge's Order to

20 arrest Mr. Campuzano.

21    Q    Were any Investigative Reports found

22 regarding these meetings?

23    A    No.

24    Q    If you would please turn to Tab 42?

25         MR. McCOY:    Your Honor,  Tab 42 are

60

CROSS EXAMINATION

BY MR. ROTH:

Q   Ms. Kempshall, were you aware that at the time Mr. Vega was serving as an informant for DEA, he was also an informant for other Agencies?

A   I knew he had been an informant for other Agencies.  I don't recall if he was still working for the other Agencies at the same time.

Q   Okay.  Were you aware that at the time he was working with DEA he was also getting paid by the FBI?

A   No.

Q   Well didn't your investigation disclose that this corruption scenario that Mr. Vega was putting forth was in fact a cover story given to him by the FBI?

A   It was a cover story given he worked out with the FBI.  I believe it was in 1988.

Q   Okay, and when did the FBI cease permitting him to employ that cover story?

A   I can't answer that, sir.

Q   Okay.  Isn't it true that the FBI permitted him, pursuant to the corruption scenario, actually permitted him to take money from traffickers?

A   I believe they did, yes sir.  And with that

61

1  approval that they were given back in '88 he was

2  authorized to accept money from the traffickers.

3      Q    And the FBI also permitted him to keep that

4  money?

5      A    Yes, they did.

6      Q    And at what point in your investigation did

7  you find that out?

8      A    If I may clarify a little bit about this.

9      Q    Sure.

10     A    I -- the -- I came into the investigation

11 of the corruption after it had already been

12 initiated.  It was initiated in March.  I was not

13 assigned until 2000; August of 2000.  So the

14 corruption case, the portion with the FBI, was well

15 underway and I only participated in it a couple of

16 weeks before our investigation was split.  One half

17 was criminal and the other half was administrative.

18 And I dealt with the administrative side.  And so I

19 -- I don't know a lot of the particulars about the

20 criminal side.

21     Q    Okay, but you knew that the FBI was

22 permitting Mr. Vega to use a corruption scenario

23 with traffickers and permitting him to keep the

24 money that the traffickers would give him?

25     A    He had been previously approved to do that,

62

1    yes sir, by the FBI.

2        Q    And your investigation also showed that the

3    DEA Agents who were working with Mr. Vega were not

4    told of this?

5        A    Can you clarify -- Can you restate that for

6    me?  I don't understand exactly.

7        Q    Well did the FBI tell anybody who was

8    working with Mr. Vega from the DEA about the fact

9    that they had provided him with this corruption

10   scenario and also had permitted him to keep the

11   money he was getting from traffickers pursuant to

12   that scenario?

13       A    I don't know that for sure, sir.

14       Q    Okay,  so  your  investigation  didn't

15   determine that one way or another?

16       A    My administrative side did not go into that

17   detail.

18            I can't answer that question.

19       Q    Okay,  but  you  indicated  on  direct

20   examination that initially there was a belief that

21   the DEA Agents, including Mr. Castillo and Mr.

22   Tinsley, were aware of this corruption scenario,

23   correct?

24       A    The initial allegation was that they were

25   authorizing Mr. Vega to charge traffickers a fee to

80

1   that you're talking about were instances where Mr.

2   Gomez and Mr. Castillo would go to Panama with

3   confidential sources and they would attempt to

4   recruit various traffickers to come to the United

5   States and cooperate with the U.S. Authorities?

6       A   But which traffickers were they attempting

7   to recruit, I don't know.  I have no documentation

8   to indicate what occurred during these trips to

9   Panama.

10      Q   Well when you interviewed Mr. Castillo, Mr.

11  Castillo told you that that was the nature of those

12  trips?

13      A   He could not recall who a lot of the

14  individuals were.  He could not recall who the

15  sources of information were because there were no

16  reports documenting their activities.

17      Q   Do you have any reason to believe that any

18  of these activities that occurred were undercover

19  activities?

20      A   I was told -- Through -- I wasn't told, but

21  through the Travel Vouchers that we looked at and

22  the request for reimbursement indicates there were

23  undercover meetings, there were operational

24  meetings, there were debriefings.  And those are the

25  reports that I was looking for.

81

1    Q    Okay, but you knew from talking to the
2    people who were involved in those reports that the
3    meetings that occurred in Panama were not in fact
4    undercover meetings in the traditional sense, isn't
5    that true?

6    A    I don't know that for a fact because their
7    -- their recollection of the majority of these -- of
8    these meetings was vague because there were no
9    reports.  They said there were so many individuals
10   coming in and out it was like a revolving door.  And
11   I don't -- I don't know what was going on in those
12   hotel rooms or at these dinners.

13   Q    Well let me go back and ask my question.
14        What is an undercover meeting?

15   A    It's when acting in a fictitious role
16   you're attempting to solicit evidence against a
17   perpetrator or a violator.

18   Q    Okay, it's a situation where a DEA Agent is
19   pretending to be something he is not, i.e., a drug
20   trafficker, in order to get evidence on actual drug
21   traffickers, correct?

22   A    It's not limited to an Agent.  An informant
23   can be --

24   Q    It can be an informant, correct?

25   A    Yes sir.

82

1   Q   Okay.   Would you agree with me that these

2   are not -- these were not -- these meetings in

3   Panama were not meetings in the traditional

4   undercover sense as I just defined them?

5   A   I do not know that for a fact.

6   Q   Well why are you the only one that doesn't

7   know this?

8   ADMINISTRATIVE JUDGE:   That's -- I'm not

9   going to allow that question.

10  MR. ROTH:   I'm sorry, Judge.

11  BY MR. ROTH:

12  Q   So you don't know whether or not these were

13  meetings to recruit informants?   You don't know that

14  as you sit here?

15  A   I had no reports to document what occurred

16  at those meetings.

17  Q   I know that.

18  But I'm talking -- you conducted an

19  investigation that went beyond reports, correct?

20  A   Yes sir.

21  Q   You talked to Mr. Tinsley for two days,

22  right?

23  A   Yes, I did.

24  Q   Okay.   You talked to Mr. Castillo for two

25  days, correct?

83

1     A    Yes, I did.

2     Q    You talked to Mr. Gomez who was at these

3   meetings?

4     A    I did not.

5     Q    Okay.  Did you talk to any of the CS's who

6   were at these meetings?

7     A    I did not.

8     Q    All right.  Based on the interviews that

9   you did conduct you knew they were not undercover

10  meetings, you knew they were meetings designed to

11  recruit informants to surrender to the United States

12  and cooperate, isn't that true?

13    A    My concern with answering your question,

14  Mr. Roth, is that during the course of this

15  investigation there was one particular incident

16  where it was said there was an undercover meeting.

17         I asked the Agent that was participating in

18  that undercover meeting what he meant by that.  And

19  he said because he did not announce to the

20  restaurant that he was a DEA Agent he was then

21  considered undercover.

22    Q    All right.

23    A    So I'm concerned with the definition.  I

24  have a definition of what undercover is but

25  obviously because that trip -- that Expense Report

84

1   was approved and signed off on and there was no

2   Investigative Reports, I have concerns about what is

3   undercover and what is not based on this Agent's

4   description of what undercover is.

5       Q   Well would you agree with me that in a lot

6   of the interviews the -- there was some confusion

7   about the use of the word "undercover"?

8       A   There was confusion.

9       Q   Okay.  But ultimately you knew that what

10  they were talking about was not a traditional

11  undercover meeting but a meeting to recruit

12  informants?

13      A   I, through my interviews, nothing

14  documented, but through my interviews I understood

15  that they were attempting to recruit or solicit the

16  cooperation of Columbian traffickers.

17      Q   And in some instances they were successful

18  and in some instances they were not successful, is

19  that true?

20      A   I know that they had meetings and gained

21  information from these individuals.  I don't know --

22  I -- I don't recall if they ever had anyone come

23  into the United States to be documented as

24  cooperating individuals and be used.

25      Q   Now how many reports did Mr. Castillo

85

1 write, how many DEA 6 Reports did he write in

2 Operation Caliman?

3     A   I can't answer that.

4     Q   Well based on your review of the Case File

5 how many did you see?

6     A   I was looking for particular reports that

7 documented the events claimed in the Travel

8 Vouchers. I don't know how many reports he wrote in

9 regards to the undercover pickup of money and the

10 laundering of money. I just don't know that.

11     Q   Well were you aware that he wrote numerous

12 reports, Debriefing Reports, with respect to the

13 individuals that he ultimately did successfully

14 recruit?

15     A   I know that there was a detailed Debriefing

16 Report of his interview with Rasguno.

17     Q   All right, could you look at Appellant's

18 Volume Four, Tab S, please?

19     ADMINISTRATIVE JUDGE: Where are we

20     looking?

21     MR. ROTH: We're looking at Tab S, Your

22     Honor, and this is Appellant's Volume Four, Tab

23     S.

24     THE WITNESS: Yes sir.

25 BY MR. ROTH:

86

1      Q    Okay now you, in your Investigative File

2   that you accumulated in this case as a result of

3   your investigation, you had all of the Reports of

4   Investigation in Tab S, did you not?

5      A    Excuse me?

6      Q    Weren't these Reports of Investigation as

7   reflected in Tab S in -- somewhere located in your

8   Investigative File that you put together on this

9   case?

10     A    (Reviewing document)   I don't remember if

11   these were included as attachments or not.

12          ADMINISTRATIVE JUDGE:  I'm going to ask the

13     witness to step out for a minute.

14          (Whereupon, the witness left the hearing

15     room.)

16          ADMINISTRATIVE JUDGE:  Let's go off the

17     record.

18          (Whereupon, a discussion was had off the

19     record.)

20          (Back on the record.)

21          (Whereupon, the witness reentered the room

22     and the Hearing was resumed.)

23

24   BY MR. ROTH:

25     Q    Now were there any Classified 6's done in

87

1  Caliman?

2      A    I believe there were.

3      Q    Were there any Classified 6's done by Mr.

4  Castillo --

5      A    I believe he authored --

6      Q    -- in Caliman?

7      a    -- some of them, yes sir.

8      Q    Okay.  Did those find their way into your

9  Case File?

10     A    There were some but they were redacted or

11  removed because of being classified.

12     Q    When you say "removed" --

13     A    They were noted -- Excuse me, it was noted

14  that they were available but they were maintained in

15  a separate file.

16     Q    And did you get those?

17     A    Did I get those?

18     Q    Yes.

19     A    Yes sir.

20     Q    Okay, and what did you do with them?

21     A    They're being secured in a safe.  They were

22  included in the Case File until it -- it was no

23  longer under DEA care and custody.  And then it was

24  noted that the Top Secret or the Secret Reports had

25  been removed.

91

1    Q    Would it be accurate to say that Mr.

2 Castillo is charged with a lot of things that Mr.

3 Tinsley is not?

4    A    He's charged with different things from Mr.

5 Tinsley.

6    Q    For example, Mr. Castillo is charged with

7 having an inappropriate association with I think

8 Ms., what, Questa?

9    A    Yes sir.

10    Q    And you have no reason to believe that Mr.

11 Tinsley knew anything about that, correct?

12    A    I -- No, I don't.

13    Q    Now you indicated that there was a

14 Provision in -- that you referenced that indicated

15 when DEA 6's are supposed to be done?

16    A    Yes sir.

17    Q    Okay, could you indicate where that is

18 please?

19    A    It was in the Agent's Manual.

20    Q    Okay, where is it in the Agency binder?

21       MS. PANTOS-DEAGOSTINO:   I believe you're

22    looking for Tab 39.

23       MR. ROTH:   Tab 39, all right.

24 BY MR. ROTH:

25    Q    Okay.   Where is it in Tab 39 that it

119

1    Q    Okay, and in both instances it appears like
2  there are two Agents involved?

3    A    Yes.

4    Q    All right.  Now was it your testimony that
5  your investigation only discovered one Secret DEA 6?

6    A    No.  There were -- there were other Secret
7  Documents with regard to this investigation but none
8  of them from my recollection dealt with the time
9  period in Panama that we're looking at except for
10  that one Secret cable -- Secret 6 that I'm referring
11  to, which was the debriefing of Rasguno.

12    Q    Well did any of the Secret 6's that you're
13  talking about relate to a debriefing of an
14  individual who was involved in those five Panama
15  trips?

16    A    The only one that I located was the one
17  that was the debriefing of Rasguno --

18    Q    You agree --

19    A    -- during that time period, you know, from
20  September of '99 on.

21    Q    Okay, you interviewed Mr. Stephens,
22  correct?

23    A    Dave Stephens?

24    Q    Dave Stephens.

25    A    Yes.

120

1    Q    Okay, he was one of the Case Agents on
2    Caliman?

3    A    He handled the books, yes sir.

4    Q    But he was one of the Case Agents, correct?

5    A    Yes sir.

6    Q    All right.  He told you at the end of his
7    testimony that Larry did quite a few DEA Secret 6's,
8    didn't he?

9    A    If you've got --

10    Q    All right, yes.  If you could turn to
11    Appellant's Volume Five?  If you could turn to Tab
12    92, and specifically Page 167?

13        All right, if you could look at your
14    question beginning on line eight --

15    A    Um-hmm?

16    Q    -- of Page 167, and if you could also look
17    at his response?

18    A    (Reviewing document.)  Yes sir.

19    Q    Okay, you ask him:  "What else should we
20    look at in this investigation?", and he tells you
21    that; 'Larry did quite a few DEA Secret 6's which
22    got approved through the Special Agent in Charge'.

23    A    Right.

24    Q    Now as a result of that what did you do?
25    Did you make an effort to obtain these?

121

1    A    Yes.

2    Q    And how many did you actually see?

3    A    I have the one Secret 6 that was prepared

4  by Larry Castillo involving his debriefing of

5  Rasguno.

6    Q    Right. Is that one of the individuals that

7  he met on one of the Panama trips?

8    A    That was one of the Panama trips, --

9    Q    Okay.

10    A    -- yes sir.

11    Q    And is that -- How -- How -- That's a very

12  substantial DEA 6 Report, correct?

13    A    Yes sir, it is.

14    Q    How many pages is that?

15    A    I don't recall. It's maybe 15. Fifteen to

16  20 pages, something like that.

17    Q    All right. Now how many other Secret 6's

18  did you find other than the Rasguno 6?

19    A    Relating to these five trips that's the

20  only one I can recall of locating.

21    Q    Now how many other 6's did you find

22  irrespective of what they related to?

23    A    There were a lot of 6's in this Case File.

24    Q    I'm talking about the Secret 6's.

25    A    This is the only Secret 6 that I found

126

1          THE WITNESS:  I do, sir.

2          ADMINISTRATIVE JUDGE:   Would you please

3     state for the record your full name?

4          THE WITNESS:  Vincent Mazzilli,

5     M-A-Z-Z-I-L-L-I.

6          ADMINISTRATIVE JUDGE:   Proceed.

7          MS. PANTOS-DeAGOSTINO:   Thank you, Your

8     Honor.

9                    DIRECT EXAMINATION

10    BY MS. PANTOS-DeAGOSTINO:

11         Q    Mr. Mazzilli, can you tell the Court about

12    your current employment?

13         A    I'm  employed  as  an  Investigator  with

14    Corporate  Integrity  Services,  which  is  a  wholly

15    owned subsidiary of Collin and Knight, the law firm

16    on Brickle.

17         Q    All right, and what do you do?

18         A    I'm an Investigator for them.

19         Q    All right.  Can you tell me who you work

20    with?

21         A    I work with Bill Mitchell and Mike Kane.

22         Q    Okay.  Now, Bill Mitchell was also a former

23    DEA Special Agent in Charge, is that correct?

24         A    That's correct.

25         Q    And just for the record when I refer to

141

individual cases, but it was all placed under the umbrella of the SARC.

Q    Okay, and what was your role in Caliman? What did you do?

A    General supervision, as in every case in the Division, as well as making sure that the case was successful and that it was headed in the right direction.  And then I oversaw the spending of the money.

Q    Any specific responsibilities having to do with expenditures?

A    Yeah.  I was required to approve the expenditure of anything over ten-thousand-dollars ($10,000.00) in advance.

Q    And where is that specified?

A    In the SARC Guidelines.

Q    All right.  Do you have any knowledge about the surrender of Orlando Sanchez Cristancho?

A    Yes.

Q    And in the overall caseload of the Miami Division at the time that you were supervising the Division, can you tell me where Caliman fell in terms of importance?

A    Well Caliman was a very important operation.  It was very successful.  But it was kind

142

1  of long in the tooth, so to speak, in that it was

2  starting to kind of run out of steam.  And it would

3  have been, I don't know, I guess I would have had to

4  make a decision down the line as to when to cease

5  that particular operation.

6      Q    All right, and in regards to or compared to

7  other cases in the Division can you give me an idea

8  of where Caliman fell in importance?  I mean, --

9      A    Well it was --

10     Q    -- most important, middle important?

11     A    No, it wasn't -- wasn't most important.  It

12 was in, I guess in the middle of -- If you're going

13 to -- If you're going to classify cases as important

14 as lowest, middle or highest, it would be in the

15 middle.

16     Q    Okay, then you'll agree it was successful

17 in at least its money laundering side?

18     A    Yeah, very successful.

19     Q    I asked you if you had any knowledge about

20 Mr. Cristancho's surrender.  Do you have an idea of

21 when that surrender took place?

22     A    I think it was in October 1999.

23     Q    Okay.  Mr. Mazzilli, do you recall being

24 present at any meetings where Cristancho's surrender

25 was discussed?

152

1  best recollection is that conversations had been

2  going on for at least two weeks prior to extracting

3  him out of Columbia, I thought initially. I -- I --

4  You know, and then afterwards it turned out to be

5  Panama.

6      Q   Okay. Do you know how Cristancho was

7  transported out of Panama?

8      A   I now know, yes.

9      Q   Okay, how was that?

10     A   It was on a private Lear Jet leased by DEA,

11  the Government, through an informant from, I think

12  Aerojet, that serves Miami.

13     Q   Okay. When do you first recall learning

14  that a private jet was used to transport Cristancho?

15     A   I was testifying before a Grand Jury here

16  in Miami several months after January 2000 and I was

17  questioned by the prosecutor who was conducting the

18  Grand Jury.

19     Q   Okay, and do you know who paid for the

20  private jet to bring Cristancho from Panama to the

21  United States?

22     A   I now know, yes.

23     Q   Okay, who was that?

24     A   You mean physically paid the money?

25     Q   Um-hum.

153

1    A    It was Vega.

2    Q    Where did it come from?

3    A    Oh, it came from DEA.

4    Q    Okay.   Can you turn to Tab 6 in the

5    Government's binder, please?

6         Can you identify that document for me?

7    A    This is the document that was presented to

8    me by the Prosecutor in the Grand Jury.

9    Q    Can you refer to the note at the bottom of

10   the invoice, please?

11   A    Under "Agent's Note?"

12   Q    Yes, that's correct.

13   A    Yes.

14   Q    Can you read it for me?

15   A    "This is the flight authorized by SAC

16   Mazzilli and ASAC Perez for the covert

17   transfer/extraction of Orlando Sanchez Cristancho.

18   Orlando Sanchez Cristancho is a DEA fugitive."

19   Q    Did you approve the expenditure of

20   twenty-three-thousand-two for the use of the private

21   aircraft?

22   A    No, I did not.

23   Q    Are you certain?

24   A    Absolutely.

25   Q    Do you think you'd remember if you approved

154

1    it?

2         A     Yes.

3         Q     Why?

4         A     Because I -- In my 30 years at that time of

5    Federal Law Enforcement experience I never knew of

6    renting a private jet for this type of operation or

7    any other type of operation.   In my supervisory

8    capacity I've never authorized the use of a private

9    jet.   I wouldn't have in this case.   Based on what

10   I knew at that time it was a waste of money.

11        Q     Okay.   Were you ever asked by anyone to

12   approve the expenditure?

13        A     No.

14        Q     Were you ever told by anyone prior to Mr.

15   Cristancho being flown in on that private plane that

16   it was going to be used?

17        A     No.

18        Q     Do you know if Ernie Perez authorized the

19   expenditure?

20        A     I was told that he did not.

21        Q     Could he have authorized the expenditure of

22   twenty-three-two?

23        A     No.   It was beyond the scope of his

24   authority to do that.   Only the SAC could have

25   authorized an expenditure over ten-thousand-dollars

155

1    ($10,000.00).

2         Q    Do you recall having any discussion with

3    Associate SAC, then Associate SAC Gonzalez about the

4    expenditure of the twenty-three two prior to the use

5    of the plane?

6         A    I had no discussions with Gonzalez about,

7    or  anyone  else,  for  twenty-three-thousand-two-

8    hundred ($23,200.00) to be expended for the lease of

9    an aircraft.

10        Q    Are  you  sure  you  didn't  speak  to  Mr.

11   Tinsley about it?

12        A    Absolutely not.

13        Q    Would it be unusual for you to be speaking

14   with Mr. Tinsley about something like this?

15        A    Yes.

16        Q    Why is that?

17        A    Because there's a chain of command in a

18   Division  that  I  adhere  to,  that  I  require  my

19   subordinates to adhere to.  That basically what Mr.

20   Tinsley,  if  he  wanted  to  discuss  this  type  of

21   matter, would have went to his ASAC, the ASAC would

22   have brought it to the attention of any Associate

23   and the Associate would have came in to me with it.

24             Now he may have brought Perez or Tinsley

25   with him to discuss the issue but ultimately the

178

1    time on that question.

2         MS. PANTOS-DeAGOSTINO:   Okay.   I'm sorry,

3    Your Honor.

4  BY MS. PANTOS-DeAGOSTINO:

5         Q    When you were Mr. Tinsley's Supervisor do

6    you know what kind of Supervisor he was; do you have

7    an opinion on that?

8         A    At the time?

9         Q    Yes.

10        A    Yes.   I thought he was a very competent,

11   intelligent, aggressive, ambitious person.

12        Q    Did Mr. Tinsley supervise Larry Castillo to

13   your knowledge?

14        A    Yes.

15        Q    Are you aware that Mr. Castillo made

16   several trips to Panama with Berut Vega in 1999 and

17   2000?

18        A    I'm aware of it now, yes.

19        Q    Okay.   Do you know, have any idea what the

20   purpose of the trips were?

21        A    Yes.   To recruit -- recruit's the wrong

22   word.   To persuade Defendants or fugitives to turn

23   themselves   in   to   DEA   in   return   for   some

24   consideration later on.   And they were doing it

25   through this one informant whose name I now know;

179

1  Berut Vega.   He was the channel of communications.

2      Q    In your opinion as the SAC, Mr. Castillo

3  was conducting meetings with Berut Vega and possible

4  Defendants,  traffickers,  sources.   What  if  any

5  documentation  should  have  been  done  to  document

6  those meetings?

7      A    There should have been a DEA 6 prepared on

8  each meeting.   And where the DEA 6, which is the

9  Report of Investigation, would have recorded salient

10 facts concerning the meeting.   Absent that, if he

11 didn't do that, he would have at least wrote a memo

12 to document the meeting.

13     Q    Anything from the informant?

14     A    Please rephrase your question.

15     Q    Should  there  have  been  an  Informant

16 Statement taken?

17     A    If  an  Agent  was  there  present,  probably

18 not.

19     Q    Okay.

20     A    Because the inform -- the Agent would be

21 writing the report, so why have an informant write

22 a report?

23     Q    Briefly   what's   the   importance   of

24 documenting the meeting?

25     A    The importance of documenting the meeting

184

1      A    Absolutely not.

2      Q    Did you ever authorize Special Agent

3  Castillo to travel aboard a private plane to and

4  from Panama?

5      A    No.

6      Q    Were you aware that Castillo was traveling

7  to and from Panama aboard a private plane leased by

8  Dave Foreman, Berut Vega's attorney?

9      A    At the time I was not.  I became aware of

10  it I think in early February 2000.

11      Q    Were you aware that on occasion Agent

12  Castillo's hotel expenses were being paid by Berut

13  Vega's attorney, Dave Foreman?

14      A    Not at the time.

15      Q    Does that bother you?

16      A    It's troubling.

17      Q    Why?

18      A    Again, it puts us in a position of having

19  been bought by an informant.  An informant was a bad

20  guy, may still be a bad guy, may want to extract

21  favors from you in the future and this could be

22  another hook.

23      Q    Does DEA Policy require that a CS be

24  activated when they are paid?

25      A    Yes.

213

1    Q    Okay.  Now would there be any reason why,

2   for example, you could not -- you would not under

3   those circumstances want to bring Mr. Cristancho in

4   by commercial airline?

5    A    Based on what you just said and the way you

6   explained it, there could be reasons.  Okay, but

7   that was not -- those -- that particular scenario

8   was not in any discussions that I had with any of my

9   subordinates that there was a logistical problem on

10   the ground in Panama that dictated the use of a

11   private aircraft.

12   Q    Well were you aware for example that it was

13   the CIA that put Mr. Cristancho on the plane in

14   Panama?

15   A    Absolutely not.

16   Q    You didn't know that?

17   A    I did not know that until today.

18   Q    And when you say "today" are you hearing it

19   from me for the first time?

20   A    I had heard it from someone else --

21   Q    Today?

22   A    Yeah.

23   Q    Now would there be any reason, if you're

24   interested in absolute secrecy, why you might not

25   want to use a DEA Airwing plane?

214

1      A    Would there be a reason?

2      Q    Yes.  Can you conceive of a reason if you

3  were absolutely obsessed with the idea of secrecy

4  and no leaks why a DEA Airwing plane might not be a

5  good idea?

6      A    Yes.

7      Q    And why so?

8      A    Well, I mean if it was explained that the

9  DEA aircraft was known to local violators, and in

10  this case Panama, that would be a credible reason to

11  consider alternatives.

12      Q    Right.  Now I take it that you personally

13  had no contact with the Country Attache, Mr. Jay

14  Bergman, who was the DEA Agent in Panama during this

15  episode?

16      A    That's correct.

17      Q    Okay, I think you said in your direct

18  examination that that would normally be done at a

19  lower level than you?

20      A    That's correct.

21      Q    Mr. Bergman would be at what GS level?

22      A    He's a GS-14.

23      Q    Okay, so he would be dealing with either a

24  GS or an ASAC?

25      A    Yeah.  I would say so.

215

1    Q    All right.   So you were not aware until

2  today that Mr. Bergman arranged for the CIA to put -

3  -

4    A    I didn't --

5    Q    -- Mr. Cristancho on the plane?

6    A    I wasn't even aware until you just said it

7  that Bergman had anything to do with arranging that

8  the CIA was involved.    I knew from earlier

9  conversations today that the CIA had been involved

10  in this activity, but I didn't know the details that

11  you just disclosed to me; that Bergman arranged it.

12        And it would make sense that he would

13  seeing that he was on the ground if that's what in

14  fact happened.

15    Q    Now how big a violator was Cristancho at

16  the time based on DEA's perception?

17    A    Well he was a significant violator.

18    Q    Did you ever read anything that suggested

19  that at the time DEA believed him to be the heir

20  apparent to the Cali Cartel?

21    A    I read that.

22    Q    Okay, where did you read that?

23    A    I don't recall.

24    Q    Okay.   Now for the Court's benefit, what is

25  the Cali Cartel?

221

1    supervising it.

2        Q    Now were you aware that Agents from Caliman

3    were doing Secret 6's?

4        A    Secret 6's, what do you mean by that?

5        Q    DEA 6's that were Classified as Secret.

6        A    I recall at least one Secret 6 that I can

7    recall that Caliman did.

8        Q    And where were those kept?

9        A    In my safe.

10       Q    And where, in your office?

11       A    That's correct.

12       Q    And what were the circumstances under which

13   you learned that?

14       A    That I learned what?    Could you just

15   rephrase that.

16       Q    Yeah.   How did you learn that the Secret

17   6's were being done?

18            Did you have to sign off on them?

19       A    You mean the 6?

20       Q    Yes.

21       A    No, I didn't have to sign off on them.  But

22   I had to classify it.    I was the Classifying

23   Official for Secret Files and Secret Information.

24       Q    Are you suggesting there was only one?

25       A    No.   I said I recall one.

222

1    Q    But there could be more?

2    A    There could, sure.

3    Q    Now is there anything wrong with the

4    concept of doing a Summary 6 that includes activity

5    that takes place over a period of time?

6         Have you ever seen that done?

7    A    Yes.

8    Q    In other words, between such-and-such and

9    such-and-such a date this Agent traveled to this

10   location and did this?

11   A    It would depend on what they were

12   reporting.  If there was significant activities on

13   the different dates then it's -- it's not

14   acceptable.  In fact the Manual says that you've

15   got, I think it's, 48 hours to prepare a Report of

16   Investigation on an investigative activity.

17        So if you're saying that it transpired over

18   a period of a week and there was significant stuff

19   in there, no, it's not all right.

20        If you're saying that, you know, there were

21   several meetings in the same day and it's reported

22   on a 6 in a summarized fashion, yeah, I guess it

23   would be okay.

24   Q    Were you aware that the Caliman Commission

25   Funds were continuing to pay for things like a safe

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
ATLANTA REGIONAL OFFICE


DAVID T. TINSLEY,
            Appellant,

v.                                    DOCKET NUMBER
                                      AT-0752-04-0116-I-1

U. S. DEPARTMENT OF JUSTICE,
            Agency.
_____/

                    *      *      *

              TRANSCRIPT OF PROCEEDINGS

                 *   VOLUME II   *

        The above and forgoing cause having

come on to be heard before RICHARD W. VITARIS,

Administrative Judge, on March 15, 16 & 17, 2004 at

the hour of 9:00 a.m. o'clock each day in the City

of Miami, County of Dade, State of Florida, for the

purpose of taking testimony in this cause.


                          COURT REPORTER,

                          ALBERT C. WEIR
                          Court Reporter

CERTIFIED COPY

NANCY WEIR REPORTING SERVICE
P.O. BOX 6033 LAKE WORTH, FLORIDA 33466
561/967 2073                          FAX 561/433 8026

323

1                    DIRECT EXAMINATION

2    BY MR. McCOY:

3        Q    Agent Upchurch, are you currently employed

4    by the Drug Enforcement Administration?

5        A    Yes.

6        Q    And for how long?

7        A    Sixteen-and-a-half-years.

8        Q    And where are you currently assigned?

9        A    To the Miami Field Division, Enforcement

10   Group Six.

11       Q    Were you ever in Group 9?

12       A    Yes, I was.

13       Q    And what was your role there?

14       A    I was a Special Agent.   Senior Agent in a

15   group.    Backup Supervisor.    Sometimes Acting

16   Supervisor.

17       Q    Were you involved in Operation Millennium?

18       A    Yes, I was.

19       Q    Were you the Acting Group Supervisor in

20   October of 1999?

21       A    Yes, I was.

22       Q    Were you involved with the surrender of

23   Orlando Cristancho?

24       A    Yes.

25       Q    Were you ever in meetings prior to his

324

1   surrender to discuss the arrangements that would be

2   made for his surrender?

3        A    Yes.

4        Q    Was   the   mode   of   transportation   ever

5   discussed prior to his surrender?

6        A    I was aware of the mode of transportation

7   but I don't think I was -- I was not involved in any

8   discussions as to, you know, the mode itself.  I was

9   aware of it.

10       Q    How were you aware of it?

11       A    By talking to Dave.

12       Q    Were  you  present  when  Orlando  Cristancho

13  arrived in Fort Lauderdale?

14       A    Yes, I was.

15       Q    And   at   that   time   what   was   your

16  understanding as to the mode of transportation?

17       A    He was coming up by private aircraft.

18       Q    Did you know at the time who paid for the

19  private aircraft?

20       A    No.

21       Q    Do you know now?

22       A    I believe it was paid for through monies

23  from the SARC.

24       Q    Did you know that Larry Castillo and Berut

25  Vega met with Orlando Cristancho in Panama?

325

1      A    I was aware of that.

2      Q    Do you know how long they met with him?

3      A    No, I don't.

4      Q    Do you know anything about the arrangements

5   that were made in Panama regarding Orlando

6   Cristancho being brought to the United States?

7      A    No.   Only that he was going to surrender

8   himself to DEA in Panama and transported up here to

9   face the charges he was indicted for.

10     Q    Do you know if the CIA was involved in the

11  arrangements for his surrender in Panama?

12     A    No, I don't know that.

13     Q    As the Group Supervisor for Group 9 were

14  you responsible for the indictment for Mr.

15  Cristancho?

16     A    I wasn't the Group Supervisor but I was a

17  co-case Agent on Operation Millennium that was a

18  joint investigation between our group and the Bogota

19  Office.

20          So he was one of about, I believe 38

21  Defendants in that operation.

22     Q    Did you ever see any DEA 6's or

23  Investigative Reports or other documentation

24  regarding the arrangements or the conversations or

25  the activities that Larry Castillo had with Orlando

326

1   Cristancho in Panama prior to his surrender?

2       A    I don't believe so, no.

3            MR. McCOY:  Nothing further.

4            ADMINISTRATIVE JUDGE:  Cross examination?

5            MR. ROTH:  Thank you, Judge.

6                    CROSS EXAMINATION

7   BY MR. ROTH:

8       Q    Agent Upchurch, you indicated that you

9   learned of the mode of transportation through

10  conversations with Mr. Tinsley?

11      A    Yes.

12      Q    In relation to when Mr. Cristancho actually

13  arrived, when were those conversations?

14      A    I would say a week maybe.  It was a short

15  period of time.

16      Q    When you say "a week" you mean a week

17  before he showed up or a week after?

18      A    No, a week before.

19      Q    So you were aware of that a week before

20  approximately?

21      A    Within days.  It wasn't --

22      Q    Okay, days?

23      A    Yes.

24      Q    And tell us about the conversation that you

25  had with him about it as best you can recall.

327

1    A    I don't remember the specifics other than,

2  you know, the sensitivities that were of concern.

3  We wanted to keep the fact that Cristancho was in

4  our custody as quiet as possible.

5          And I know one of the conversations that

6  Dave and I had, concerning bringing him into the

7  country, using a private aircraft in his opinion was

8  the best way to do that.

9    Q    And what did he say the reason was for

10  using the private aircraft, why it would be the

11  best?

12    A    I don't know if there was a specific reason

13  other than the fact that we were hoping to use

14  Cristancho as a cooperating Defendant and we needed

15  to keep this as quiet as possible.

16    Q    Was there any discussion between you and

17  Mr. Tinsley as to why a DEA aircraft couldn't be

18  used?

19    A    No.

20    Q    Do you have any understanding as to whether

21  or not Mr. Cristancho had any travel or citizenship

22  documents on him when he arrived?

23    A    I don't remember what documents he had on

24  him, no.

25    Q    Now were you physically present when Mr.

328

1  Cristancho arrived?

2      A    Yes.

3      Q    And who else was there?

4      A    From Group 9, myself and Keven Burns, who

5  is my partner and co-case Agent in the Millennium.

6  Dave was there.  There was a couple Agents from

7  Group 43 and I don't -- I really don't recall who

8  they were but I know he had a couple of his people

9  there.  I believe Theresa VanFleet was there.

10          ADMINISTRATIVE JUDGE:  Who?

11          THE WITNESS:  Theresa VanFleet.  She was

12      the prosecutor.

13  BY MR. ROTH:

14      Q    Okay, and when I say "there" I mean at the

15  airport when he arrived.

16      A    Yes.

17      Q    Did you physically see the plane that

18  night?

19      A    Yes.

20      Q    When I say "you met the plane", I mean you

21  were actually out on the runway?

22      A    Well, yes.  Yes.

23      Q    And what was the purpose of you being

24  actually out on the runway?

25      A    I suppose it was a dual purpose.  It was a

329

1   joint venture on our part between Group 43 and Group

2   9.  We both had interest in this guy and as well as

3   security.

4       Q    Part of it was security?

5       A    (Witness nodding affirmatively.)

6       Q    You have to say.

7       A    Yes.  Yes.

8       Q    You can't shake your head.  It's being

9   recorded.

10      A    That's what he indicated earlier.

11      Q    Now what happened to Mr. Cristancho after

12  he arrived?  What arrangements were made and by

13  whom?

14      A    He was processed through Immigration and

15  Customs and from the airport he was taken to a hotel

16  down in Fort Lauderdale, temporarily, where he spent

17  the night.

18      Q    Now was there a protective detail assigned

19  to Mr. Cristancho for a period of time?

20      A    We had worked out a joint schedule between

21  Agents from Group 43, Agents from Group 9, as well

22  as other Agents from within a Division.  It was a

23  24-hour day, seven day a week schedule.

24           I think we had at least three Agents on

25  each shift.  And once again that was worked out

330

1  between Dave and I.

2      Q    And there were actually -- even though

3  basically he was -- Is it accurate to say that

4  basically he was turned over to Group 9 after his

5  arrival?

6      A    He was, I didn't differentiate between

7  Group 9 and Group 43.   I thought that we were

8  working this jointly.  We each had interest in this

9  gentleman.  And it was shared.  We were present.

10  Group 43 was present.

11      Q    And who paid for his, let's say housing in

12  the hotel, and security and so on?

13      A    I think the first few days, I think Dave

14  provided the funding for that.  We got a fund site

15  from Bogota in furtherance of Operation Millennium

16  as well as some Division funds.

17      Q    Did there come a time when he was put into

18  a safe house?

19      A    Yes.

20      Q    And was that done through Mr. Melendez in

21  some way?

22           Hold on.

23           (Mr. Roth conferring with his client.)

24      Q    Okay, withdrawn.

25           Did the Caliman SARC continue to pay for

492

1  you above that level?

2      A    No, I was above that level.   I did read

3  some.   But the 6's didn't have to come to me for

4  approval.

5      Q    Okay, what about Secret 6's?

6      A    Secret 6's I would review because they

7  would come up and have to be -- have to be numbered

8  and placed in the safe.

9      Q    So you would be involved in those?

10     A    Yes.

11     Q    And were there Secret 6's in Caliman?

12     A    Yes, there were.

13     Q    Now based on your supervision, how often

14  would you see Mr. Tinsley in the workplace?

15     A    Sometimes I'd see him two or three times a

16  week.   Sometimes none.   Other times, you know, once

17  a week.   But him or his Group or his Operation was -

18  - I think we discussed almost on a daily basis.   By

19  that I mean the ASAC and myself.

20     Q    Now based on your association with Mr.

21  Tinsley, do you have an opinion as to his integrity?

22     A    Yes, I do.

23     Q    And what is your opinion?

24     A    It's a very high opinion.   I think he's a

25  man of very high integrity.   During the whole time

493

1  that I was his Second Line Supervisor his integrity

2  was never questioned.

3      Q   Was he the kind of Supervisor that would

4  engage in, well that would spend twenty-three-

5  thousand-dollars ($23,000.00) without approval?

6      A   No.

7      Q   Was he the type of individual that would

8  lie about it in an OPR Interview?

9      A   No.

10     MR. ROTH:  I have no further questions.

11     ADMINISTRATIVE JUDGE:  Cross examination?

12     MR. McCOY:  Yes sir.  Thank you.

13                CROSS EXAMINATION

14 BY MR. McCOY:

15     Q   Mr. Gonzalez, you mentioned just now that

16 for DEA 6's, if they were classified, they'd have to

17 be passed through you to Mr. Mazzilli?

18     A   They wouldn't necessarily have to be passed

19 through me, but if it was on my side of the house or

20 one of the Groups, and they had to be put in the

21 safe they usually would bring it to me, yes.

22     Q   Mr. Mazzilli was the Classification

23 Authority though, correct?

24     A   Yes.

25     Q   How many Classified 6's from Caliman do you

494

1  recall seeing?

2      A   I want to say four or five.  Maybe six.

3  But somewhere, I'd say somewhere between five and

4  10.

5      Q   Do you recall who they were referring to?

6      A   I remember -- Well they all had to do with

7  high level Columbian traffickers.

8         The reason for the classification was that

9  I believe that they talked about possible corruption

10  in the Columbian Government and possibly leaks in

11  the U.S. Embassy, and things of that nature.

12      Q   Do you recall the time frame for these

13  Classified 6's?

14      A   You know, the best I can do is '99 and

15  2000.

16      Q   You said a few minutes ago on examination

17  by Mr. Roth that you believed that Dave Tinsley had

18  approval for ten-thousand-dollar expenditures

19  because he said that he did?

20      A   That was one of the things I said, yes.

21      Q   Did David Tinsley or Ernie Perez ever come

22  to you and ask you for approval for any specific

23  ten-thousand-dollar expenditure under Operation

24  Caliman?

25      A   I believe -- I recall one time that there

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
ATLANTA REGIONAL OFFICE


DAVID T. TINSLEY,
            Appellant,

v.                                      DOCKET NUMBER
                                        AT-0752-04-0116-I-1


U. S. DEPARTMENT OF JUSTICE,
            Agency.
_____/

              *      *      *

### TRANSCRIPT OF PROCEEDINGS

          *  VOLUME III  *

          The above and forgoing cause having

come on to be heard before RICHARD W. VITARIS,

Administrative Judge, on March 15, 16 & 17, 2004 at

the hour of 9:00 a.m. o'clock each day in the City

of Miami, County of Dade, State of Florida, for the

purpose of taking testimony in this cause.


                    COURT REPORTER,

                    ALBERT C. WEIR
                    Court Reporter

CERTIFIED COPY

NANCY WEIR REPORTING SERVICE
P.O. BOX 6033 LAKE WORTH, FLORIDA 33466
561/967 2073                      FAX 561/433 8026

549

```
 1                    DIRECT EXAMINATION
 2    BY MR. ROTH:
 3         Q    Mr. Ryan, are you currently employed?
 4         A    Yes sir.
 5         Q    And how, sir?
 6         A    Assistant  United  States  Attorney  in  the
 7    Western District of North Carolina.
 8         Q    And  how  long  have  you  been  an  Assistant
 9    United States Attorney there?
10         A    I've  been  an  Assistant  there  since
11    September of '03.  So just about six months.
12         Q    And  were  you  an  Assistant  United  States
13    Attorney elsewhere --
14         A    Yes sir.
15         Q    -- before you went to North Carolina?
16         A    Yes sir.  I was an Assistant United States
17    Attorney here in the Southern District of Florida
18    from September of 1989 until August of 2003.  So
19    just about 14 years.
20         Q    Now do you know Mr. Tinsley?
21         A    I do.
22         Q    And how do you know him?
23         A    Dave was an Agent that I worked with for
24    years and then later became a Group Supervisor that
25    I worked with.  And we were both assigned to what
```

550

1  was called HIDA for a number of years together.

2      Q    And did you work cases together?

3      A    Yes,   principally,   early   on   in   my

4  relationship with him, but I've known him since that

5  time.

6      Q    And was he a Case Agent on some of the

7  cases that you did with him?

8      A    Yes.

9      Q    And during what period of time did you

10  actually work with him?

11      A    I met Dave, I believe I met Dave when I

12  first got out to HIDA or shortly before, and that

13  would have been I believe April of 1991, possibly

14  March, but somewhere in that vicinity. That's when

15  HIDA began its sort of start-up and the first AUSA's

16  arrived out there.  I was one of them.

17          And I was, actually even before I got there

18  I was assigned to a case that had been in progress

19  for some time that was called Operation Wizard and

20  David was one of the two Co-case Agents on it.

21          And at that point the case was, as I said,

22  had been in progression for quite some time.  We

23  were kind of thrown into a position where takedown

24  was going to become imminent.  So I ended up working

25  very  closely  with  Dave  and  his  Co-case  Agent;

551

1   closely and extensively for quite a period of time.

2       Q    All right.  Did there come a time when you

3   became    involved    in    an    investigation    and    a

4   prosecution which was known as Operation Millennium?

5       A    Yes sir.

6       Q    And what was that?

7       A    Operation Millennium was an investigation

8   that actually took place in Columbia.  In the Nation

9   of Columbia.   It was a joint investigation run by

10  the Columbia National Police and the DEA.  Primarily

11  the DEA Office Bogota, Columbia.

12       The    Columbia    National    Police,    because

13  obviously they had Law Enforcement jurisdiction down

14  there,  were  the,  I  guess  described  as  primary

15  Investigative Agency.  The Columbia National Police,

16  I'm sorry.   The DEA down there assisted.   Provided

17  equipment,  training,  support.    All  that  sort  of

18  thing.

19       It was initially, and throughout the course

20  of  the  proactive  part  of  the  investigation  down

21  there,  an  electronic  type  investigation;  that  is

22  many phones were tapped, many beepers were cloned.

23  And  in  terms  of  principal  evidence,  the  most

24  important  thing  was  they  bugged  an  office

25  electronic,  eavesdropping  devices  placed  in  an

552

1    office in Bogota that was used by the lead Defendant

2    in the case and target.   A man named Alahondro

3    Burnell-Mondregal.

4            And -- I'm sorry.

5    Q    Can I just stop you there.

6    A    Yeah.   I'm sorry.   Please.

7    Q    Was there a group in Miami that was

8    assigned, in the Miami Field Division that was

9    assigned to Millennium?

10   A    Yes.

11   Q    And what Group was that?

12   A    Group 9, I believe.

13   Q    And who was the Group Supervisor of Group

14   9 when you worked the case?

15   A    Okay, I didn't become part of the case

16   until shortly before takedown, which was the fall,

17   I think October of '99.   I think I'm right on that

18   date.

19           And at the that time it had been going on

20   for quite some time.   Probably at least two years.

21   Maybe three.

22   Q    In October of '99 who was the Group

23   Supervisor?

24   A    It was Mike Upchurch, and I think he was

25   Acting at that time.

553

1    Q    Right.  Now did there come a time when you

2    heard the name Orlando Cristancho?

3    A    Yes sir.

4    Q    And when did you hear that for the first

5    time?

6    A    Probably right around the time of the

7    indictment and takedown.  There were 43 Defendants

8    listed in the Millennium indictment.  All of them,

9    I think all of them Columbian and almost all of them

10   in Columbia, and his was just one of the names on

11   the list.  Probably the first time I heard it it

12   probably didn't mean a thing to me but as time went

13   on his name grew in importance.

14   Q    Now you indicated you got involved at the

15   takedown.

16   A    Yes.

17   Q    You mean basically the arrest of the people

18   indicted?

19   A    Right.  Yeah.  I think I was involved maybe

20   a week, two weeks before takedown.  I mean I

21   literally came into it that late.  And I came into

22   it to be, you know, third guy down the line or

23   something.

24   Q    All right.  Was Mr. Cristancho arrested

25   during the takedown?

554

1     A     No.

2     Q     Did there come a time when you learned that

3     it might be possible to have Mr. Cristancho

4     surrender?

5     A     Yes.

6     Q     Okay, and when did you learn that in

7     relation to the takedown?

8     A     It was after the takedown.  And when I say

9     "takedown" what I mean is there was one day in

10    Columbia at which time all the forces were kind of

11    put in motion.  Police raided, I can't even tell you

12    how many different locations.  A good number of

13    people arrested.  I'm going to say over 20.  But I

14    don't have an exact number for you on it.  A lot of

15    places were searched, that kind.  It was a takedown

16    in the normal sense of the word.

17          But on that day Cristancho was not one of

18    them.  I don't think they knew where he was.  After

19    that day at some point, I don't know exactly when

20    but it would have been within days, I was apprised

21    that Cristancho was in Panama.  Or was going to

22    Panama.  Or something along, Panama ultimately

23    became his destination.

24    Q     How did you learn that?

25    A     I probably learned it from Theresa

555

1  VanFleet.  Who was the Lead Prosecutor at the time.

2      Q    So Theresa VanFleet was the Lead Prosecutor

3  in Operation Millennium and you were, you had some

4  sort of subordinate capacity at that time?

5      A    Yes.

6      Q    Okay.  Now did there ever come a time when

7  Mr. Cristancho actually arrived in the United

8  States?

9      A    Yes sir.

10      Q    And prior to his arrival did you attend a

11  meeting?

12      A    I attended several.  There were meetings

13  all the time.

14      Q    All right.  Did you ever attend a meeting

15  before his arrival where the subject of how he would

16  arrive in the United States was ever discussed?

17      A    Yes sir.  I remember that meeting.  I

18  remember a meeting where that was discussed.

19      Q    Could you tell us where that meeting

20  occurred and who attended.

21      A    It occurred in the U.S. Attorney's Office

22  in Fort Lauderdale where I and Ms. VanFleet were

23  both assigned.  I believe it occurred in the eighth

24  floor conference room.  Which is one of the bigger,

25  which is sort of the main conference room in that

556

1  office.

2           I remember Theresa VanFleet,

3     Q    Who was at the meeting?

4     A    That's what I'm saying.  I remember Theresa

5  VanFleet.  I remember Dave Tinsley.  I remember Mike

6  Upchurch.  And I remember myself.  There might have

7  been others.  It's quite possible Glen Alexander was

8  present.  He was a DOJ Trial Attorney assigned to

9  Operation Millennium as well.  But those are the

10 persons I remember specifically.

11    Q    And at some point was there a discussion

12 about how he would be transported to the United

13 States, did that occur?

14    A    Yeah.  It was, I mean it was a long

15 conversation.  That was by no means the sort of

16 principal reason for the meeting or even a principal

17 topic of the meeting.  I just --

18    Q    What was the principal reason for the

19 meeting?

20    A    Following the takedown in Millennium, you

21 know, things were, there was a lot of urgency.

22 There was a lot of attention being paid.  We were

23 literally working on this matter all the time.

24         Anyway, in terms of Cristancho when it

25 became apparent that he was in a position to either

557

1  surrender himself or negotiate some sort of placing

2  himself in U.S. jurisdiction that became a focus of

3  a lot of attention.

4        Cristancho, prior to his arrival in the

5  U.S., was seen as a really important figure in the

6  case and I just have to do a slight bit of

7  background here.

8        Cristancho had this really colorful past

9  where he had been an informant for at least two U.S.

10  Agencies that I can think of and maybe more, but

11  while doing that the information we gathered from

12  the Millennium Investigation was he was still a

13  major trafficker in own his right in Columbia.  That

14  possibly or very probably he was gathering

15  information from U.S. Authorities as best he could

16  and passing it along to his confederates in the drug

17  trade in Columbia.

18        He was seen as somebody who was sort of,

19  something of a hub in a kind of a wheel situation.;

20  where he had connections to many of the different

21  players in the Millennium indictment, and

22  specifically the bigger names, which included

23  Bernell Majugal and Fabio Ajolla.

24        The feeling was that if we could get

25  Cristancho in and get him to cooperate it would be

558

1  a major coo for our purposes.  Because one, we

2  thought because of his central location within the

3  conspiracy and because of his importance all of the

4  others would immediately, you know, throw up their

5  and hands, plead guilty and that sort of thing.

6       And two, that if we could get him in in a

7  way that he could work in a proactive fashion, that

8  is, work in an undercover capacity, that he could

9  produce huge results because he was so well placed

10  within the Columbian trafficking community.

11       So  for  that  reason  his  arrest,  his

12  surrender and ultimately his transportation to the

13  U.S. became a matter of big importance.

14  Q   Were  extraordinary  efforts  taken  to

15  maintain secrecy and security?

16  A   Yeah.

17  Q   What kind of efforts?

18  A   Well when he actually arrived, and I may be

19  jumping ahead.  But this is germane to the question.

20       When he actually arrived I remember the

21  efforts of getting him from, I think it was Miami

22  Airport but it could have been Fort Lauderdale, from

23  the airport to the U.S. Attorney's Office were

24  extreme.  The measures were extreme in a sense of

25  trying to keep it quiet.  Keep it secret.  Keep it

559

1   covert.

2          He was transported in with Marshalls and

3   with DEA Agents and they brought him up to the DUS

4   Attorney's Office conference room after hours.

5   Arrangements were made to have his wife meet us

6   there and everything was done to keep it secret.

7          Thereafter he was kept not in jail. Or not

8   on his own recognizance. But he was put up in a

9   hotel. At which time, you know, during which he

10  could be debriefed. That he was in a custody and

11  company of Agents I think 24/7.

12      Q   Were any extraordinary efforts taken in the

13  courtroom?

14      A   Yes. The courtroom, I think every time,

15  and I should point out. I don't think I was present

16  for any of his hearings. I might have been but I

17  don't think so.

18          But I know he had hearings up in West Palm

19  Beach in front of Judge Vitunac. The courtroom I

20  know was sealed. I have read transcripts thereafter

21  in which Theresa VanFleet was asking that the Court

22  not only seal the proceedings and seal any pleadings

23  relating to it but literally seal the fact that the

24  Defendant was even in custody and in the U.S.

25  jurisdiction. So that there wouldn't even appear on

560

1  the docket sheet any kind of a notation that Mr.

2  Cristancho had ever appeared before the Court.

3      Q    All right, let's go back to the meeting in

4  Fort Lauderdale.    Okay?

5      A    Okay.

6      Q    Did there come a time during that meeting

7  that you previously discussed where the issue of how

8  he would be transported to the United States --

9      A    Yes.

10      Q    -- was discussed?

11      A    Yeah.    I --

12      Q    And tell us as best you can recall what was

13  said.

14      A    Yeah.    I remember this.    And honestly, in

15  the course of that meeting, I think was a rather

16  slight detail and it went very, very quickly.    But

17  I do remember it.

18          At some point Ms. VanFleet was talking to

19  those present and I remember, principally Tinsley,

20  and I think Upchurch as well.    Inquiring about the

21  steps that were being taken to get Cristancho from

22  Panama to Miami and do it in such a way that it

23  would be kept secret.    Nobody would know and all the

24  Panamanian    traffickers   who   would   be   watching

25  wouldn't see, and that sort of thing.

561

1    And at some point I remember a comment, or

2  a question from her; 'How is he getting here?'  And

3  I remember Agent Tinsley saying words to the effect,

4  or as best I can remember them, as closely as I can

5  remember them, Mazzilli had approved the leasing of

6  a private plane to bring him up.

7    Q    And this conversation and meeting occurred

8  before Mr. Cristancho --

9    A    Yes.

10    Q    -- showed up?

11    A    Yes.  And I remember, at least to my own

12  mind thinking, you know, what's the matter with the

13  Airwing?  And maybe that's why it sticks in my mind.

14  But I don't think any further conversation went on

15  about that subject.  My memory is Theresa basically

16  liked the idea and we moved on to something else.

17    Q    Can you think of reason why the Airwing

18  might not have been used?

19    A    Well one, maybe it was taken with doing

20  other things.  As I said, there was an awful lot of

21  activity at this time.  The other might be a secrecy

22  issue.  I mean if the DEA planes are in a foreign

23  country it's quite possible that the airport workers

24  or a variety of other persons could have been in a

25  position to be watching the planes and seeing who

652

1          THE  WITNESS:   Okay,  that's  a  Memo  that
2      Larry wrote.
3 BY MR. ROTH:
4      Q    But  it relates to his trips to Panama?
5      A    Absolutely.  It says so, yes.
6      Q    Now what are the circumstances under which
7 DEA Agents communicate by memo as opposed to DEA
8 6's?
9      A    Well this was an issue.  Evonna Escoff or
10 Evonna Scoff was an issue where, it came up and
11 there was some discussion about; was she going to
12 cooperate, was she not going to cooperate, who's
13 involved.  It's one of those type of things.  And I
14 told Larry to generate a memo about it and he did.
15          Again, this isn't a DEA 6.  This is just
16 about a meeting or discussions about meeting people
17 in Panama.
18      Q    Okay.
19      A    That one is dated December the 9th.  And if
20 you turn two pages there's a -- this is a DEA 6 by
21 Larry Castillo dated February the 25th of 2000.
22 It's a debriefing of a source.
23          And the second paragraph talks about that
24 approximately 9,000 kilograms of cocaine was seized
25 off the coast of Chile.  That's off the motor vessel

653

1   Montego which they were talking about earlier from

2   Peru when Jay Bergman testified.   This is that

3   particular seizure.

4       Q    Now does this have anything to do with Mr.

5   Castillo's trips to Panama?

6       A    Absolutely.

7       Q    In what way?

8       A    Well this CS is, this is a very interesting

9   situation.  This CS is deceased.  The CS's code name

10  is Pele, P-E-L-E, okay.  Pele came to DEA and he

11  would not meet us in Columbia.  He would only meet

12  us in Panama.  Which is very important.  So I had to

13  send Larry to Panama to meet with Pele.

14       And Pele worked at the port in Columbia.

15  and, as a result, he was able to give us very good

16  information.   And his information, between his

17  information  and  another  source  named  Nicholas

18  Bergonzoli, we were able to isolate this shipment of

19  cocaine.  We originally thought it was 5,000 kilos.

20  It ended up being approximately 9,000 kilos.

21       Q    Okay, now in --

22       ADMINISTRATIVE  JUDGE:    I'm  a  little

23  confused.   This 6 seems to  indicate  it's  a

24  debrief on a meeting that occurred in Miami.

25       THE WITNESS:  This is, what I'm getting to,

654

1    Your Honor.  I haven't read it in detail.  But

2    this is the CI that did the 9,000 kilos.  I can

3    explain it further in a minute.

4        ADMINISTRATIVE JUDGE:  Well I don't see how

5    that document, what went on on these five trips

6    to Panama.

7        THE WITNESS:  Well these are numerically

8    out of order is what I'm saying.  There's other

9    ones where they're talking to this man in

10   Panama where it gives the extensive debriefing.

11   We're going to come to that in just a minute.

12        He just asked me if Larry wrote reports

13   about those events.

14        ADMINISTRATIVE JUDGE:  Mr. Roth, I'm a lot

15   more interested in what documents, what went on

16   in the visits in Panama.  Because that's what

17   the Agency's alleging here.

18   BY MR. ROTH:

19        Q    Okay, how about the next one.

20        A    The very next one is written by Bill Gomez

21   with Larry referenced in it under, it's actually

22   "Other Officers."  Number 9.

23        And it says; "On October 18, 1999."  It

24   lists Macklin, Gomez, Larry Castillo and DEA Panama

25   Country  Office,  Art  Ventura.     "Conducted  a

655

1    debriefing of CS Number N, Panama City, Panama."

2          And then it talks about, you know, it gives

3    a report of what happened there.  I can read the 6

4    or however you want to do that.

5          Q    Okay.

6          ADMINISTRATIVE JUDGE:  We don't need to

7    read them.  It's whether they exist that is of

8    concern to me, Mr. Roth.

9          MR. ROTH:  Right.  Okay.  I understand.

10         THE WITNESS:  Okay, flipping, Your Honor,

11   I'm turning from that front page two, three,

12   there's another one, Your Honor, that listed

13   12/13/99 by Larry Castillo, and it references

14   an October 19th and a December 7th, I have to

15   read it, saying that they conducted a

16   debriefing of this particular CS in Panama

17   City, Panama again.  That's three pages, four

18   pages.  I'm sorry.  Five pages.

19         After that there's the --

20   BY MR. ROTH:

21         Q    Okay, so I just want to make sure.

22         So far we've had two 6's that relate

23   specifically to Mr. Castillo and Mr. Gomez's

24   trips --

25         A    Yes sir.

656

1    Q    -- to Panama?

2    A    Yes sir.

3         ADMINISTRATIVE JUDGE:    And they're both

4    dated 12/13/99?

5         THE WITNESS:  Yes sir.  Yes sir.

6    BY MR. ROTH:

7    Q    However do they refer to debriefings on

8    other dates?

9    A    Yes sir.

10   Q    Okay, what are those dates?

11   A    I have to thumb back.  It says October 19th

12   and December 7th.

13   Q    All right, how about the other one, the one

14   before that?

15   A    I don't remember.  I have to look.  October

16   18th and December 6th.

17   Q    So those two 6's refer to debriefings of

18   CS's on four separate dates, correct?

19   A    That's what it says.

20        The next one is a Memo from March 1 of 2000

21   from Larry to me regarding security concerns.

22   That's already been talked about.  But it

23   references, in the second paragraph it references a

24   DEA Classified Secret 6.

25   Q    Okay, do we know what that Secret 6 is?

657

1    A   I can't sit here specifically and tell you

2  which one that is. I can't do that. But I do know

3  that he wrote several Classified 6's about Panama.

4    Q   Now let me ask you this question. We've

5  had testimony about Classified 6's relating to

6  Panama.

7         Are there any Classified 6's relating to

8  Panama that you have not seen in the files?

9    A   Well there's ones that I remember that I

10  haven't seen yet. Because once we do the 6's and

11  they're Classified they don't stay in the Group

12  Supervisor's office. Nor do they go to the CI File.

13  They go to the SAC safe.

14    Q   Approximately how many Secret 6's did Mr.

15  Castillo do if you recall?

16    A   I want to say about six that I can

17  remember. Not counting Rasguna, which is the

18  biggest one he did.

19    Q   But that's in here?

20    A   Yes, I think it is.

21    Q   All right, let's go past this Memorandum

22  here.

23    A   Okay.

24    Q   And let's keep going.

25    A   This is a --

658

1    Q    What's this, this Memorandum?

2    A    No, I've skipped the Memorandum as you

3    said.  I'm at a 6 that's July 12, 1999.  I need to

4    read it just again to see.  The first part of the

5    details he's debriefing a CI.  And he references

6    another Classified 6.   It's regarding Columbia

7    National Police.

8         ADMINISTRATIVE JUDGE:    Is this dated

9    February 23rd?

10        THE WITNESS: July the 12th, Your Honor, is

11   the one I'm looking at.

12        ADMINISTRATIVE JUDGE:   Hold on.   Did we

13   skip something?

14        THE WITNESS: Yes.  We skipped a

15   February --

16        ADMINISTRATIVE JUDGE: We were at the Memo

17   regarding security concerns.

18        THE WITNESS:   Yes sir.  He said to skip

19   that.

20        ADMINISTRATIVE JUDGE:  And then the next

21   document is dated February 23, 2000.

22        THE WITNESS:  He told me to skip that.

23        ADMINISTRATIVE JUDGE:    You're skipping

24   that?

25        THE WITNESS:  Presumably so.

659

BY MR. ROTH:

Q    Is there any reason to talk about this one?

It doesn't appear on its face to talk about Panama.

A    It doesn't talk about Panama.   It talks about Columbia.

Q    Okay.  All right, let's go to the next 6.

A    This is a July 12, 1999 6.  It doesn't talk about Panama.   It's talking about Costa Rico.   But it does refer to other 6's, Classified 6's.

The importance of this 6 in the March --

Q    Now which 6 are we talking about?

A    March 15, 1999.

MR. McCOY:  Your Honor, I'm going to object to this.   These are prior to any of the trips that we're alleging are a problem.

ADMINISTRATIVE JUDGE:   Let's go off the record here.

Whereupon, a discussion was had off the record.)

(Back on the record.)

ADMINISTRATIVE JUDGE:   We're back on the record.

THE WITNESS:  Okay, Your Honor, we have to if I can count the pages, we have to skip over

660

1  to get back to a Panama 6, Your Honor.  From

2  where we are right now --

3       ADMINISTRATIVE JUDGE:  From March 15th?

4       THE WITNESS:  I'm actually at December 9th,

5  I guess, Your Honor.  The Memo.  December 9,

6  1999.

7       Did I pass, am I ahead of myself?

8       ADMINISTRATIVE JUDGE:  Let me try to find

9  that.

10      MR. ROTH:  I've got December --

11      THE WITNESS:  It's after March 15th, right?

12  Is that right?  Yes, Your Honor, it's right --

13      ADMINISTRATIVE JUDGE:  Why don't we go off

14  the record until we have, I'll tell you what.

15      THE WITNESS:  Okay.  Because I've got it

16  with fingers here.

17      ADMINISTRATIVE JUDGE:  Why don't we go off

18  the record till we find it.  We don't need to

19  have two pages of transcripts looking for a

20  document.

21      (Whereupon, a discussion was had off the

22  record.)

23      (Back on the record.)

24      ADMINISTRATIVE JUDGE:  Continue, counsel.

25

661

1    BY MR. ROTH:

2        Q    All right, let's take the last one in Tab

3    S which is a DEA 6 dated 12/22/1999.

4        A    Yes sir.

5        Q    Does that refer to a number of trips to

6    Panama?

7        A    It mentions two dates; November 13, '99 and

8    December 16, '99.

9             And it says:

10            "Larry Castillo and William Gomez and DEA

11   Panama  Country  Office,  Art  Ventura  conducted  a

12   debriefing of," it's   CS number, CI number, "in

13   Panama City, Panama on December 16, 1999."

14            Then it did the debriefing on the previous

15   dates.

16            And then on December 16, '99 Larry brings

17   the CS to Miami or whatever.

18       Q    Okay, is it unusual to do a 6 that refers

19   to debriefings on more than one date?

20       A    No, it's not unusual.

21       Q    All right, let's take the next one.

22       A    The next one is the, as was stated earlier,

23   it's the Rasguno 6.  Which is --

24            MR. MCCOY:  Your Honor, and this is the 6

25        that we're going to object to being relevant

662

1    here.  It's the sixth trip and there's been no

2    contention in that trip there was anything

3    missing.

4         ADMINISTRATIVE JUDGE:  Okay.  Then move on.

5         THE WITNESS:  Okay.  All right, Your Honor,

6    passing that one, the next one is 1/27/2000

7    regarding the seizure of eight-thousand-eight-

8    hundred-ninety-five kilos.

9         And the first synopsis paragraph states,

10   gives the dates.  And says:

11        "DEA Special Agents from Miami Group 40 and

12   DEA Offices in Panama, Columbia and Chile

13   coordinated the location of subsequent seizure

14   of approximately 8,000 kilograms of cocaine

15   aboard the motor vessel Nativa."

16   BY MR. ROTH:

17        Q    Okay, in what way does this 6 relate to any

18   of the trips to Panama?

19        A    Well in paragraph two it says:  "Group 43

20   Special Agent Larry Castillo and William Gomez, Art

21   Ventura using well placed sources regarding plan and

22   loading of approximately two-thousand kilos."

23        This is the boat that -- and if you read

24   the whole thing it goes into the -- this boat left

25   Columbia.  It came to Panama.  We coordinated it

663

1   with the Panama Office.  We actually tried to get a

2   bug on the boat and we tracked the boat and took it

3   off in Chile, seizing it in Chile.

4        Q    But in what way does this relate to a trip

5   to Panama?

6        A    Because they went there and debriefed

7   people about this.

8        Q    All right, let's put these away.

9        A    Okay.

10       Q    Is that --

11       A    That's it in here.

12       Q    Okay.  Now could there be others?

13       A    There's definitely others.

14       Q    When you say "there's definitely others"

15   why wouldn't they be here?

16       A    Well I can't say why they're not here.

17   Some of these I hadn't seen since I've been gone

18   because we got them in Discovery.  They're weren't

19   in the file originally.

20            But when 6's are written, if I can explain

21   how that works real quick.  Classified 6's are

22   different than regular 6's.  Because when Classified

23   6's are done they have to be vetted through the

24   chain of command.  There's some level of fact

25   checking, and it has to be.  It has to be qualified

664

1   by the Management Staff that it's worthy to be

2   Classified and sent to the SAC.

3        For example we sometimes will have people

4   make outlandish statements that are just nonsense.

5   And they'll say; 'Don't put that in there.'   And

6   sometimes it will be something of substance that's

7   believable but they want it Classified.  They don't

8   want it in general relates.

9        The    reason    that's    important    these

10  Classified 6's stay in the safe in the SAC's office.

11  They don't go to the CS File and they don't go to my

12  file.

13        ADMINISTRATIVE JUDGE:  And I take it they

14       don't onto the computer system?

15        THE WITNESS:  A lot of them don't.   And

16       Your Honor, it takes a long time.  And if I

17       could, on a couple of Larry's 6's, Your Honor,

18       what's sensitive about this -- it bothered me.

19       I hadn't been able to tell you since -- is many

20       of these 6's talk about corruption in Columbia.

21       And they talk about high level corruption.

22       That's important.  And DEA guards that.   We

23       just don't tell the world about it.

24        It even goes to Washington.  And some of it

25       doesn't go in the NADDIS System.  Mr. Kane said

665

1    earlier it all has to go in the NADDIS

2    computer, or whoever said that.

3        They decide on certain things.  In other

4    words when you have a National Official where

5    they say is taking money or bribes they don't

6    always put that in the computer that's vetted

7    and they determine if that goes in the computer

8    because DEA NADDIS Systems are used for other

9    reasons, and sometimes Intelligence sharing, so

10   they guard what is Classified.

11   BY MR. ROTH:

12       Q    All right, let's move on to another

13   subject.

14       Now how did the issue with Mr. Cristancho

15   come about?  And when I say "the issue with Mr.

16   Cristancho", I'm talking about the concept of him

17   surrendering.

18       How did it arise?

19       A    Here's what happened on him.  And in this

20   tab we didn't go into it but there's --

21       ADMINISTRATIVE JUDGE:  Counsel, I'm a lot

22   more interested in the plane --

23       MR. ROTH:  Okay.  Well I was --

24       ADMINISTRATIVE JUDGE:  -- than how --

25       MR. ROTH:  I was moving in that direction.

666

1          ADMINISTRATIVE   JUDGE:     --   or   why   Mr.

2     Cristancho decided to surrender.

3          MR. ROTH:   Okay.   All right.

4  BY MR. ROTH:

5     Q     How did the jet come about?

6     A     What happened, Mr. Cristancho was in Miami.

7  Had been working for the FBI.   And he fled during

8  the Millennium indictment.   There's one 6 in here

9  where he was debriefed in May 7th.

10    Q     Even before he was indicted?

11    A     Yes.   My guys met him and debriefed him.

12         He fled.   And it became a big issue of

13 getting him back.   Because if you look at the May

14 7th debriefing you can see he had a lot of valuable

15 information.

16         I   was   at   several   meetings   about   this

17 because my SARC targeted Fabio Achillo.   That's the

18 initial target in the SARC, is Fabio Achillo.   So

19 was the Millennium target is Fabio Achillo.   The

20 uniqueness of our situation is our case predated

21 Millennium.   A lot of people don't know that.   We

22 predated Millennium by like a year-and-a-half or two

23 years.   So we're targeting Achillo as well.

24         So we had a meeting of the minds about

25 Orlando, to get to the point, Your Honor, when he

667

1  left there was a meeting of the minds and I sat with
2  Mike Upchurch.   I had other meetings where Mr.
3  Mazzilli was present and the Management Staff, but
4  more specifically Mike Upchurch, and Mike Upchurch
5  and I would go to the U.S. Attorney's Office and
6  have meetings, infinitum meetings about this.

7          It came that Vega, and this is before
8  anything about the corruption scheme of even hearing
9  of it that this guy could do all this garbage.   It
10  came that Vega sent word to Larry that he could put
11  his hands on Orlando Cristancho.   That's totally
12  just from memory.   I haven't read my OPR Statement.
13  But that's basically it.

14          I go to the meeting.   I take Larry with me
15  to the U.S. Attorney's Office.   And I say; 'Larry,
16  tell them what you got.   What do we think we have.'
17  I would routinely take my Agents with me for several
18  reasons.

19          Larry said; 'Hey, we've got a guy.   We
20  think we can get him.'   Then we could go through the
21  whole thing and they make it extraordinary clear at
22  the U.S. Attorney's Office; 'This is a big deal.   We
23  want the guy.'   Okay?

24          There's many other meetings had.   And then
25  the meeting comes up about how are we going to get

668

1   him and how are we going to get him in.

2          That's where we talked about an operational

3   plan to get him; taking a plane to get him,

4   providing security to get him back and then making

5   him proactive.  But the most focus was making him

6   proactive because he talked about doing 20-ton

7   cocaine deals with some Mexican Federal Police

8   Officers.  That was our focus is to get him back in

9   to do that.

10          The second focus which is equal, that would

11   probably be the second focus in the U.S. Attorney's

12   Office.  It was the first focus of mine.  The second

13   focus was he was, as I was told, the domino for the

14   Achillo case.  If he came in and cooperated they

15   thought he could knock the rest of them over to

16   cooperate.

17      Q   Okay, now let's get to the issue of the

18   jet.

19          How does that even come up?

20      A   Well the jet comes up because we have to

21   have a way to get him back, to keep him secreted,

22   And to do it expeditiously and without any fanfare.

23          I talked to, besides Upchurch and these

24   people I talked to Jay Bergman.  I talked to

25   different people.  I sent an E-mail to Headquarters

669

1  once we knew tentatively we could do this.  But this

2  was all, there was an overall acting principle, Your

3  Honor, was -- I wasn't sure this guy would show up.

4  I did not know -- I mean I can't -- they said he was

5  going to show up but I've been in this business for

6  awhile and that doesn't always happen.

7       We have a meeting.  And I say --

8       Q    Now who's at the meeting?

9       A    Oh, I'm sorry.  Well we have a meeting

10  about getting him in here.  I call the FBI Office.

11  I speak to two different FBI Agents who were working

12  with Larry about what type of service they had used

13  to bring their fugitives in, because they were

14  bringing people in, and they told me the same plane

15  that we used.  Okay?

16       I had Larry check to see, to run down what

17  the expenses would be for a round trip if we put it

18  together.  After that I went and spoke to Mr.

19  Mazzilli and I explained again what I just explained

20  to you.  But what we covered in that meeting were

21  our meetings with the U.S. Attorney's Office.  We

22  brought him up to speed on the U.S. Attorney's

23  Office.  What they had said.  What they wanted.

24       We brought him up to speed, Mr. Mazzilli

25  and others up to speed on what Orlando is saying he

670

1   could do.   What kind of operation he could put

2   together.   That was important.   A proactive.   We

3   brought him up to speed on what, who he, we thought

4   he could cooperate against.

5          Then we brought him up to speed on the jet.

6   What it would cost.   What we thought we could do it

7   in and how it would work.   Work being get him, get

8   him down here, take him to the Executive Airport

9   instead of a major airport when we brought him in.

10         Then lastly we talked about housing him.

11   How we would house him and where we would put him.

12      Q    In the overall scheme of things, of all the

13   things that were discussed, how important was the

14   jet?

15      A    The jet was important.   I mean without

16   question.   But it wasn't the biggest issue.   The

17   issue was proactive, proactively going after the

18   Mexican Federal Police Officers.   And the issue was

19   proactively him talking to and locating the 30 or 40

20   some odd people that had been indicted in Millennium

21   that were still out.

22      Q    The discussion that you had with the jet

23   who was present?

24      A    From my memory now, now I'm going back

25   about five years, yeah, is Mr. Mazzilli, Ernie Perez

671

1  and myself.  We had subsequent meetings about this

2  where it was talked.   But about, when we talked

3  about getting it and what it would cost it was us

4  three.

5      Q   Okay.   As best you can recall what was

6  said?

7      A   Well the issue wasn't the jet candidly.

8  The issue was from Mr. Mazzilli; 'Can you produce

9  him?'  I mean, I told him verbatim.  What I said to

10 him was this.  I said; 'Mr. Mazzilli, we can get a

11 jet.  We checked with what the Bureau is using.'

12 That's always a card in DEA.   'It's going to be

13 around twenty-thousand-dollars ($20,000.00), okay,

14 is what I understand it would be.  And I think we

15 can do it, get him down and back and stick him in

16 the hotel.  I think he can do stuff.'

17      He said; 'Fine.'  He said, and then he said

18 to me; 'What else is this guy going to do for us?'

19 And I said; 'Well we've got him proactive we think.

20 We want to hook up a satellite phone and do a 20

21 something ton deal in Mexico.'  Which the FBI had

22 already shared Intelligence with us on about.  Which

23 is in the file.  Anyway that was the big key.  That

24 one he was very interested in.

25      And then the third thing of course was

672

1    bringing in the Millennium Defendants.   Which Mr.

2    Kane was ferociously interested in.

3           When we finished the conversation Mr.

4    Mazzilli says to me.  He took his two fingers, I'll

5    never forget, and he looked right at me and he said;

6    'Go do it.  Get him in here and get him in here

7    now.'  As God is my witness that's exactly what he

8    said.  And that's exactly what we were able to do.

9           I did not know for certain we could get him

10   in.  I was a nervous wreck for a few days because I

11   had already obligated.  I already told them; 'Bring

12   the jet.  We're good for it.'  I still get chills

13   talking about that.  The jet went down.  And thank

14   God in heaven they got him.  And Jay and the CI put

15   him on the jet and brought him in.

16          We had to have the CI because Panama, one

17   of the issues if you leave Panama that you will find

18   if you've never been there is two issues.  It is not

19   just Immigration issues.  Is they collect exit tax.

20   Even though it was twenty-five dollars ($25.00) you

21   would think they're collecting a pint of blood.

22   It's huge.  That's huge with them.  They collect

23   exit tax.  And then of course they look at

24   documents.

25          Orlando Cristancho is a fortune 500 level

673

1   guy.  You've already heard all that.  And I didn't

2   want anybody to see him.  And I wanted him here.

3   Mr. Upchurch will tell you the same thing.  That was

4   absolutely agreed upon.  And that's what we did.

5         Q    Now why not the Airwing?

6         A    It's a ludicrous statement.  No disrespect

7   to Mr. Kane.  Mr. Kane said; 'Well we use the

8   Airwing all the time to do Enforcement operations,

9   to raid labs.  To ferret Officials.'

10        And the key thing he said, Your Honor; 'We

11  use the DEA planes to move our counterparts.'

12        Our counterparts are corrupt, sir.  That's

13  what Orlando Cristancho is giving us information on,

14  is our counterparts that are taking U.S. money

15  illegally.  So we did not want our counterparts to

16  see Orlando Cristancho get on a DEA plane, and

17  anybody that knows Columbia or Panama knows this.

18  That's why there's several Active OIG and DOJ, PI's,

19  investigations on the Officials that were giving

20  money to Columbia or that are stealing money.  This

21  is all part of the Classified 6's that nobody wants

22  to talk about.

23        So when Cristancho was put on the plane he

24  is brought in for that purpose and we used that

25  plane without exception.  If I may say, and what

674

1    really gets me crazy about this, I've been to

2    Columbia many times.   I've been to Panama many

3    times.

4           Every major trafficker knows the N numbers

5    on our planes that are parked in the Eldorado

6    Airport in Bogota.  Why that is important is, all of

7    our overseas offices have diplomatic plates.   OPR

8    didn't want to hear this.  Diplomatic plates show

9    you're a gringo and you're a U.S. Government

10   employee.  Okay?

11          And they take pictures of our planes and

12   they have pictures of our planes.  And a matter of

13   fact, I don't why Mazzilli and Kane, they're on the

14   Internet.  You can sometimes pull them up.  Because

15   traffickers communicate on the Internet about our

16   aircraft.  I don't want to belabor it to death and

17   get in trouble.  That's the issue.  They're known.

18   And we did an unknown.  We used a rental that wasn't

19   known or connected to DEA.

20        Q    And was it your understanding that the FBI

21   had used it?

22        A    I know they used it.  They told me they

23   used it and I read the OPR Report where they used it

24   17 or 18 times.  And the guy says I'm the only one

25   that asked for a receipt because they paid cash and

675

1   my people had to have a receipt.  That's in the

2   report.

3          One of the pilots is an uncle to one of the

4   FBI Agents I was told by an FBI Agent.  That's one

5   of the uses that come to me.

6      Q    All right.  Now let me ask you to take a

7   look at Agency Tab Eight.

8      A    Okay.  This is an Operation Caliman Monthly

9   Report.

10     Q    Okay, which one is it?

11     A    This is the one for the jet.  November, if

12  you look at the report on the left under Tab Eight.

13  The way to read these.  The subject always defines

14  the month of the expenses.  So it's November 1999

15  expenses.  The Memo is dated December 16th.  The

16  reason for the record these dates are always late.

17  We have to wait to the end of the billing cycle to

18  get the bills to prepare the report.

19     Q    Okay, do you also have to wait for Pete

20  Marwick?

21     A    Absolutely.  They can't go out till they

22  reconcile it.

23     Q    Now is this the report that lists the

24  expenditure for the jet?

25     A    I can tell you without looking it is, yes.

676

1  But it is.

2      Q    Is the jet clearly indicated on here?

3      A    Yes sir, it is.

4      Q    Now what was your partici --

5          MR. McCOY:  Your Honor, I object to this.

6  We've been over this, I can't tell you how many

7  times.  We all know the jet's on this report.

8          THE  WITNESS:    It's  good  with  me,  Your

9  Honor.

10         ADMINISTRATIVE JUDGE:  I certainly know it.

11  And I certainly know it's listed there.  And I

12  certainly know that you had a couple of SES's

13  say it isn't an approving document.  And you

14  had a few who said it was.

15         MR. ROTH:  All right.  But let me --

16         ADMINISTRATIVE JUDGE:  And if you want to

17  just get the Appellant's understanding on that,

18  that's  fine.   But  we  don't  need  a  lot

19  protracted discussion about this.

20         MR. ROTH:  Okay.

21  BY MR. ROTH:

22      Q    What was your understanding about whether

23  this was an approval document?

24      A    Your Honor, for the record, it's not just

25  an understanding.  It's a fact.  I helped write some

701

1    A    I    think    he    got    two-thousand-dollars

2    ($2,000.00).   That's correct.

3    Q    And   he   wasn't   making   money   from   money

4    laundering pickups, was he?

5    A    He had nothing to do with money laundering

6    pickups.

7    Q    His sole purpose, involvement with Caliman

8    was basically Intel?

9    A    That's correct.   To bring it, yes.

10   Q    And as early as the spring or summer of

11   1999 you had concerns about Berut Vega.   At least

12   there were allegations about Berut Vega.

13        In fact you testified that nine times you

14   tried to have him deactivated and polygraphed?

15   A    That's true.

16   Q    But yet you continued to send him to Panama

17   with Agents and to be involved in operations and

18   you're not making sure that every move he's making

19   is documented?

20   A    Let me explain that to you.   Because it's

21   not quite that case.

22        The first issue we had about Berut Vega is

23   that he's meeting all these high level traffickers

24   and he has tenored something to them.   That was

25   nothing about corruption at that time.   There was

702

1    nothing about this operation he was doing.

2         I heard about that in November and I heard
3    about it from Dan Foreman who's one of the attorneys
4    representing Carlos Ramon and he called and told me.
5    When he called me I called the U.S. Chief of
6    Narcotics, Neil Stephens.  And I called Ernie Perez,
7    and I called a whole litany of people.  And I wrote
8    this in my log.

9         There were previous conversations that I
10   put in my agenda where Kacerosky, Eddie Kacerosky,
11   who's a rolling agitation with us at DEA had first
12   tried to recruit Vega.  And then came back and said;
13   'Well he's trying to extort people.'

14        The whole complexity of this scheme that
15   Vega was doing was not known to me.

16   Q    And isn't that the problem in this case.

17        It's not until after November of 1999 when
18   everything hits the fan that you find any DEA 6 that
19   talks about what Berut Vega is doing?

20   A    No.  No.  The problem is this, is the FBI
21   didn't tell me what he was doing.  And Toby, that's
22   -- when we would sit with him and I would talk to
23   these guys, I probably seen Berut Vega as many times
24   as I've seen the Judge, coming in and out.  It's not
25   like he was somebody in our office all the time.

703

1        Secondly what's important is that when we
2  would talk to him it was always, and I've seen this
3  my whole career in DEA.  He's working for the FBI.
4  He's working for, when you heard Jay, not say CI
5  over    the    phone.    We    call    them    the    spooks
6  domestically.  We say he's working for the spooks.
7  And we knew that Vega was.  So we know they're
8  paying him.  The FBI always historically pays way
9  better than we do.
10       Where we paid him, so I can just clear this
11  on the record.  His big money he would have made
12  with us is when he would bring in some major league
13  trafficker that would do something major and we'd
14  put him in for some sort of award and that was what
15  we had planned to do with him.
16       Q    But that didn't happen, did it?
17       A    No, it didn't happen.
18       Q    These, I'm not going to ask you to flip
19  back   through   Tab   S   and   talk   about   these   6's.
20  because you've had a chance to look at them and I've
21  had a chance to look at them.  We know what's in
22  them.
23       A    But that's not all of them.
24       Q    And these 6's that were highlighted in here
25  that were relevant to the five trips to Panama, none

704

1  of them document Berut Vega?

2       A    No.  And there's a reason for that.

3           Berut Vega, and I told Larry Castillo this

4  a hundred and, not literally a hundred times.  But

5  countless times.  Our goal was to have Vega do the

6  introduction and get him out of there.  There's even

7  one, I can't tell you in the file.  But there's one

8  time when they're down there in Panama and Berut

9  Vega is at the DEA Office with the FBI.  He's doing

10 something entirely different with them.

11          Vega's job was to bring the people in and

12 then I wanted him totally cut out of the thing.  The

13 FBI told me when they brought him he's a

14 non-testifier.  He's what's called an FCI-CI which

15 is Foreign Counterintelligence Service CI.  Which

16 means he's broke in with the CIA.  I mean there's

17 different terms, back channel sources, all this,

18 that's what he did and I didn't want him on any, as

19 limited papers we could have.

20          As a matter of fact there's a 6 in there --

21      Q    So you made a decision then not to have

22 paper on him?

23      A    I said as limited as we have.  If you'll

24 let me finish.

25          Under that tab there's a 6 that the

705

1  Administrator of DEA wanted to see.  Because Berut

2  Vega waltzed into the jail cell of Miguel Rodriguez

3  in Columbia and we had to write a 6 about that.  And

4  the Administrator, I had to come in on the weekends

5  because the SAC at the time had the Administrator on

6  the phone wanting to know the circumstances of that.

7      Q   By the time Orlando Cristancho is going to

8  be   brought   in   in   October   you've   already   had

9  suspicions about Berut Vega?

10     A   Not necessarily.  I had heard things, light

11 things.  But nothing about this corruption scheme.

12     Q   Okay,  so  maybe  it's  not  the  corruption

13 scheme.  But you've had suspicions about Berut Vega

14 by the time you get to Cristancho.

15     A   I  act  suspicious  about  everybody.   But

16 specifically about him not to the level that we're

17 talking about, no.

18     Q   But you still trusted him to rent a private

19 aircraft for the surrender of a fugitive?

20     A   I didn't trust him whatsoever.

21     Q   You  trusted  him  enough  to  rent  a  private

22 aircraft through him to transport this fugitive.

23     A   I trusted the FBI when they told me that's

24 the air service they use.  And I had my Agent check

25 to make sure that's that air service.

706

1    Vega went out --

2    Q    Mr. Tinsley --

3    A    Well if you'll let me finish my answer.

4    Q    -- doesn't --

5    ADMINISTRATIVE JUDGE:   Let him answer the

6    question, counsel.

7    THE WITNESS:   We sent Vega, Your Honor, to

8    get the plane because we're not going to put it

9    in a DEA name or a DEA Agent's name and we had

10   him do it that way.   And then I wrote a check

11   for twenty-three-thousand-dollars ($23,000.00)

12   for the rental of that aircraft.

13  BY MR. McCOY:

14   Q    So you admit that Berut Vega rented the

15  aircraft?

16   A    There's no question.

17   Q    And don't our Agents have undercover names?

18        Could an Agent have rented it in an

19  undercover name?

20   A    Sure they could.

21   Q    But you didn't do that, did you?

22   A    No.   There's a reason for that.

23        Larry's undercover name is Mark

24  Christopher.   That's a gringo name.   Mark

25  Christopher.   My undercover name is David Stone.

707

1  Berut Vega's name is Berut Vega.   You're using a

2  South American or Latin name in South American.

3       Q   And you're telling me that DEA doesn't have

4  anybody with an undercover name --

5       A   No I --

6       Q   -- or we can't establish an undercover name

7  that would have worked?

8       A   Now Toby, I didn't say that at all, no, And

9  I'm not saying that.   I'm saying I felt it was best

10  for him to do that.

11       Q   Isn't it true that Theresa VanFleet and the

12  Bogota Agents in the Millennium case became so upset

13  about the meetings that were going on in Panama that

14  it became heated?

15       A   Of course that's true.

16       Q   So much so that Mr. Perez eventually said;

17  'Stop it?'

18       A   That's very true.   But there's something

19  else to that.   I mean there's, this is a bad

20  cocktail.   You had Group 9 working the U.S. side of

21  the thing.   Another thing that hasn't come into the

22  record.   DEA Group 43 was the Columbian Response

23  Group.   We were responsible for Columbia for the

24  Miami Division.

25            So we --

708

1    ADMINISTRATIVE JUDGE: Mr. Tinsley, I don't

2  have an earthly clue what you're talking about.

3    THE WITNESS: Oh, I'm sorry, Your Honor.

4    ADMINISTRATIVE JUDGE: So why don't you

5  start over and --

6    THE WITNESS: He's asking --

7    ADMINISTRATIVE JUDGE: I guess I don't even

8  know where this is going.

9    What does Ms. VanFleet have to do with the

10  Charges?

11    MR. McCOY: It has to do with what Mr.

12  Tinsley knew was going on with Berut Vega in

13  Panama and the fact that he's not doing

14  anything to ensure that these things are being

15  documented in a way to protect his Agents.

16    ADMINISTRATIVE JUDGE: But there's been

17  nothing elicited about Vega doing anything

18  other than introducing potential informants to

19  Mr. Castillo and then getting out of there.

20    MR. McCOY: That's exactly right. That's

21  exactly the problem. Nobody knows what he's

22  doing because it's not being documented. And

23  the problem is --

24    ADMINISTRATIVE JUDGE: I haven't heard any

25  evidence about there being a problem.

709

1    MR. McCOY:  He just testified there was a

2    problem and that's exactly what he's testifying

3    to now.

4        ADMINISTRATIVE JUDGE:  And that's when I

5    said I didn't understand what he was talking

6    about.  Because there's been nothing up until

7    now about a problem.  I don't know what you're

8    talking about, counsel.

9        MR. McCOY:  Mr. Tinsley knows what I'm

10   talking about.

11       ADMINISTRATIVE JUDGE:  I don't know what

12   you're talking about.  And if I don't know what

13   you're talking about you're wasting this

14   Board's time.

15       MR. McCOY:  Your Honor, it goes to his

16   motive to not ensure that reports were done.

17       ADMINISTRATIVE JUDGE:  Why don't you start

18   over and lay a foundation so I understand what

19   problems you're referring to.  Because I do not

20   know what you are talking about.

21       MR. ROTH:  I'll start over, sir.

22       ADMINISTRATIVE JUDGE:  Good.

23   BY MR. McCOY:

24   Q    Mr. Tinsley, in the meetings with the other

25   Agents discussing Berut Vega meeting with Millennium

71

1  targets.

2      A    Yes.

3      Q    Those meetings became a contentious issue

4      A    They became contentious but they were also

5  the issue, Your Honor, was Berut Vega was meetin

6  with targets that were targeted by the DEA Bogot

7  Group as well as DEA Group 9 in Miami and Calima

8  and there became somewhat of a turf battle about wh

9  was doing what.

10         Now so you know the importance of this

11  there were several meetings.  And of course the

12  meetings were heated, just as we've had here.  But

13  there wasn't any rock throwing.  As Mike Upchurch

14  says, we worked this out.

15         And everyone knew that Vega worked for the

16  CIA and the FBI and they knew he was down there

17  doing other things besides what he did for us.

18      Q    And yet you're not having your Agents

19  document his every move while he's in Panama?

20      A    No, I am not.  I'm having my Agents cut him

21  out every chance they can.   I don't want him

22  documented.   I don't want him in our Case Fi

23  anymore than we have to.

24      Q    Okay.  You heard Mr. Gonzalez test

25  the meeting that he was in he felt like M

711

1  had given you a bit of a blanket authority or a

2  delegation of authority.

3      But then you testified today that you had

4  a specific conversation with Mr. Mazzilli.

5      A   I had to go back and tell him exactly how

6  much the jet was going to cost.  Absolutely.

7      And I had the meetings at the U.S.

8  Attorney's Office to tell him, Mazzilli, Mazzilli

9  came and said; 'Look, I want it soup to nuts.  I

10  want to know what this guy's going to do and the

11  whole thing.'

12      Because what's going here is the SAC is

13  getting on with the U.S. Attorney saying; 'Either my

14  guys can do it and this is what we're going to do.'

15      We had to, in essence we had to sell the

16  program on up the chain.  Even though the line

17  attorneys, if I can finish real quickly.  The line

18  attorneys, Theresa VanFleet and Ed Ryan, were a

19  thousand percent for it.  It had to still be sold up

20  the chain.  That's why there were these multiple

21  meetings.

22      Q   Mr. Tinsley, isn't the real problem with

23  this whole jet issue that it was just a way to keep

24  Berut Vega happy?

25      A   Toby, that's insane.  That's insane.

712

1    Q    Will you turn to Tab 29 of the Agency's

2    binder please.

3    A    Oh, I'm sorry.  I'm sorry.

4    MR. ROTH:  No, you got it there.

5    THE WITNESS:  Okay.  Okay.

6    BY MR. McCOY:

7    Q    Didn't you know that Dan Foreman acting on

8    behalf of Berut Vega was purchasing the plane that

9    was rented to bring Cristancho in?

10    A    No.  That's absurd.

11    Q    Is this Memo not addressed to you, this

12    letter?

13    A    It is addressed to me.

14    Q    And you're aware that this letter was found

15    on your desk in your office?

16    A    I am so glad you said that today on the

17    record.

18    This letter was not found on my desk.  It

19    has never been on my desk.  That Kempshall lied as

20    an OPR Agent when she said it was on my desk.  Which

21    is in my record.  Which I can show you.

22    This letter was found in Larry Castillo's

23    locked credenza per the FBI sheet, and I'm welcome

24    to show you that, too.  It was not found on my desk.

25    I had never seen this letter before.

713

1      As a matter of fact, when they showed it to

2  me at OPR I wouldn't even handle it.  I didn't even

3  want my fingerprints around it.  And they asked me

4  if I had ever seen it before and I said no.

5      I had one conversation with Dan Foreman in

6  my life about this kind of money stuff.  And I said;

7  'Dan, if any of these Defendants are bringing you

8  money you better fill out your 8300.  You're dealing

9  with dirtbags.'  And that's what I told him.

10      This, and Toby, no disrespect to you,

11  that's a lie.  This has never been found on my desk

12  and I'm furious about it.  And it's one of about 15

13  lies in this file.  Your Honor, I've never seen this

14  letter.  And the file reflects that it was found in

15  Larry Castillo's credenza, locked credenza that I

16  had never seen.

17      Q    It's    convenient,    Mr.    Tinsley,    that

18  everybody is lying here but you.

19      A    No sir.  I'm not saying you're lying.  I'm

20  saying what you just stated is just not true and I

21  think we need to enter into evidence where it was

22  found.

23      Q    It's in the Agency File.

24      A    It is.  And it shows it was taken out of

25  Larry Castillo's credenza not my desk.

714

1      MR. McCOY:  Nothing further, Your Honor.

2      MR. ROTH:  Judge, I have a few questions.

3      ADMINISTRATIVE JUDGE:  All right.

4      MR. ROTH:  I'm looking for it.  Hold on.

5      (Pause as Mr. Roth reviews documents.)

6      MR. ROTH:  Well I know it's in our file.

7  Let me look for this.  See if you can find it.

8      Judge, if I could just have a minute.  I'm

9  looking for one specific document here.   I

10  should have it momentarily.

11      (Pause as Mr. Roth reviews documents.)

12      (Off the record.)

13      (Back on the record.)

14                REDIRECT EXAMINATION

15  BY MR. ROTH:

16      Q    All right, Mr. Tinsley, I'd like you to

17  look at Appellant's 4(a), Tab MM, and I'd like to

18  ask you what that document is?

19      A    It is an FBI Receipt dated March the 30th,

20  2000 of a Search Warrant of Larry Castillo's:

21  "Seized from the work space of SA Castillo's filing

22  cabinet.  Labeled number five, bottom drawer."

23      And on number eight is his copy of a Dan

24  Foreman letter dated 1/4 of 2000.  "Re:  plane."

25      Q    Okay, is that the letter that Mister --

715

1    A    It is.

2    Q    -- McCoy just referred to?

3    A    It is.

4    MR. McCOY: Your Honor, I object. He can't

5    tell if that's the same letter or not.

6    THE WITNESS: It's the only letter in the

7    file, Your Honor, dated 1/4/2000 by Dan

8    Foreman.  It's the letter.

9    MR. McCOY:  And it says it's a copy of it.

10    ADMINISTRATIVE JUDGE:  Let's not argue.

11    MR. ROTH:  All right, let me --

12    THE WITNESS:  The letter wasn't found --

13    ADMINISTRATIVE JUDGE:  Just a minute.

14    THE WITNESS:  Yes, Your Honor.

15    ADMINISTRATIVE JUDGE:  Comments should be

16    directed to me.  Not to the witness.  Not to

17    opposing counsel.

18    MR. ROTH:  I understand, Your Honor.

19    ADMINISTRATIVE JUDGE:  You can certainly

20    ask on recross about what his basis for saying

21    that's what it is, counsel.

22    The objection is overruled.

23  BY MR. ROTH:

24    Q    Okay, is the Dan Foreman letter that Mr.

25  McCoy just asked you about on this Exhibit MM?

728

1   and Larry went down from Miami and that's how

2   that worked.  I don't think they flew together.

3   And I certainly --

4       ADMINISTRATIVE JUDGE:  Are you saying it

5   was all right for Mr. Castillo to travel --

6       THE WITNESS:  Well preferably --

7       ADMINISTRATIVE JUDGE:  -- with Mr. Vega

8   and --

9       THE WITNESS:  No sir, I wouldn't say it was

10  all right.  I cut you off.  I don't think it's

11  all right and if that happened I wouldn't

12  normally approve that.  I've seen DEA do it.

13  It's been done.

14      ADMINISTRATIVE JUDGE:  So you're saying

15  that one got by you?

16      THE WITNESS:  Oh, no question if it

17  happened.  Yes sir.  I'm not doubting you, Your

18  Honor.  I'm just saying I don't remember him

19  being by himself ever with the guy traveling.

20      ADMINISTRATIVE JUDGE:  Why was Mr. Vega's

21  attorney going on these trips?

22      THE WITNESS:  Dan Foreman has been, if I

23  can tell you this.  I first met Dan Foreman

24  through Theresa VanFleet and Ed Ryan, the man

25  who was here earlier.

729

1      I worked a Columbian case a long time ago

2   where some of the attorneys, Your Honor, were

3   leaking information back to Columbia and we had

4   people killed.  And in Miami they have -- and

5   I could used to tell you the term for it, but

6   certain attorneys that they -- for cooperators

7   that they bring in.  And it's like a list.  I

8   could tell you a few of them off the top of

9   head if you like.  That --

10     ADMINISTRATIVE JUDGE:  No.  What I really

11  want to know is why you had a private attorney

12  going on a DEA operation.

13     THE WITNESS:  Well that's what I wanted to

14  tell you.  Different times different attorneys

15  show up.  Foreman went.  Foreman was, and this

16  is another name that got misconstrued.  Foreman

17  provided information to us and actually gave us

18  a lot of information from time to time but it's

19  not like, I mean if he went, he went for his

20  own interest as well.

21     I would be wrong to tell you we didn't get

22  a benefit.  Because we got benefit from it.

23  But we didn't like direct him to go.  We

24  certainly would recommend him as well as we

25  recommended Oscar Arroyave and Oscar Rodriguez

730

1   and several other attorneys.

2       ADMINISTRATIVE JUDGE:  So were CS's free to

3   bring their attorney along?

4       THE WITNESS:  They do it all the time.

5   Bogota came up and brought in a major league CS

6   in their office and he came in with his

7   attorney and the Agents because they don't

8   trust us.

9       ADMINISTRATIVE JUDGE:  Why didn't the

10  Government pick up the tab for that travel?

11      THE WITNESS:  Well I wouldn't want to get

12  in a habit of that, of paying the attorneys.

13  I don't think we need to.  And I think these

14  guys can very well afford to pay their fee.

15      ADMINISTRATIVE JUDGE:  Putting to one side

16  the jet which we've talked about already.

17      THE WITNESS:  Yes, Your Honor.

18      ADMINISTRATIVE JUDGE:  What about the other

19  expenditures in excess of ten-thousand-dollars

20  ($10,000,00).  I don't recall your talking

21  about those.

22      THE WITNESS:  I didn't.  But it is in my

23  testimony because I told them I talked to Ernie

24  Perez or whoever the ASAC was on every

25  expenditure at some point.  And I know that I

731

1    did.

2         And the ludicrous stuff, I mean for someone

3    to me that knows what's going to happen, one of

4    the things I tell my Agents which is in one of

5    their Statements, MI Statements; documents live

6    in perpetuity.  Documents are there forever.

7    And just because an inspection wouldn't catch

8    it they would catch it later.

9         I always talked to Ernie or, Ernie's a

10   former OPR Agent.  So I always talked to Ernie.

11   Before that I always talked Kent Kennedy and

12   said; 'Look, this is what we need.'

13        ADMINISTRATIVE JUDGE:   What about the

14   travel to, or the Cristancho expenses that were

15   in excess of ten dollars ($10,000.00)?

16        THE WITNESS:  Cristancho's expenses?

17        ADMINISTRATIVE JUDGE:  Right.

18        THE WITNESS:  That when we talked --

19        ADMINISTRATIVE JUDGE:  Did you clear that

20   with Mr. Mazzilli?

21        THE WITNESS:  Oh, yes sir.  Absolutely.

22   Judge, at one time I told him that this thing

23   may run 30, forty-thousand-dollars because if

24   we -- Here's what happened, Your Honor.

25        We expected to really roll with this guy,

732

1    and the unique little point here is, this guy's

2    capture got leaked by the Agents in Columbia.

3    They told General Sorono, General Sorono did a

4    national media release on Orlando Cristancho.

5    If you look in the 6's in the file, even the

6    ones that are there, they talk about General

7    Sorono taking money.  That's why he leaked that

8    this guy is up here.  He was one of our targets

9    later.  He would have ended up in the soup.

10   And so it got leaked.

11        And honestly before the Lord I tell you I

12   think Orlando's expenses probably would have

13   ran a hundred thousand if he would have got

14   operational and we would have ran him for

15   several months, easily.

16        ADMINISTRATIVE JUDGE:  Any questions based

17   on mine?

18        MR. ROTH:  I have nothing, Judge.

19        MR. McCOY:   Just two brief ones, Your

20   Honor.

21             FURTHER RECROSS EXAMINATION

22   BY MR. McCOY:

23        Q    If a Classified 6 exists shouldn't there be

24   a Memo in the file annotating somehow that it does?

25        A    Well either a Memo or a 6.

733

1          And Toby, a couple of these reports that we

2   read   into   the   file   reference   Classified   6's.

3   There's an M number, Your Honor, on the 6 where it

4   refers to a Sub 6 which is Classified.  It refers to

5   that.

6          Your Honor, one thing about me as a witness

7   I'm   not   going   to   dance   around   and   say   I   did

8   everything perfect.  I'm not here to do that.  Even

9   if my attorney tells me not to say that I'm not

10  going to sit here and lie to you.  I did the very

11  best I could, Toby, in my capabilities to do this as

12  best as I could.  I gave it everything I had.

13          MR. McCOY:  Nothing further.

14          ADMINISTRATIVE JUDGE:  Anything else?

15          MR. ROTH:  Nothing, Judge.

16          ADMINISTRATIVE JUDGE:  You may step down.

17          THE WITNESS:  Thank you, Your Honor.

18      (Whereupon, the witness was excused)

19          ADMINISTRATIVE JUDGE:  We'll take a

20  five-minute recess that you asked for.

21          MR.  ROTH:   Yes.   Thank  you  very  much,

22  Judge.

23      (Whereupon, a brief recess was taken)

24              (Back on the record)

25          ADMINISTRATIVE JUDGE:  Okay, we are back on